1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    INTELLECTUAL VENTURES I LLC, and
     INTELLECTUAL VENTURES II LLC,        :    CIVIL ACTION
5                                         :
                 Plaintiffs,              :
6                                         :
                 v.                       :
7                                         :
     ALTERA CORPORATION, MICROSEMI        :
8    CORPORATION, LATTICE SEMICONDUCTOR   :
     CORPORATION and XILINX, INC.,        :
9                                         :    NO. 10-1065 (LPS)
                 Defendants.
10                             - - -

11                        Wilmington, Delaware
                          Tuesday, January 15, 2013
12                        *Telephone Conference*

13                             - - -

14   BEFORE:          HONORABLE **LEONARD P. STARK**, U.S.D.C.J.

15                             - - -
     APPEARANCES:
16

17            FARNAN, LLP
              BY:  BRIAN E. FARNAN, ESQ.
18
                   and
19
              DESMARAIS, LLP
20            BY:  JOHN M. DESMARAIS, ESQ., and
                   MICHAEL P. STADNICK, ESQ.
21            (New York, New York)

22                   Counsel for Plaintiff

23

24                             Brian P. Gaffigan
25                             Registered Merit Reporter

```
1    APPEARANCES:  (Continued)

2
              RICHARDS LAYTON & FINGER, P.A.
3             BY:  ANNE SHEA GAZA, ESQ.

4                   and

5             O'MELVENY & MYERS, LLP
              BY:  MARK LIANG, esq.
6                  (Los Angeles, California)

7                      Counsel for Microsemi Corporation

8
              ASHBY & GEDDES, P.A.
9             BY:  TIFFANY GEYER LYDON, ESQ.

10                  and

11            COVINGTON & BURLING
              BY:  MICHAEL N. KENNEDY, ESQ.
12                 (Washington, District of Columbia)

13                     Counsel for Lattice Semiconductor Corp.

14
              MORRIS NICHOLS ARSHT & TUNNELL, LLP
15            BY:  KAREN JACOBS LOUDEN, ESQ., and
                   MICHAEL J. FLYNN, ESQ.
16
                    and
17
              JONES DAY, LLP
18            BY:  PATRICK T. MICHAEL, ESQ.
                   (San Francisco, California)
19
                       Counsel for Xilinx Inc.
20
              MORRIS NICHOLS ARSHT & TUNNELL, LLP
21            BY:  KAREN JACOBS LOUDEN, ESQ.

22                  and

23            MORRISON & FOERSTER, LLP
              BY:  ERIC C. PAI, ESQ., and
24                 COLETTE R. VERKUIL, ESQ.
                   (Palo Alto, California)
25
                       Counsel for Altera Corporation
```

1                         - oOo -

2                   P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following telephone

4     conference was held in chambers, beginning at 2:03 p.m.)

5              THE COURT:  Good afternoon, everybody.  This is

6     Judge Stark.  Who is there, please?

7              MR. FARNAN:  Good afternoon, Your Honor.  This

8     is Brian Farnan for the plaintiff.  With me is John

9     Desmarais and Michael Stadnick from Desmarais, LLP in New

10    York.

11             THE COURT:  Okay.

12             MS. JACOBS LOUDEN:  Good afternoon, Your Honor.

13    This is Karen Jacobs Louden.  I'm here with Michael Flynn

14    from Morris Nichols; and we are on for Xilinx together with

15    Patrick Michael, Jones Day; and also for Altera, we have on

16    the line with us Eric Pai and Colette Verkuil at Morrison &

17    Foerster.

18             THE COURT:  Okay.  Thank you.

19             MS. LYDEN:  Good afternoon, Your Honor.  Tiffany

20    Lyden for Lattice Semiconductors.  With me is my co-counsel,

21    Michael Kennedy from Covington & Burling.

22             THE COURT:  Okay.

23             MS. GAZA:  Good afternoon.  It's Anne Gaza from

24    Richard Layton & Finger.  I'm joined by Mark Liang of

25    O'Melveny & Myers for defendant Microsemi.

1                    THE COURT:  Okay.  Is that everyone?

2                    All right.  I'll take it that it is.

3                    I have my court reporter here.  For the record,

4      it is our case of Intellectual Ventures I, LLC, et al versus

5      Altera Corp., et al, our Civil Action No. 10-1065-LPS.

6                    The purpose of this call is to discuss the

7      request by defendants Xilinx and Lattice for an order

8      prohibiting Mr. Desmarais, lead counsel for plaintiff, from

9      accessing their highly confidential materials.

10                   Let me just note preliminarily that I did

11     receive and review the supplemental letters, those that

12     followed our call about ten days ago which was not a

13     substantive call, as I'm sure you all remember.  So I have

14     reviewed those, and I will consider them including the

15     plaintiffs' proposal for an amendment to the protective

16     order.

17                   With that, let me turn it over to the moving

18     defendants, please.

19                   MR. MICHAEL:  Good afternoon, Your Honor.  This

20     is Patrick Michael with Jones Day on behalf of Xilinx.  I'll

21     be speaking on behalf of the moving defendants here today.

22                   THE COURT:  Okay.

23                   MR. MICHAEL:  John Desmarais has two roles with

24     conflicting duty.  As the owner and the chairman of Round

25     Rock, he has the duty and, in fact, he has the incentive to

1    learn as much information as he can to help Round Rock

2    monetize the patent portfolio consisting of thousands of

3    semiconductor related patents.  On the other hand, as

4    counsel for plaintiffs in this case, he has a duty not to

5    use or disclose what he learns from defendants' highly

6    confidential information, again, all relating to the

7    defendants' operations in the semiconductor industry.

8           Now, Mr. Desmarais's duty to maximize the value

9    of Round Rock's patents is in direct conflict with his duty

10   of confidentiality here.  The defendants' position is that

11   he can't reconcile that conflict by implementing some sort

12   of screen on Mr. Desmarais at Round Rock.  I believe the

13   *Norbrook Laboratories* case in this matter, which plaintiffs

14   don't address in either one of their letter briefs, makes

15   this plain.

16          There is an unacceptable opportunity for

17   inadvertent disclosure when you have this dual role

18   situation.  And in this case, that risk of disclosure

19   outweighs any prejudice to the plaintiffs.  So the solution

20   in this dual role situation is to prohibit Mr. Desmarais

21   access to highly confidential information in the first

22   place.

23          Now, patent assertion entities like Round Rock

24   are different in some respects to operating companies.  The

25   assets of these patent assertion entities are entirely

 1    patents.  Their business model is to drive revenue by

 2    enforcing their patents but, in many respects, these patent

 3    assertion entities operate like any other company.  These

 4    are no longer rogue companies.  They're part of a well

 5    founded and sophisticated industry; and, like any other

 6    company, they go out and they determine the value of their

 7    assets.  They engage in competitive intelligence.  They

 8    gather and analyze information.  They watch the market.

 9    They understand the financial landscape.  They look for

10    revenues to get insight.  They look for companies that are

11    vulnerable and how they can have the greatest opportunities

12    when they target those companies.  Based on that collection

13    of information, they implement strategic decisions to best

14    monetize their assets.

15            Here is the predicament.  Competitive

16    intelligence is a legitimate practice if it's done in a

17    manner that is fair.  When patent assertion entities like

18    Round Rock engage in competitive intelligence, they have to

19    do so just like any other company through publicly available

20    information.  But what we're talking about here is giving

21    Mr. Desmarais, the owner and the chairman of Round Rock,

22    competitive intelligence into the moving defendants, all

23    defendants' most highly confidential documents.

24            Now, the fact that Mr. Desmarais is also an

25    attorney doesn't change the reality that he is the chairman

1    and the owner of a nonparty competitor and seeking direct

2    access to Xilinx's highly confidential document.  Quite

3    frankly, I'm unaware of any authority standing for the

4    proposition that this type of access is acceptable.

5              The plaintiffs don't deny the conclusions from

6    this Court by Judge Andrews or the Court in the Eastern

7    District of Texas that Mr. Desmarais is a competitive

8    decisionmaker for Round Rock.  Instead, what they really do

9    here and what we're left with is plaintiffs' delegation and

10   abdication argument, and they want the Court to accept that

11   because Mr. Desmarais has abdicated some authority for Round

12   Rock business involving the defendants, he, for some reason,

13   is no longer a competitive decisionmaker with respect to the

14   defendants.  They try to parse Mr. Desmarais's role at Round

15   Rock and argue that there is no longer a risk of inadvertent

16   disclosure because Mr. Desmarais moved Round Rock out of his

17   home.  He stepped down as the CEO in October.  And as the

18   chairman of Round Rock, he no longer runs Round Rock's

19   day-to-day operations.

20             But this attempt to screen Mr. Desmarais at

21   Round Rock from the defendants, it just doesn't hold up.

22   Bill Gates is no longer the CEO of Microsoft.  That is now

23   run by Steve Ballmer, but I don't think anybody would argue

24   that Bill Gates is no longer a competitive decisionmaker for

25   Microsoft.

1              Whether Mr. Desmarais is the chairman or the

2     CEO, he remained a competitive decisionmaker.  Because of

3     that, there are just some fundamental and specific problems

4     with plaintiffs' proposal, including the proposal that they

5     made by way of their supplemental brief that Mr. Desmarais

6     can simply be screened at Round Rock.

7              First, Mr. Desmarais owns Round Rock.  He is

8     Round Rock.  So Round Rock is not really being screened from

9     anything.

10             Second, as we pointed out in our supplemental

11    letter brief, Mr. Desmarais is going to remain central to

12    directing the strategy at Round Rock.  Indeed, as the

13    chairman of Round Rock, that is his duty.  He is the leader

14    of that company.

15             Third, also as we pointed out in our letter

16    brief, this is a patent portfolio that Round Rock has that

17    consists entirely of semiconductor-related patents.  The

18    point here is that this is not a situation where you have a

19    portfolio of patents where, for example, 50 percent of the

20    portfolio is medical devices and 50 percent is semiconductor

21    and Mr. Desmarais can simply screen himself from the

22    semiconductor side of the business.  That can't happen here.

23             Fourth, any screen on disclosure is only as

24    effective as Mr. Desmarais's ability to follow it.  There is

25    simply going to be situations where Mr. Desmarais won't know

1    whether the discussions at Round Rock are directed at

2    Xilinx's products or not.  As we pointed out in our

3    supplemental letter brief, Xilinx has over 20,000 customers

4    and Xilinx owes indemnity obligations to these customers.

5    So when Round Rock is targeting a Xilinx customer, Round

6    Rock may be going after Xilinx whether or not Mr. Desmarais

7    or anyone else at Round Rock knows it.

8              Now, the plaintiffs have characterized this as

9    some sort of phantom concern, but the reality is it has

10   already happened.  There is a great example of this in the

11   letter briefs, and we suggested it in our supplemental

12   brief.  That is that we know plaintiffs are wrong when they

13   cite to Mr. Desmarais's declaration at page 2 of their

14   letter brief for the statement that when Mr. Desmarais

15   delegated authority to Mr. deBlasi -- I hope I'm pronouncing

16   that correctly -- that Round Rock had no business activities

17   involving the defendants or its products.

18             The reason we know that statement is wrong is

19   because Mr. Desmarais delegated this authority in July 2012

20   and, three months earlier, Round Rock went after one of

21   Xilinx's customers, and that customer turned to Xilinx and

22   advised Xilinx that the patents Round Rock asserted may

23   actually implicate features and functionality of Xilinx's

24   integrated circuits.  This is the April 13th, 2012, letter,

25   Your Honor, that is attached as Exhibit 4 to our opening

1    letter brief.  So we know Round Rock has had business

2    activities involving Xilinx's products.

3            Now, this isn't to say that anybody was

4    attempting to mislead this court or that Mr. Desmarais is

5    beyond truthful in his declaration.  We don't think that

6    is the case at all.  Quite frankly, we think the better

7    explanation is Mr. Desmarais was being entirely honest and

8    just didn't appreciate that when Round Rock asserted patents

9    against this customer, Round Rock was, in fact, implicating

10   Xilinx's products.  If he has no ability to know when a

11   Round Rock discussion relates to one of Xilinx's 20,000

12   customers, he has no ability to implement a screen around

13   Round Rock that effectively isolates him from discussions on

14   Xilinx or Xilinx products.

15           Finally, Your Honor, IV's proposed screen here

16   is really a screen that is aimed at allowing access and then

17   after-the-fact preventing use or disclosure of confidential

18   information rather than a screen that prevents access in the

19   first place.  A screen, as Your Honor is aware, on using

20   information after access is far more prone to failure than a

21   screen on accessing information in the first place.  The

22   case law on this is in line with that.

23           Now, of course, there is a balancing test here.

24   We appreciate that.  The prejudice to plaintiff in this

25   situation certainly must be considered.  We appreciate that

1    in certain situations, confidentiality has to give way to

2    disclosure where necessary to avowed undue prejudice, but

3    this isn't one of those situations.

4            As an initial matter, Your Honor, the defendants

5    didn't create this situation.  Nor is this a situation where

6    plaintiffs or Mr. Desmarais had no choice in the matter.

7            When Intellectual Ventures, the largest patent

8    assertion entity ever, with tens of thousands of patents,

9    hired Mr. Desmarais who owns Round Rock, the second largest

10   patent assertion entity with thousands of patents in the

11   same technological field as the defendants in this case,

12   both plaintiffs and Mr. Desmarais knew the risk.

13           Round Rock, Intellectual Ventures, and Desmarais

14   LLP, they may be relatively new entities, but the law with

15   respect to competitive decisionmakers is not.  They knew

16   that there was going to be a conflict that would be created

17   by having Mr. Desmarais as an attorney in this case.  That,

18   quite frankly, is a voluntary business choice they made.

19   It's not one that the defendants created.

20           But even if we assume that this conflict was

21   not foreseeable or we ignore who created this conflict

22   situation, there is still no undue prejudice here to the

23   plaintiffs in this case.  The plaintiffs didn't hire just

24   John Desmarais for this litigation.  Plaintiffs are

25   represented by two excellent law firms, and the other

1    lawyers at these firms have been involved in this case from

2    Day One.  In fact, until Mr. Desmarais submitted a

3    declaration in opposition to this motion, I am unaware of

4    Mr. Desmarais having any involvement in this case.  If we

5    were to take a look at his declaration, I believe it is

6    entirely silent on his role in this litigation.  So as a

7    result, this isn't a situation where the plaintiffs will

8    somehow be left with inadequate representations.

9         Again, the *Norbrook Laboratories* case on this

10   point is instructive.  In that case, the court concluded

11   that the risk of inadvertent disclosure outweighed any

12   prejudice because other outside litigation counsel had been

13   involved in the case and the defendant wasn't forced to

14   hire new counsel.

15        The same is true here.  Plaintiffs are not being

16   forced to hire new counsel.  There truly is a deep bench of

17   excellent trial lawyers at Desmarais, LLP and at Farnan, LLP

18   who have been involved in this case from the outset.  Nobody

19   is seeking to restrict access of these other attorneys.  So

20   this, too, is a situation where the risk of inadvertent

21   disclosure outweighs any prejudice to the plaintiffs.

22        We do want to emphasize for the Court that the

23   defendants are in no way questioning Mr. Desmarais's

24   integrity, his intent, or his trustworthiness.  The concern

25   here, and the concern expressed in the case law, is that

1    Mr. Desmarais, like all of us, is human, and the human

2    mind, being what it is, simply makes it impossible to detach

3    decision-making from the confidential information Mr.

4    Desmarais would obtain if he had access to this highly

5    confidential information.

6              As a result of human beings being who we are and

7    what we are, the solution here is not to place Mr. Desmarais

8    in the untenable position of obtaining confidential

9    information, surrendering that duty to Round Rock, and then

10   trying to adhere to a screen that, quite frankly, is just

11   impossible for anyone to follow.  The solution here, and

12   what the moving defendants request, is an order prohibiting

13   Mr. Desmarais from having access to the highly confidential

14   material in the first place.

15             THE COURT:  All right.  Thank you.  Let me ask

16   you a few questions.

17             Let's take your example of where Round Rock

18   has asserted patents against at least one customer of

19   Xilinx's.

20             Help me understand, articulate as best as you

21   can, how it is that Xilinx is harmed or, going forward,

22   would be harmed if Round Rock were to do that in the future

23   after a time at which Mr. Desmarais has had access to your

24   highly confidential information?

25             MR. MICHAEL:  Sure, Your Honor.  I want to try

1    to appreciate your question.  We're talking about in the

2    future as opposed to right now?

3                    THE COURT:  Well, yes.  I mean because you're

4    saying if I deny your request, he'll have access to the

5    highly confidential information, and the risk that you are

6    articulating is the inadvertent use or disclosure of your

7    highly confidential information in connection with I guess

8    Round Rock's activities vis-a-vis your customers.  That is

9    your concern; right?

10                   MR. MICHAEL:  That is one concern.

11                   THE COURT:  Okay.

12                   MR. MICHAEL:  Let me try to answer your

13   question, Your Honor.

14                   The range of harm to Xilinx as we can articulate

15   it goes from the most obvious to the subtle.  At the most

16   obvious level, obviously, Mr. Desmarais can use this

17   information to better understand Xilinx's products and

18   process and, armed with that knowledge, direct others at

19   Round Rock to embark on a strategy that is economically

20   harmful to Xilinx.

21                   But at the other end of the spectrum, which is

22   where I think Your Honor is going with this, Mr. Desmarais

23   will not only know what product he and his team are consider-

24   ing enforcing their patents against, he may consider a product

25   that is a Xilinx customer product and recommend pursuing

1    enforcement actions against that customer based upon what he

2    thinks are customer features but which in fact are informed

3    by his knowledge of Xilinx's products and only later learn

4    that the Xilinx integrated circuits provide the allegedly

5    infringing technology.

6         Along those same lines, there are going to be

7    discussions at Round Rock regarding enforcement of patents.

8    Whether it's an individual patent or a group of patents,

9    that discussion does not necessarily require mentioning or

10   consciously thinking of the moving defendants in this case.

11   Mr. Desmarais may find himself suggesting that certain

12   patents deserve a closer look based on his knowledge of

13   the moving defendants' market, their market plans, their

14   implementation of products.

15        Keep in mind the highly confidential information

16   that we're talking about is not just technical materials.

17   It's financial information, it's business plans, it's

18   customer information, it's product roadmaps, it's licenses

19   and settlements.

20        All of this information is of tremendous value

21   to a company like Round Rock and can be used to the economic

22   harm directly or indirectly to Xilinx and its customers

23   whether Mr. Desmarais is aware that or not.

24        THE COURT:  Let's break this down a little bit.

25   First of all, we're not talking about Mr. Desmarais's

1    intentional use or disclosure of this information.  That is

2    not at issue; right?  That is already not going to be

3    permitted; correct?

4              MR. MICHAEL:  That is correct.  We agree with

5    that.

6              THE COURT:  So in your scenario where he

7    inadvertently, unintentionally, perhaps not even consciously,

8    has the advantage of whatever he has learned from your

9    confidential information, and he participates in Round Rock

10   going after one of your customers, let's say, and then later

11   learns that the feature that is being accused is actually one

12   of yours; at that point, once he becomes aware of that, if he

13   then has to wall himself off or in some other way be precluded

14   from participating any further in that activity, wouldn't that

15   protect you at that point?

16             MR. MICHAEL:  Well, no, it wouldn't.  The reason

17   is that the harm has already been caused.  He has, at that

18   point in time, already, unknowingly perhaps, used and

19   disclosed our confidential information within the world of

20   Round Rock in order to implement a strategy that is creating

21   this economic harm.

22             There is also the obvious issue that we just

23   don't have insight into what Round Rock is or is not doing.

24   We can't monitor what is going on at Round Rock, what the

25   discussions are, or how these decisions were reached.

1              THE COURT:  The proposal in the supplemental

2    letter from the plaintiffs would be that John Desmarais not

3    personally participate in or supervise any patent assertion

4    activity at Round Rock involving the defendants or their

5    products and shall screen himself from any such patent

6    assertion activity at Round Rock.

7              If we expressly indicated that he would have

8    no such role with respect to defendants, their products,

9    or their customers, would that in any way alleviate your

10   concerns?

11             MR. MICHAEL:  It would, Your Honor.  But that

12   would be literally screening off Mr. Desmarais from 20,000

13   companies.  I'm not quite sure how we would implement that

14   sort of screening.  But that would certainly be something we

15   would consider.

16             THE COURT:  Now, help me understand how your

17   concern is any different from concerns that you would

18   presumably already have with respect to folks who are just

19   litigators, just outside counsel who have access to your

20   highly confidential information.  Don't you have that same

21   concern that you are articulating here with respect to

22   those folks?

23             MR. MICHAEL:  We don't, Your Honor, for a couple

24   reasons.  First and foremost, we have received a representation

25   from the Desmarais, LLP firm that with the exception of John

1    Desmarais, the only other relationship that any attorney at

2    that firm has with Round Rock is purely as outside counsel.

3    In that context, we're not faced with a dual role situation.

4    We're not in the world of competitive decisionmakers because

5    these individuals are acting purely as outside counsel and

6    not business decisionmakers for the entity itself.

7              THE COURT:  Let me put it this way.  Why isn't

8    Desmarais, LLP a competitor of yours just as you say Round

9    Rock is?

10             MR. MICHAEL:  For the reasons I did articulate,

11   we don't believe, at least according to the representations

12   we understand, that others within Desmarais, LLP are not

13   involved with competitive decision-making.  This issue

14   actually was raised by *Dell* coming out of the District in

15   Delaware as well as the Eastern District of Texas in a

16   separate case where Dell attempted to argue to the Federal

17   Circuit -- initially, the District Court and then by way of

18   petition up to the Federal Circuit -- that Mr. Desmarais's

19   role as a competitive decisionmaker for Round Rock should be

20   imputed to the entire Desmarais, LLP firm.  The Federal

21   Circuit denied that request.

22             At this point in time, we are not taking the

23   position that any other members within the Desmarais firm

24   fall into the competitive decisionmaker bucket or that

25   Mr. Desmarais's role should be imputed throughout the firm.

1          THE COURT:  Right.  I appreciate you are not

2    arguing any of those or folks are competitive decisionmakers,

3    but let's put aside "competitive decisionmaker" for a moment

4    and go back to what you were saying about the human mind and

5    being able to compartmentalize.

6          I'm trying to understand why we don't have that

7    concern for the noncompetitive decisionmaker, for the just

8    outside counsel who has access to the highly confidential

9    information and might inadvertently use or disclose that in

10   subsequent representations against your clients or your

11   client's customers.  Do we have that same concern?

12         MR. MICHAEL:  Again, Your Honor, no, we don't.

13   We're dealing with a unique factual circumstances here in

14   which the largest patent assertion entity in the country is

15   represented by the chairman and the owner of the second

16   largest patent assertion entity in the country.  Those

17   portfolios overlap.  As a result of that, the concern is

18   heightened.

19         That is not to say we don't have a concern.  We

20   certainly do.  But in the overall scheme of the law, when

21   you go through the balancing test, the risk of inadvertent

22   disclosure with respect to Mr. Desmarais is substantially

23   higher than it is with other attorneys within the Desmarais

24   firm.  As a result of that, that opportunity for inadvertent

25   disclosure and that risk outweighs the potential prejudice.

1           If we were looking to expand this discussion

2    into how would this come out in the hypothetical world with

3    respect to the other members of Desmarais, LLP, I don't know

4    that we would reach the same conclusion on the balancing

5    test.

6           THE COURT:  It appears from the record that you

7    all offered Mr. Desmarais access to your highly confidential

8    source code for about four months before raising the concern

9    you are articulating here today; is that correct?  If so,

10   doesn't that undermine your position?

11          MR. MICHAEL:  That is not correct, Your Honor.

12   What we did was, if Your Honor will recall, the protective

13   order in this case was entered on July 24th.  The next day,

14   in accordance with this Court's scheduling order, we advised

15   plaintiffs that core technical documents would be made

16   available for inspection.  There are very specific parameters

17   set forth in the protective order whereby access to these

18   documents are made available.

19          What that means is that the core technical

20   documents are maintained on a stand-alone computer at the

21   Jones Day office here in Northern California.  Before anyone

22   has access to that information, they have to give us notice

23   that they want to come and inspect.  As a result of that,

24   we were able to monitor who was or who was not coming to

25   inspect these documents.

1          In this case, plaintiffs didn't come to

2    inspect until September 2012.  At no point in time, has Mr.

3    Desmarais requested access to inspect these documents.

4          The reason we brought this issue up again in

5    October was it was in advance of actually producing in the

6    sense of actually sending highly confidential documents to

7    plaintiffs' counsel which, under the scheduling order, was

8    to take place on November 2nd.  It ended up getting pushed

9    back a couple weeks as a result of Hurricane Sandy, but we

10   brought that up in advance to make sure this issue was teed

11   up in a timely manner.

12          THE COURT:  What about the fact that two of your

13   codefendants are not joining the motion?  What weight should

14   I give that?

15          MR. MICHAEL:  I don't know that that should be

16   given any weight.  I don't have and understanding for why

17   that is.  But I don't understand them to be opposing this

18   motion either, Your Honor.

19          THE COURT:  Okay.  Thank you.  Do any of the

20   other defendants wish to be heard?

21          I will take silence as a no.  Let me hear from

22   the plaintiffs, please.

23          MR. DESMARAIS:  Thank you, Your Honor.  It's

24   John Desmarais for Intellectual Ventures.

25          First of all, let me start at the beginning,

1    which is obviously the defendants are trying to preclude me

2    from seeing their confidential information because of my

3    role as chairman of Round Rock and because I own Round Rock.

4    I own the equity of Round Rock.

5           That is unprecedented in the case law that you

6    would be precluded because of your role in a protective

7    order situation.  This is not a conflicts question.  It's

8    not an ethical conflicts question or a legal conflicts

9    question.  This is a protective order issue that we're

10   grappling with here.

11          Every case in the protective order context turns

12   on what the lawyer actually does day to day, not what his

13   role is or what his title is.  This is made perfectly clear

14   in the Federal Circuit's *Deutsche Bank* decision.

15          In that case, the issue was how to deal with

16   patent prosecutors.  The Federal Circuit made very clear,

17   when they granted mandamus there, that denying access to an

18   outside party's counsel on the ground they also prosecute

19   patents for that party is the type of generalization counsel

20   is against in *U.S. Steel*.  The facts, not the category, must

21   inform the result.

22          I think that is important to stay focused on in

23   this particular case because the defendants have totally

24   mischaracterized the factual situation here about Round Rock

25   and about my role at Round Rock.  I would like to take the

1    Court through that, because I think when you understand what

2    I actually do at Round Rock, not only is there little risk

3    of inadvertent disclosure, I would go so far as to say there

4    is actually no risk of inadvertent disclosure.

5            If we look at what the Federal Circuit was

6    grappling with in the *Deutsche Bank* case, specifically

7    there, one of the key issues was a particular attorney who

8    actually supervised patent prosecution.  What the Federal

9    Circuit said there was, "Some attorneys may be involved --

10   and this is a quote from the case.  "Some attorneys may be

11   involved in high altitude oversight of patent prosecution

12   such as staffing projects or coordinating client meetings

13   but have no significant role in crafting the content of

14   patent applications or advising clients on the direction the

15   portfolio should take.  In that case," the Court said,

16   "there is little risk that attorneys involved solely in

17   these kinds of prosecution activities will inadvertently

18   rely on or be influenced by information they may learn as

19   trial counsel during the course of litigation."

20           As I will explain in a moment, my role at Round

21   Rock is orders of magnitude less involved than that lawyer

22   that the Federal Circuit was grappling with in the *Deutsche*

23   *Bank* case.  In that particular case, the court said it's

24   important then for the court to examine all the relevant facts

25   surrounding counsel's actual preparation and prosecution

1    activities on a counsel-by-counsel basis.

2              Here, the defendants simply talk about I'm the

3    chairman of Round Rock or I own the equity of Round Rock.

4    They don't address actually what I do at Round Rock.  It's

5    clear why they don't do that.  There is no actual analysis of

6    the facts that can yield an answer that I am a competitive

7    decisionmaker at Round Rock vis-a-vis these defendants or

8    their products.

9              So let me take you through how Round Rock is set

10   up and what my actual role is.

11             First of all, on the notion of patent prosecution.

12   The protective order already has a bar on patent prosecution,

13   and I have agreed to abide by that bar.  But in all candor,

14   that bar wasn't even necessary because I don't do any patent

15   prosecution at Round Rock, nor do I supervise patent

16   prosecution at Round Rock.  The patent prosecution at Round

17   Rock is done by two outside counsel, prosecution boutiques.

18   One is in San Diego, California.  The other is in Newark, New

19   Jersey.

20             It's all done by outside counsel.  I don't even

21   supervise the outside counsel.  Round Rock's CEO Gerry deBlasi

22   is the supervisor of the outside prosecution counsel.  In

23   November, Round Rock hired general counsel, and so he will

24   assist the CEO in supervising the prosecution of the Round

25   Rock patent applications.

1        I haven't seen a Round Rock patent application

2    in over a year; and I haven't met with the prosecuting

3    attorneys in over a year.  I have no role in the prosecution

4    and I have no role in the supervision of the prosecution.

5        The potential for inadvertent disclosure of

6    Xilinx or Lattice's confidential information in a Round Rock

7    patent application is not only a little risk, I would have

8    to affirmatively assert myself into that process for there

9    to be any risk.

10        I have agreed, of course, to the bar in the

11   protective order so there is no risk.  It's just assumed I'm

12   going to follow the bar and the protective order.  The case

13   law assumes good faith conduct on behalf of outside counsel.

14        With respect to the next topic, patent

15   acquisition.  It's the same story, and I have agreed to the

16   bar on patent acquisitions that is already in the protective

17   order.

18        Lastly, as Your Honor pointed out in your

19   opening comments, we did try to resolve this by broadening

20   the protective order draft to include patent assertion

21   activities.  But just like with patent prosecution and

22   patent acquisition, I'm not even sure as a practical matter

23   that the bar is even necessary because even without the

24   proposed bar on patent assertion activities, I don't get

25   involved in those activities at the level where it would be

1    an issue for Xilinx or Lattice.

2              The way that patent assertion activities happen

3    at Round Rock -- and this is the way this has happened at

4    Round Rock from Day One at Round Rock.  Round Rock has a

5    consulting agreement with an outside consulting service

6    called IPValue.  This is well reported in the press.  If

7    the defendants would have engaged in a meaningful meet and

8    confer, they would know all of this.

9              The outside consultants at IPValue do all of the

10   Round Rock infringement analysis.  They analyze the Round

11   Rock patents.  They look for potential licensees.  They

12   analyze the licensees' products.  They make the claim

13   charts.  It's all done at an outside consulting service with

14   offices in New Jersey and in California.

15             I do not office at those offices, and I do not

16   interact with those folks on the creation of those claim

17   charts or on the analysis of the potential licensees' products.

18   It's all done with their engineers and their in-house patent

19   lawyers at those companies.

20             It used to be the case that Round Rock, in the

21   early months, back in early 2010, where I would get the

22   results of that analysis in the form of already prepared

23   claim charts and already prepared product materials.  But

24   since the hiring of Mr. deBlasi, which was in mid or

25   actually the Spring of 2011, that stuff doesn't even come

1    to me any longer.

2              Mr. deBlasi used to be at IPValue.  He was hired

3    at Round Rock to supervise the IPValue relationship.  All

4    those materials go to Mr. deBlasi; and Mr. deBlasi is the

5    interface between Round Rock and IPValue.

6              Again, I'm not even sure the patent assertion

7    bar in the protective order was factually necessary.  I

8    would have to insert myself into the IPValue relationship

9    at their offices in New Jersey or California to actually

10   inadvertently use Xilinx information.  It would have to be

11   advertent.  I would have to do it on purpose.

12             I haven't been to the IPValue offices in New

13   Jersey or California in more than a year.  It's not my role

14   at Round Rock.  Now, since November, we have a general

15   counsel; and he will assist the CEO in whatever the CEO's

16   needs are in order to move forward on the IPValue

17   relationship.

18             I spend my days as outside counsel at

19   Desmarais, LLP.  Desmarais, LLP has offices on Park Avenue

20   in Manhattan.  The only people who office this location are

21   Desmarais attorneys and staff.  There are no Round Rock

22   employees that office this location.

23             Round Rock, prior to January 1st of this year,

24   had no office.  When I did Round Rock work, I did it out of

25   my home.  When Mr. deBlasi, our CEO, did Round Rock work, he

1   did it out of his home.  I live in Westchester County, New

2   York.  Mr. deBlasi lives in Bridgewater, New Jersey.  We

3   didn't have an office, and we didn't get together for office

4   meetings.

5           When we hired our new CFO and General Counsel,

6   David Elkins and McNeill Taylor.  In the beginning, McNeill

7   Taylor worked out of his apartment and David Elkins worked

8   out of his home in Delaware or his apartment in New York

9   City.  As of January 1st, they found office space in Jersey

10  City, New Jersey, and now our CFO and our General Counsel

11  office in Jersey City, New Jersey.

12          I've never even been there, and I have no plans

13  on going there.  So when they have Round Rock meetings,

14  they're having them without me.  And when they're managing

15  Round Rock and moving it forward, they're doing it without

16  me.

17          It would have to be an actual intentional act on

18  my part to take Xilinx's confidential information and travel

19  to one of these offices where Round Rock work is being done.

20  I would have to affirmatively assert myself into the process,

21  and it would have to be nefarious.  It doesn't happen

22  accidentally because these are not issues I deal with at

23  Round Rock.

24          Counsel talked about the *Norbrook* case and duties

25  of a board of directors.  That case is totally inapplicable

1    here and Round Rock is not a public company.  We don't have a

2    board of directors.  I'm the chairman of the board, I am the

3    only director, and we don't have board meetings.  It's a

4    private company.

5              I'm the chairman of the board because I own the

6    company.  But we don't have regular board meetings, and the

7    officers of Round Rock and I haven't been together in one

8    place on a business matter yet ever except we did have

9    dinner once through the holidays.  So there are no regular

10   board meetings at which I could trip up and inadvertently

11   use confidential information.

12             When I want to know something about Round Rock,

13   I call the relevant officer, whether it's the CEO or now

14   the General Counsel, the CFO, I ask them questions and then

15   they update me.  If there is information I want, I have to

16   call and ask for it.  If they do something significant, they

17   may call and tell me about it.  But there isn't a situation

18   where I would accidentally, in the day-to-day course of my

19   relationship with Round Rock, use Xilinx's information.

20             Now, I did, when this issue first came up in

21   July, just so there would never be a situation where the CEO

22   called and accidently told me something about Xilinx, even

23   though back in July, when this issue first arose, I didn't

24   have any information about Round Rock doing anything with

25   respect to Xilinx or its products or Lattice and its

1    products, I formally told the CEO, "Should that ever come up

2    in the future for any of the defendants in this case or any

3    of their products, you handle that yourself.  You have all

4    authority to deal with it.  I don't want to know about it.

5    I'm screened from it."  He acknowledged he understood; and I

6    have never heard about it since.

7            We're now proposing to add that to the protective

8    order, to give of the defendants comfort that that delegation

9    will stick going forward.  I'm happy to live with that.

10           I tried to engage the defendants on what language

11   they would prefer in the protective order to give them the

12   comfort they need that there would be no inadvertent disclosure.

13   They refused to even engage on the language, so we were unable

14   to resolve it.

15           But on the facts of this litigation, not only is

16   there little risk there of inadvertent disclosure, I would

17   go so far as to say there is absolutely no risk, especially

18   if we enter the protective order that has the prosecution

19   bar, the acquisition bar, and the patent assertion bar as

20   currently drafted.  I don't see any risk whatsoever.

21           The case law is clear that you have to look at

22   the actual facts of this situation.  Even if the Court saw

23   some risk, which on these facts I would say would be

24   surprising, but even if the Court did find some risk, you

25   have to then balance that against the harm to Intellectual

 1  Ventures.

 2          This is not a Round Rock case, this is an

 3  Intellectual Ventures case.  I'm their lead trial counsel.

 4  I take a little bit of issue with the defendants saying that

 5  I haven't been involved.  I've been involved in this case

 6  from Day One, from the very first meeting with Intellectual

 7  Ventures about the case.  I've been involved in all the

 8  prefiling investigation.  I've been involved in all the

 9  decisions up to today.  I've been involved in setting the

10  Markman strategy for the case.  I've been involved in

11  setting the infringement strategy.  I've been involved in

12  setting the defense strategy, validity strategy.  I've been

13  involved.

14          The litigation is two years along at this point.

15  The defendants have known about this issue since the very

16  beginning.  There is nothing secret or non-public about my

17  role at Round Rock.  They've known about this and my role

18  since the day the case was filed.  We've discussed it with

19  Your Honor at the protective order hearing back in July.  At

20  that hearing, they said they weren't even contemplating this

21  motion back in July.  Now, here we are, six months later

22  when they finally move.

23          This would be hugely prejudicial to Intellectual

24  Ventures.  It's true we have a team of lawyers and I'm not

25  the only one, but I'm the one that Intellectual Ventures

1   hired.  The case is here at this firm because of me.  I'm

2   the first chair trial lawyer.  The balance of this team I'm

3   not sure has ever first chaired a trial without me.  So to

4   say that they could go on in this trial if I'm replaced,

5   I'm 100 percent sure Intellectual Ventures would find new

6   counsel to take this case to the distance because the rest

7   of the team have not first chair tried a case yet.

8            This is a huge prejudice to Intellectual

9   Ventures; and the defendants have sat on it for two years.

10           The last point on active confidential

11  information that Your Honor mentioned, the defendants made

12  their source code and other production available months and

13  months ago, before they even made a motion in this case.

14  There was nothing in this -- it's true, I did not go look

15  at the source code computers, but I could have under the

16  protocol that was set up at the time.

17           Lawyers in my office went to look at the source

18  code and went to look at the documents and actually printed

19  stuff out, brought it back here to the firm, and I was free

20  for the last six months to engage with them and talk about it

21  and review it and talk about what they found.  There was no

22  prohibition on that.  They didn't even file this motion until

23  towards the end of the year.  So we have had access here to

24  confidential information of the defendants even before they

25  filed their motion.

```
 1              This is not the situation in the Norbrook case.

 2   The Norbrook case is entirely distinguishable.  There, the

 3   outside counsel was a director on the board of the party in

 4   the lawsuit where he was a secretary and recorded and took

 5   the minutes at all the board meetings.  They had regular

 6   board meetings.  It was a legitimate company with a full

 7   board that had regular minutes.  They said that because he

 8   had a fiduciary duty there to that board and to that party,

 9   where he was taking and participating in conversations about

10   the substance of the lawsuit, that he couldn't separate his

11   fiduciary duty to the board versus his duty to the protective

12   order.

13              That has nothing to do with this case.  I have

14   no fiduciary duties to the board of Round Rock.  Round Rock

15   and I am the same thing, unless you want to hold that I have

16   fiduciary duties to myself.  The Norbrook case is entirely

17   different, and Round Rock is not a party to the litigation.

18   I am not on board meetings like they were on the Norbrook

19   case that are going to be talking about the merits of the

20   case or the details of Xilinx's or Lattice's confidential

21   information.

22              Lastly, with respect to the Dell litigation.

23   The fact that I was deemed a competitive decisionmaker in

24   the Dell case is entirely distinguishable from this case.

25   In the Dell case, Round Rock was the plaintiff.  It was a
```

1    case that had been long in the making.  I was actually

2    involved at that time in the beginning of Round Rock with

3    the decision to file the *Dell* suit, and I was involved as

4    the client in that case because the plaintiff was Round Rock

5    and I was designated as the person from Round Rock to engage

6    Dell in the settlement negotiations.

7           We didn't actually contest the decisionmaker

8    issue at the Federal Circuit in the *Dell* case because I took

9    myself out of that case, and I was not an outside counsel to

10   Round Rock in the *Dell* case.  It's an entirely distinguishable

11   situation than it is here where I have taken myself out of

12   all Round Rock decision-making with regard to these defendants

13   or their products.  Because I'm not involved in it all, I

14   think the Court would be hard pressed to find that I'm a

15   competitive decisionmaker with respect to these defendants

16   and these defendants' products.

17          THE COURT:  Let me ask you some questions, Mr.

18   Desmarais.

19          At times in your presentation, you talked about

20   no or little risk of inadvertent disclosure.  Are you making

21   your argument with respect to "disclosure" and "use" or are

22   you acknowledging there is some risk of your inadvertent use

23   of the highly confidential information?

24          MR. DESMARAIS:  No, Your Honor.  I did not mean

25   to draw a distinction.  I believe there is little or no risk

1    of my use of the confidential information as well.  I was

2    using "disclosure" and "use" simultaneously.

3              THE COURT:  Okay.  So let's talk about "use."

4              I'm a little confused by your role now at Round

5    Rock.  Are you representing that you don't have any role

6    whatsoever in any decision that is going to be made by Round

7    Rock in any way going forward?

8              MR. DESMARAIS:  No, Your Honor.  That is not

9    what I intended to say.  I'm sorry if that is the way that

10   it was conveyed.

11             THE COURT:  So let's talk about then this

12   intangible.  I think counsel referred to it as a subtle

13   concern that you are a human being like the rest of us and

14   if you have access to the defendants' highly confidential

15   information, that when you are participating in whatever

16   level you participate in any decision of Round Rock, you are

17   not able, any better than the rest of us, to compartmentalize

18   and not have in your mind at some level whatever that highly

19   confidential information of the defendants is.  Therefore,

20   there is a risk that, without you even knowing it, you will

21   be influenced in the advice you give and the decisions you

22   make on behalf of Round Rock.

23             Is it your argument that that is not real or

24   just that it's not something that I should be especially

25   concerned with, or some other argument?

1          MR. DESMARAIS:  Yes.  So I can address that in a

2     couple different ways, Your Honor.

3          First of all, with respect to the three ways

4     that I can think of where Xilinx or Lattice confidential

5     information could be used at Round Rock are the ones that I

6     articulated, which is patent prosecution, patent acquisition,

7     or patent assertion.  Those are really the only three things

8     that Round Rock does; right?

9          So in patent prosecution, as I outlined, I don't

10    get involved in those activities at all.  Zero.  They're

11    done by outside counsel.  The outside counsel is supervised

12    by Gerry deBlasi, the CEO.  Gerry deBlasi, in the day-to-day

13    work of Round Rock, does not update me on those decisions or

14    any prosecution strategy.  I haven't spoken with Mr. deBlasi

15    about prosecution strategy, not even once.

16          THE COURT:  So at some point, you're going to be

17    called on to give some advice or make some decision.  We're

18    going to use our resources to do X or Y.  We're going to focus

19    on small players or big players.  We're going to focus on

20    litigation or with we're going to focus on licensing.  You're

21    going to be involved in some decision and that decision, as

22    I understand it, given Round Rock's holdings, is necessarily

23    going to be a semiconductor industry related decision.

24          Don't I have to conclude then that at some

25    point, there is a risk, notwithstanding your good faith and

1    your intentional effort notwithstanding, there is a risk

2    that inadvertently the information you would learn in this

3    case could influence your decision, your advice, in your

4    capacity at Round Rock?

5            MR. DESMARAIS:  Actually, Your Honor, I think

6    that at that level -- so let me break that down into two

7    separate responses, because I think that while there may be

8    some sort of metaphysical level at which that could happen,

9    in the practical, that is not the case.  That is not what

10   the case law is after.

11           If you take a look at the Federal Circuit's

12   mandamus decision in the *Deutsche Bank* case, the lawyer

13   that they were discussing in that particular case actually

14   supervised patent prosecution.  But they said because he

15   wasn't working at the level of drafting claims, that his

16   supervision level was at such a high level that there was,

17   in their words, little risk of inadvertent disclosure of

18   the confidential information.

19           I would say here that I am levels removed from

20   the lawyer that was being discussed in *Deutsche Bank*.

21           Here, I don't do prosecution at all in my hands.

22   I don't even review the material.  They're not even done in

23   the office that I'm in.  In *Deutsche Bank,* the lawyer was in

24   an office that did prosecution and his underlings actually

25   did the claim drafting and he supervised them.

1            Here, it's done by outside counsel and not in

2     my office.  And it is supervised by somebody else.  I'm not

3     even supervising.

4            So if you take the three areas where Xilinx

5     might have some concern, which are the three I articulated:

6     patent prosecution, patent acquisition, and patent assertion,

7     I'm at a higher level in each of those three areas than the

8     lawyer at *Deutsche Bank* by at least two layers.

9            So is there some sort of metaphysical

10    hypothetical risk that you could conjure where I might

11    disclose something from Xilinx or Lattice inadvertently?  I

12    guess there is a chance of that on some metaphysical level,

13    but I think, as I articulated in my comments, I believe, as

14    a practical matter, no.  I think I would have to -- it would

15    have to be affirmative misconduct, because I would have to

16    insert myself into a decision-making role that I'm not in

17    right now.

18           If we're not talking about patent prosecution,

19    patent acquisition, or patent assertion, I'm not sure what

20    Round Rock does that Xilinx could be concerned about.  Right?

21           THE COURT:  What about the Bill Gates and

22    Microsoft analogy?

23           MR. DESMARAIS:  I think that was directly

24    addressed by the Federal Circuit in *Deutsche Bank* because they

25    said we don't make these decisions based on generalizations of

1      roles.  We make these decisions on a factual analysis, counsel

2      by counsel, by what they actually do for a living.

3              In the Bill Gates/Microsoft example, I think

4      that Bill Gates, I think if you talk to Steve Ballmer, he

5      would tell you quite clearly he is running Microsoft, not

6      Bill Gates, but I think we would have to figure out what

7      Bill gates does on a daily basis.  If he is still pulling

8      the strings at Microsoft and getting in the weeds, we would

9      have to talk about that.

10              If he is at a high level, not actually

11      supervising the activities that the confidential information

12      relates to, I don't see what the issue is.

13              You have to actually make it concrete here, as

14      we're instructed by the Federal Circuit in the *Deutsche*

15      *Bank* case.  We're talking about Xilinx is going to make

16      available technical information about how their products

17      work.  That is only useful to draft patent claims or to

18      draft patent claim charts for an assertion.  If I'm not

19      doing those two things, what could I possibly do with

20      Xilinx's confidential technical documents that would in

21      any way harm them?

22              If we get off the metaphysical plane, and we

23      looked at the actual practical realities here, the way these

24      cases always come out is there are some lawyers that are not

25      involved in the direct work related to the documents, and

1    they get cleared under the protective order and others don't.

2            You could think of any corporation in this

3    country that is in litigation.  Some lawyers from the legal

4    department will have access to confidential information and

5    other lawyers in the exact same legal department won't.

6            It's the same at any law firm that does

7    litigation and patent prosecution.  Some lawyers at that

8    firm will have access to the confidential information and

9    others won't.  The analysis always turns on what are the

10   individual lawyers doing?  They don't get excluded based on

11   generalizations of their role.  That's what *Deutsche Bank*

12   instructs us, and that is how the cases come out.

13           THE COURT:  Well, there is a concrete example in

14   the record with respect to one at least customer of Xilinx

15   that Round Rock evidently attempted to assert patents

16   against.  Talk about that and just generally whether in fact

17   you are a competitive decisionmaker vis-a-vis the customers

18   of the defendants.

19           MR. DESMARAIS:  It depends -- to answer that

20   question, I guess it depends on the facts.  So let me step

21   back and say that I don't know what is in the record is all

22   that helpful because what is in the record, as I understand

23   it right now, Xilinx attached to their letter brief a

24   letter from a company -- I believe it was Mitsubishi.  What

25   Mitsubishi said to Xilinx was Round Rock has made an

1    assertion against Mitsubishi.  It may involve your product.

2    I don't even think it said that it did involve the product.

3    So I don't know.  I have no information about what the Round

4    Rock assertion was against Mitsubishi.  I can't give clarity

5    to Your Honor about what happened there and whether Round

6    Rock was actually asserting against Xilinx's products.

7            But I can say I don't think it's relevant to

8    this question that we're presented with here because that

9    assertion, if it was, in fact, a Round Rock assertion

10   against Mitsubishi, it was conducted by Mr. deBlasi and it

11   was conducted without my knowledge of the details of it.

12           For the reasons I have already expressed in

13   the call, that is not my role at Round Rock.  It certainly

14   wouldn't be my role at Round Rock going forward if we put

15   that into the protective order as we proposed.

16           The protective order, the way that we phrased it,

17   would prohibit me from being involved in patent assertion

18   activities relating to the defendants or their products.  The

19   "or their products" language was an attempt to capture

20   situations like the Mitsubishi situation, if that is what it

21   is here, that if Round Rock was asserting against the Xilinx

22   customer because the customer was using Xilinx chips, I would

23   be precluded from that under the protective order language

24   that we proposed.

25           As a factual matter, I'm not involved with them

1    anyway, but if you ordered it in an protective order, then I

2    would be precluded from being involved in it.

3            To preclude me from being a decisionmaker in

4    that context makes no sense because I'm not making decisions

5    about that, Mr. deBlasi is.

6            THE COURT:  So by the language you propose

7    with respect to products, you also meant to include the

8    defendants' customers' use of those products; correct?

9            MR. DESMARAIS:  Yes.  And if Your Honor wanted

10   to modify the language, I would be perfectly comfortable

11   with that.  The reason I was hesitating is only -- and Your

12   Honor fixed it in the thing you just said there.  Rather

13   than have it say, "and Xilinx's customers," it should say

14   "Xilinx's customers' use of the Xilinx products," and that

15   would be perfectly acceptable because Round Rock may be

16   doing something else with somebody who happens to be a

17   Xilinx customer that has nothing to do with Xilinx or their

18   products.  I don't know that it would be fair in this case

19   to preclude me from participating in that.

20           THE COURT:  I understand we're focused on

21   Xilinx, but you do mean your language to be broader than

22   that.  You are willing to undertake that modification with

23   respect to all four defendants, all of their products, and

24   all of their customers' use of their products?

25           MR. DESMARAIS:  Yes.  Yes, Your Honor.  That is

1    what I intended.

2              THE COURT:  Now, it does seem to me factually

3    correct when defendants argue that you won't know, Round

4    Rock won't know when this type of situation will arise.  You

5    don't know who the defendants' customers are, and you don't

6    know necessarily when you start out on your assertion

7    activity that their customers may or may not be using their

8    products.

9              Is there any further protection that you could

10   see going into the protective order that would impose any

11   additional obligation on you or Round Rock at such time that

12   a situation like this apparent Mitsubishi situation comes to

13   the attention of Round Rock?

14             MR. DESMARAIS:  Well, yes, Your Honor.  I think

15   we put in the draft -- let me take a quick look here.  I

16   think it says already, "and shall screen himself from any

17   such patent assertion activities at Round Rock."  I think we

18   can say that.  Certainly, I would be screened from any such

19   patent assertion activities at Round Rock.  And, you know,

20   to the extent that it comes to light later in the process,

21   "would be screened at that time" or something.  I mean we

22   can work on the language.  But, certainly, if that were to

23   come to be, we would certainly pull ourselves out or I would

24   pull myself out of anything.

25             But I think that is very easy to guard against

1   here as a factual matter because, as I mentioned before, all

2   of that activity of making claim charts and approaching

3   licensees is started in the first instance at IPValue which

4   is an outside service in New Jersey and in California, and

5   they interface with Mr. deBlasi, not with me.

6          The chance that I would be involved at the level

7   that would concern Xilinx or Lattice is highly suspect.  I

8   mean it's almost zero chance of possibility that I would

9   even be involved in that, whether it was their customer or

10  not.

11         So I think we're looking at, it is true that

12  Round Rock apparently is asserting against Mitsubishi,

13  but I wasn't involved in that.  Right?  So there was no

14  chance that there was any Xilinx confidential or Lattice

15  confidential information use in that assertion because I'm

16  not involved in that.

17         We can put whatever language makes Your Honor

18  comfortable, and that was the reason we reached out to the

19  defendants was to try to have a meaningful meet and confer

20  on what language would make them comfortable.

21         But as a practical factual matter, the language

22  is not all that relevant because I don't do that at Round

23  Rock anyway.

24         THE COURT:  Finally, to the extent I need to be

25  concerned with any prejudice to the plaintiff here if I

1   were to grant the relief argued for by defendants, aren't

2   defendants correct that everybody on your side of the table,

3   your eyes were open and knew that this day could come about,

4   and plaintiffs didn't have to hire you, didn't have to hire

5   your firm; and, as you suggest, if it's you they primarily

6   want to be lead counsel and they can't have you, they've

7   got the resources to go hire someone else.  Isn't that all

8   correct?

9              MR. DESMARAIS:  I don't think so, Your Honor,

10  for a couple I think very important reasons.

11             One is this motion, in our view, is not

12  meritorious on the case law as it exists with the *U.S. Steel*

13  and *In Re: Deutsche Bank*.  The standard and the test for

14  when you get precluded from seeing confidential information

15  under a protective order depends on the facts of the

16  situation and what is actually happening at Round Rock.

17             We've known from the beginning what my role is

18  at Round Rock in a very concrete fashion; and we've known

19  from the very beginning of this matter, in fact, I don't

20  think it's ever been in our mind that such a motion as this

21  would be successful.

22             I would point out to Your Honor that just

23  because the motion was made doesn't mean it's meritorious.

24  There is a couple I think indications of that.  First of

25  all, only two of the four defendants have joined the motion.

1           But even more interesting than that, as Your

2    Honor well knows, I'm outside counsel in dozens of cases,

3    many of them in Delaware, many of them across the country,

4    and I have been for a long time.  I've been a Desmarais, LLP

5    for years now, and not a single party in any litigation has

6    ever raised this issue except Xilinx and Lattice in this

7    case.  So to say that this firm or my clients expected this

8    sort of motion, seeing as how this is the first time it has

9    ever happened in any of the dozens of litigation I'm on?

10          And when you look at the merits of the test in

11   *U.S. Steel* and *In Re: Deutsche Bank,* I hope Your Honor

12   doesn't grant the motion.  I think it would be remarkable

13   because I think it would be against the prevailing law,

14   especially on the facts as we know them.

15          THE COURT:  All right.  Is there anything else

16   from you, Mr. Desmarais?

17          MR. DESMARAIS:  No, Your Honor.

18          THE COURT:  Let me turn it back to Xilinx,

19   please.

20          MR. MICHAEL:  Briefly, Your Honor.

21          First, on the facts as we know them.  Since we

22   finished there, why don't we start there.

23          We operated on the information that was made

24   available to us through the meet and confer process.  The

25   information that we provided to this Court in connection

1    with our letter briefs provided the factual information that

2    plaintiffs' counsel was willing to provide to us.

3             I just heard Mr. Desmarais go through what

4    arguably would be testimony in the absence of the ability to

5    have them sit down at either a deposition or on the stand

6    and be subject to cross-examination so that we could really

7    dig into what the facts are and what he does.  I think it's

8    rather unfair for Mr. Desmarais to come forward at this

9    point in time and suggest that we have operated with a

10   dearth of facts when the lack of information, to the extent

11   there is any, is attributable to the information that

12   plaintiffs were willing to provide us.

13            Mr. Desmarais also referenced the *Deutsche Bank*

14   case several times.  In that case, the court was looking at

15   whether or not an individual's role in patent prosecution

16   inherently made that person a competitive decisionmaker.

17            That is not the analysis here because it's

18   Mr. Desmarais's role with Round Rock that makes him a

19   competitive decisionmaker.  By his own statement, the

20   fiduciary duty that he owes to Round Rock is a fiduciary

21   duty to himself.

22            As this court found and Judge Andrews found, Mr.

23   Desmarais is Round Rock.  The notion he is not a competitive

24   decisionmaker or that he isn't involved in strategic

25   decision-making as the chairman and owner or whatever other

1    title you want to give Mr. Desmarais, quite frankly, is not

2    plausible.

3             The other point that Mr. Desmarais made, which

4    is just factually inaccurate, is that Mr. Desmarais suggested

5    that attorneys at his firm were able to print out core

6    technical documents and bring them back to his law firm, and

7    that he always had the ability to review and access that

8    information.

9             That is just wrong, Your Honor.  Actually, in

10   advance of this hearing, I made sure I went back to confirm

11   what we understood the record to be.

12            Plaintiffs' counsel didn't request printouts of

13   any of the core technical documents until December of 2012,

14   long after this issue was teed up and long after we received

15   an agreement from plaintiffs' counsel that Mr. Desmarais

16   would not look at any information.  At no point in time has

17   Mr. Desmarais had access to any of our highly confidential

18   information, assuming there has been compliance with the

19   representations that were made by IV's counsel.

20            THE COURT:  Are you making that assertion with

21   respect to Lattice's highly confidential information, or

22   just Xilinx's?

23            MR. MICHAEL:  I'm making that just with respect

24   to Xilinx, Your Honor.  I do not know the facts with respect

25   to Lattice.

1            THE COURT:  They may speak for themselves in a

2    moment, but let me ask you first on behalf of Xilinx, because

3    there is a letter in the record.  It was attached to one of

4    the plaintiffs' letters.  I believe it's DI 187, Exhibit F,

5    a July 25th letter from Kindra Baer to Mr.  Stadnick, which

6    indicates in the first paragraph that certain highly

7    confidential attorney eyes only documents are being provided

8    to counsel.  There does not appear to be any limitation on

9    the use or disclosure of those documents within the Desmarais

10   firm.

11           On behalf of Xilinx, do you have any knowledge

12   of that?

13           MR. MICHAEL:  I do not, Your Honor.

14           THE COURT:  Is there anything else you want to

15   add?  Then I will give Lattice a chance to address that, if

16   they wish.

17           MR. MICHAEL:  No, Your Honor.  I don't think so.

18           Actually, there is one other point.  I have

19   sitting in front of me a presentation that was made by

20   Intellectual Ventures quite some time ago.  The title of

21   the slide, it's called "IV's Reality.  Who Represents IV?"

22           The Desmarais, LLP firm is certainly one of

23   those firms, but also listed in the firms is Weil Gotshal,

24   Feinberg Day, Sussman Godfrey, Irell Manella, Matt Powers,

25   and Tim Taggerty.  They do have a plethora of firms from

1    which they could have chosen to.

2              Again, I think Your Honor is right to note that

3    they did go into this situation with their eyes wide open.

4    This is not a situation that the defendants created.  We do

5    believe the right solution here is to prohibit Mr. Desmarais

6    from having access.

7              THE COURT:  Okay.  Thank you.  Did Lattice wish

8    to add anything?

9              MR. KENNEDY:  Your Honor, this is Mike Kennedy

10   with Lattice.  I think I can speak to the letter that Your

11   Honor just cited, Exhibit F.

12             The phrase "core technical documents" in that

13   letter is being used in a somewhat different sense than what

14   Mr. Michael was saying.  That is referring to the Delaware

15   discovery disclosure of initial documents concerning the

16   accused products.

17             What we did was we provided in the production

18   documents that were either public documents or they were

19   less sensitive documents concerning the accused products.

20   That is what that production is referring to.

21             There is a separate procedure, as Your Honor is

22   aware, for what we've been calling the source code, which

23   is covered in the third paragraph.  With respect to source

24   code, the situation with Lattice is similar than what

25   Mr. Michael described.  My understanding is to date, IV has

1  received exactly one document printed out from the source

2  code review that it has conducted.  Other than that, there

3  hasn't been an issue of printouts of the source code

4  documents that they have inspected.  As with Xilinx, they

5  disclosed in advance which lawyers were attending, and it

6  was people other than Mr. Desmarais.

7            THE COURT:  Are you saying your understanding is

8  that at least one page or one document of Lattice source

9  code did go back to the Desmarais firm?

10            MR. KENNEDY:  Yes, my understanding is it was

11  exactly one document.  I don't have it in front of me, but

12  it was a circuit diagram that IV's expert asked to be

13  printed out in late September.

14            THE COURT:  Was there any limitation on who at

15  Desmarais could see it?

16            MR. KENNEDY:  Not to my knowledge.

17            THE COURT:  On this Exhibit F, in the first

18  paragraph, it does say straight out, "Some of the enclosed

19  documents have been designated highly confidential attorneys'

20  eyes only pursuant to the protective order in this case."

21            So it is correct that Lattice sent at least

22  some "highly confidential attorney eyes only" documents to

23  the Desmarais firm without any limitation on who at the

24  Desmarais firm could see them, isn't it?

25            MR. KENNEDY:  Yes.

```
 1              THE COURT:  All right.  Thank you.  Let me give
 2    you my ruling.
 3              The record that you all created before today
 4    was very helpful, and this conversation today has been very
 5    helpful and thorough on both sides, which I think is fitting
 6    given the seriousness and, I would say, difficulty of the
 7    issue that you all have put before me.  Nonetheless, happily
 8    for me, I do find myself in a position where I am able to
 9    make a ruling.
10              The issue in front of the Court, of course, is
11    the request by defendant Xilinx and Lattice for an order
12    prohibiting Mr. John Desmarais, plaintiffs' lead counsel,
13    from accessing the defendants' highly confidential materials.
14              After considering all of the evidence and the
15    argument, this request is denied.  I want to explain the
16    reasons why.
17              First, going through the factors that the law
18    directs me to consider, I'll first say it's unclear to me
19    on this record whether Mr. Desmarais should be viewed as a
20    competitive decisionmaker in the context of this case or,
21    more importantly, it's unclear that even if he is viewed as
22    a competitive decisionmaker that the nature of his decision
23    making, competitive decision making "gives rise to a risk of
24    inadvertent use of confidential information learned in the
25    litigation."
```

1          That's a quote from *Deutsche Bank* which I find

2     to be helpful, if not controlling, authority on this question.

3          As has been represented, and the Court accepts

4     the representation, Mr. Desmarais, although he is the owner

5     of Round Rock, he is the non-executive chairman of the

6     board.  He is no longer the president or an officer of

7     any kind, and he represents that he is not involved in the

8     day-to-day business of Round Rock.

9          He further represents that months ago, he

10    delegated corporate authority to the Round Rock CEO relating

11    to the defendants and their products.  At that time, he was

12    not aware of Round Rock having any business relating to

13    defendants or their products.

14         Mr. Desmarais has further agreed not to

15    participate in any way in Round Rock's decisions going

16    forward, should there be any, in connection with defendants

17    or their products.

18         As there are with respect to competitive

19    decision-making, Mr. Desmarais, there is this other case,

20    the *Dell* case here, in which Mr. Desmarais was found to be

21    a competitive decisionmaker for Round Rock.

22         I don't view that as dispositive or even

23    particularly probative here given that in that case, Round

24    Rock was a party, unlike here, and it was at a different

25    time and particularly predates both the delegation of

1    authority that I have already spoke of with respect to the

2    defendants and their products in this case and also predates

3    the recent hiring and reorganization at Round Rock.  It is

4    unclear to me whether defendants have met their burden on

5    showing Mr. Desmarais is the type of competitive decisionmaker

6    that the type of bar they're seeking would require.

7                I turn next to whether there is, even assuming he

8    were that type of competitive decisionmaker, whether there

9    is some risk of inadvertent use or disclosure of defendants'

10   confidential information.  Here, I do want to emphasize the

11   risk is inadvertent use or disclosure.  We're not today

12   talking about the intentional or advertent use or disclosure

13   of the defendants' confidential information.  That is

14   prohibited by the protective order and other obligations.

15   There are protections against that, and so that is not what

16   we're talking about.

17               Instead, we're talking about the inadvertent,

18   intangible, subtle, even, as was referred to, metaphysical

19   risk.  A risk that at some point, perhaps a point that nobody

20   will be able to identify, Mr. Desmarais, perhaps indeed

21   likely without conscious awareness, may make a decision or a

22   statement in his role at Round Rock which may, unbeknownst

23   to him, be impacted, at least in part, by things that he

24   has learned from access to defendants' highly confidential

25   materials, such as financial documents, source code, or

1    schematics.

2              I view that as a real concern and one that

3    might, under appropriate circumstances, warrant the type of

4    relief that defendants are seeking here.  It seems to me

5    that there is a heightened likelihood of that risk coming to

6    fruition in the circumstance where Round Rock may engage in

7    patent assertion activity in connection with customers of

8    defendants given that there are apparently many such customers

9    And, of course, Round Rock can't know who all those customers

10   are.  So I think this is a real and legitimate concern.

11             It is echoed in the *Deutsche Bank* case in which

12   the Federal Circuit said, and I'm quoting:

13             "It is very difficult for the human mind to

14   compartmentalize and selectively suppress information once

15   learned, no matter how well intentioned the effort may be

16   to do so."

17             So I do think that that is a risk, and the

18   defendants have shown that that is a risk.

19             But that just takes me to the next step of the

20   analysis where I am asked to weigh the harm to the plaintiffs

21   that would come from granting defendants' request against the

22   potential harm to defendants from denying it.

23             Under the circumstances here, particularly given

24   the protective order and the modifications of the protective

25   order proposed by plaintiffs and the further modifications

1   that I have discussed with Mr. Desmarais today and which I

2   will order, I think that that weighing comes out in favor of

3   the plaintiffs and against the relief sought by defendants.

4   Granting the request would deprive plaintiffs of its chosen

5   lead trial counsel.  I recognize that is a harm, and I have

6   given it some weight.

7         Now, I do want to add that there will be cases

8   where the weight given to that harm is greater than the

9   weight I have accorded it here today.

10        I do think that, notwithstanding the plaintiffs'

11  view as to the likelihood that today's request would be

12  granted, I do think that Intellectual Ventures and the

13  Desmarais firm all acted with their eyes open and knew

14  that there was at least a nonzero and, I would even say,

15  significant risk that today would arrive and the relief

16  sought today might be asked for.  Plaintiffs certainly had

17  the choice to hire other counsel if it wished to avoid that

18  risk altogether.

19        Further, although this case is I guess two years

20  old chronologically, it's still a relatively young case.  We

21  only entered the scheduling order last April.  We're still

22  in discovery.  We have not gotten to the Markman hearing

23  yet.  So if plaintiff were to lose its first choice of lead

24  trial counsel, I'm confident they have the time and the

25  resources to recover from that and to obtain other counsel.

1    So this is a harm, but it's again not as great a harm as it

2    could be otherwise.

3              I have talked about the harm to defendants, this

4    intangible, subtle risk.  But under the circumstances here,

5    that harm doesn't get a great deal of weight either.  That

6    is because, first of all, the protections in the protective

7    order, and the new protections that will be added, and

8    also that I think at this point it is clear from the record

9    that at least defendant Lattice has produced at least one

10   document of confidential source code, highly confidential

11   source code, attorneys' eyes only, has permitted it to be

12   not only accessed but printed and taken back to the Desmarais

13   firm without any restriction on whether or not Mr. Desmarais

14   could have viewed it and also produced, consistent with the

15   letter that we referred to, produced some other documents

16   that were "highly confidential attorney eyes only" type

17   material that went to the Desmarais firm without again any

18   restriction on Mr. Desmarais seeing them.

19             I also do think it is noteworthy that while

20   there are four defendants in this case, only two of them

21   have moved for the relief sought today.

22             So when I weigh all of that and add finally to it

23   that the plaintiffs, it appears to me, have tried repeatedly

24   to resolve this issue, to do what they can to try to allay the

25   concerns of the two moving defendants and have willingly

1   agreed to further modifications of their most recent revised

2   proposal to amend the protective order, when I add that up in

3   weighing the harms, I come to the conclusion that the harm to

4   the plaintiffs from granting the relief would outweigh the

5   potential harm to the defendants from denying the relief.

6           So, overall, I do find that this issue presents

7   a close call, but for the reasons that I have stated, the

8   Court sides with the plaintiffs, and the defendants' request

9   is denied.

10          We will modify the protective order consistent

11  with the proposal made by the plaintiffs in their letter to

12  us.

13          We will require the further modifications to

14  clarify that Mr. Desmarais will not participate with respect

15  not only to defendants and to defendants' products but also

16  with respect to defendants' customers' use of defendants'

17  products.

18          We will further require that there be added

19  further clarification an indication as to if, notwithstanding

20  all of those protections, Round Rock or Mr. Desmarais ever

21  should learn that he has been involved inadvertently with

22  respect to a Round Rock activity against a defendant or

23  defendants' products or defendants' customers' use of

24  defendants' products, that he will certainly refrain from

25  any further participation going forward from the time he

1  learns that.

2           Those are the concepts that I want to see added

3  and clarified to the protective order.  I hereby direct that

4  the parties meet and confer and submit to the Court, by a week

5  from today, hopefully an agreed upon proposal to implement

6  those additional protections in the protective order.

7           I don't want to here anymore argument, but I do

8  want to make sure I've been sufficiently clear on what I

9  have ruled.

10          Are there any questions from Xilinx?

11          MR. MICHAEL:  No, Your Honor.  Thank you.

12          THE COURT:  All right.  From any other

13 defendant?

14          MR. KENNEDY:  No, Your Honor.

15          THE COURT:  All right.  From plaintiffs?

16          MR. DESMARAIS:  No, Your Honor.

17          THE COURT:  All right.  Thank you all very much.

18 Good-bye.

19          (Telephone conference ends at 3:32 p.m.)

20

21      I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.

22

23                          /s/ Brian P. Gaffigan
                          Official Court Reporter
24                          U.S. District Court

25