IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC and )
INTELLECTUAL VENTURES II LLC, )
)
Plaintiffs, )     C.A. No. 10-1065 (LPS)
)
v. )
)
ALTERA CORPORATION, MICROSEMI )
CORPORATION, LATTICE )     PUBLIC VERSION - REDACTED
SEMICONDUCTOR CORPORATION and )
XILINX, INC., )
)
Defendants. )
)

**XILINX, INC.'S OPENING BRIEF IN SUPPORT OF
ITS *DAUBERT* MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF IV'S DAMAGES EXPERT MICHAEL J. WAGNER**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Michael Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@mnat.com
mflynn@mnat.com
*Attorneys for Defendant Xilinx, Inc.*

OF COUNSEL:

Patrick T. Michael                    David B. Cochran
JONES DAY                             JONES DAY
555 California Street, 26th Floor      North Point
San Francisco, CA 94104               901 Lakeside Avenue
(415) 875-5893                        Cleveland, OH  44114
                                      (216) 586-7029

Laurie M. Charrington
Joe C. Liu                            William C. Rooklidge
Kathleen D. Lynott                    JONES DAY
JONES DAY                             3161 Michelson Drive, Suite 800
1755 Embarcadero Road                 Irvine, CA  92612-4408
Palo Alto, CA 94303                   (949) 553-7501
(650) 739-3939

Original Filing Date:  November 20, 2013
Redacted Filing Date: November 27, 2013

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

NATURE AND STAGE OF PROCEEDINGS ........................................................ 1

SUMMARY OF ARGUMENT .............................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

ARGUMENT ........................................................................................................ 6

I.     MR. WAGNER IGNORES THE ███████████████████
███████████████████ THAT CAPS IV'S DAMAGES .................................... 6

    A.    The ██████████████ Establish A Royalty For The Asserted Patents
    That Is Dispositive Of The Damages Inquiry ...................................... 7

    B.    Mr. Wagner's Consideration Of Only A Hypothetical Negotiation Renders
    His Opinions Irrelevant ...................................................................... 8

II.    MR. WAGNER'S OPINIONS ON A REASONABLE ROYALTY ARE BASED
ON INCORRECT DATA AND UNRELIABLE METHODS ....................................... 10

    A.    Mr. Wagner Conducted A Flawed Hypothetical Negotiation ............................. 11

        1.    Mr. Wagner Uses The Wrong Date And Parties .................................... 11

        2.    Mr. Wagner Relies On Non-Comparable Agreements ........................... 13

        3.    Mr. Wagner Failed To Consider The Sales Prices Of The Patents .......... 14

        4.    Mr. Wagner Ignores All Record Evidence That The Form Of The
        Negotiated Royalty Would Be A Lump Sum ....................................... 15

    B.    Mr. Wagner's Royalty Base Improperly Uses The Entire Market Value
    Rule, And Fails To Apportion Between Infringing And Non-infringing
    Features ............................................................................................ 16

    C.    Mr. Wagner Uses An Arbitrary Royalty Rate ................................... 19

CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006) ................................................................................ 11

*Clark v. Wooster*,
119 U.S. 322 (1886) .................................................................................................. 7

*Garretson v. Clark*,
111 U.S. 120 (1884) .................................................................................................. 16

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997) .................................................................................................. 20

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ....................................................................................... 2

*Integra Lifesciences I, Ltd. v. Merck KgaA*,
331 F.3d 860 (Fed. Cir. 2003) .................................................................................. 11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ................................................................ 11, 14, 17, 18

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ............................................................ 13, 15, 16, 17

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) .............................................................................................. 15, 16

*Mobil Oil Corp. v. Amoco Chemicals Corp.*,
915 F. Supp. 1333 (D. Del. 1994) .......................................................................... 9, 10

*Network Protection Sciences, LLC v. Fortinet, Inc.*,
No. C 12–01106 WHA, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013) ................. 18

*Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab., Inc.*,
No. 2-cv-46-B (JMA), ECF No. 808 (S.D. Cal. May 2, 2006), *rev'd on other grounds*,
195 F. App'x 947 (Fed. Cir. 2006) .......................................................................... 11

*Nickson Indus., Inc. v. Rol Mfg. Co.*,
847 F.2d 795 (Fed. Cir. 1988) ................................................................................ 7, 8

*Odetics, Inc. v. Storage Tech. Corp.*,
185 F.3d 1259 (Fed. Cir. 1999) ............................................................................... 14

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ...................................................................... 9, 10

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) .................................................................. 2, 13, 16

*Riles v. Shell Exploration & Prod. Co.*,
   298 F.3d 1302 (Fed. Cir. 2002) ....................................................................... 16

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) (en banc) ........................................................ 7, 11

*Rude v. Westcott*,
   130 U.S. 152 (1889) .......................................................................................... 7, 9

*Seymour v. McCormick*,
   57 U.S. 480 (1854) .................................................................................... 1, 7, 8, 9

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
   289 U.S. 689 (1933) .......................................................................................... 13

*Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*,
   872 F.2d 978 (Fed. Cir. 1989) ............................................................................. 7

*Trell v. Marlee Elecs. Corp.*,
   912 F.2d 1443 (Fed. Cir. 1990) ......................................................................... 14

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ............................................................... 2, 16, 19

*WhitServe, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) ..................................................................... 1, 2, 20

**STATUTES**

35 U.S.C. § 284 ................................................................................... 1, 6, 7, 16

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ........................................................................... 10, 16, 20

Martha K. Gooding, *Reasonable Royalty Patent Damages and the "Smallest Salable Patent-Practicing Unit" Dicta*, 86 PATENT, TRADEMARK & COPYRIGHT J. 771 (2013) ......... 18

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV") have asserted four patents against Xilinx, Inc.  IV's damages expert, Michael Wagner, opines that Xilinx should pay IV ███████████████████████████████████ ████████████████████████████████ for seven years of alleged infringement.  Xilinx submits this brief in support of its motion to exclude Mr. Wagner's testimony in its entirety.

## SUMMARY OF ARGUMENT

Mr. Wagner has failed to meet any of the standards for reliable, admissible expert testimony.  Testimony of a damages expert is intended to aid the jury.  Where the expert's analysis is "out of line with economic reality," it will not assist the jury, and is properly excluded.  *WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 12-17 (Fed. Cir. 2012).

1.      At the outset, Mr. Wagner's damages analysis overlooks a key economic fact that is rarely available in patent disputes but, when it is, is critical—namely, that █████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████ by definition it generally establishes a royalty that is "reasonable" under 35 U.S.C. § 284, and eliminates the need to engage in a hypothetical negotiation.  *See Seymour v. McCormick*, 57 U.S. 480, 490-91 (1854).  Mr. Wagner acknowledges this threshold inquiry, but fails to apply the established royalty.  Instead, he opines solely on a hypothetical negotiation for a reasonable royalty.  The Court need not even reach the errors in that analysis, but should exclude Mr. Wagner's testimony because he refuses to recognize ████████████ established royalty, which governs the amount of damages IV can recover as a matter of law.

2.      Mr. Wagner's (irrelevant) analysis of a hypothetical negotiation for a royalty is flawed on multiple, independent grounds.  First, Mr. Wagner uses the wrong model for the negotiation by (i) ignoring that Xilinx would have been negotiating on three different dates and with the original patent holders of the '325, '087, and '646 patents and with IV solely on the '669 patent, and would not have been negotiating just with IV for all four patents on a single date as Mr. Wagner posits, (ii) ignoring the facts of this case showing the preference of the negotiating parties for a lump-sum payment rather than a running royalty, (iii) relying exclusively on non-comparable settlement agreements, and (iv) deeming irrelevant the prices at which the original patent holders sold their patents to IV close in time to the dates of the hypothetical negotiations.  All of this is contrary to bedrock principles for constructing a hypothetical negotiation.  *See, e.g.*, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868-71 (Fed. Cir. 2010).  Second, he uses the entire market value of the accused products as the royalty base, without establishing that the products' patented features are the basis for consumer demand—an approach the Federal Circuit has repeatedly rejected.  *See Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1315 (Fed. Cir. 2011).  Third, he assigns a royalty rate for each asserted patent by using ████████████████████████████████████████████, and then without any explanation of how each *Georgia-Pacific* factor affects that rate, he more than doubles it.  *See WhitServe*, 694 F.3d at 15-17.  Each of these alone is a fundamental error that renders his analysis unreliable.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible," whether it "completely changes a reliable methodology or merely misapplies that methodology.").  Collectively, the errors compound the lack of any reliable economic analysis.

## STATEMENT OF FACTS

*The Patents-in-Suit.*  IV accuses Xilinx of infringing four of the five patents-in-suit: U.S. Patent Nos. 5,687,325 ("the '325 patent"), 6,260,087 ("the '087 patent"), 6,272,646 ("the '646 patent"), and 6,993,669 ("the '669 patent") (collectively, "the asserted patents").  IV does not practice the patents.  *See* Declaration of Kathleen D. Lynott ("Lynott Dec."), Ex. 1 (Wagner Opening Report at ¶ 169).  It acquired the patents and over 70,000 others in support of its business model of licensing patents.  *See id.* (Wagner Opening Report at ¶ 30).  Xilinx, by contrast, is the market leader for the products at issue.  *See id.* (Wagner Opening Report at ¶¶ 22–23).  It began selling products that allegedly infringe the patents in February 2005 (for the '325 and '087 patents), in April 2006 (for the '646 patent), and in January 2006 (for the '669 patent).  *See id.*, Ex. 2 (Davis Report at 53), Ex. 3 (Wagner Dep. Tr. at 280:9-284:13).

*Mr. Wagner's Damages Opinion.*  IV presents damages expert Michael Wagner, who submitted an opening report on June 26, 2013, and a reply report on September 6, 2013, and was deposed October 8-9, 2013.  *See id.*, Ex. 1 (Wagner Opening Report), Ex. 4 (Wagner Reply Report).  Mr. Wagner opines on a hypothetical negotiation for a reasonable royalty for a non-exclusive license to the asserted patents.  He posits a single negotiation in January 2006, solely between IV and Xilinx as the licensor and licensee.  *See id.*, Ex. 1 (Wagner Opening Report at ¶¶ 88-89).

The only agreements that Mr. Wagner considers relevant to the hypothetical negotiation are settlement agreements IV entered into ███████████████████████████████ ███████████████████████████████████████ *See id.* (Wagner Opening Report at ¶¶ 104, 115-122, 156-157, 163, 277). ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████     *See id.*, Ex. 5 ████████████████, Ex. 6 ████████████████

In Mr. Wagner's opinion, the parties at the hypothetical negotiation would initially agree on a ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ *See id.* (Wagner Opening Report at ¶ 298).  Based on these calculations, Mr. Wagner concludes that, for royalties running through March 2013, Xilinx would owe IV approximately ███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ In reaching this conclusion, Mr. Wagner refuses to take into account numerous other key pieces of evidence relevant to a reliable economic analysis.

████████████████████████.  One key fact that Mr. Wagner deems irrelevant is that IV and Xilinx ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

4



and each plaintiff is a wholly-owned subsidiary of the correspondingly named fund. (D.I. 11.)

As an investor, Xilinx

Thus,

***The Original Patent Holders' Sales of the Asserted Patents.***  Mr. Wagner also considers irrelevant the sales prices at which the original patent holders sold the asserted patents to IV (or an intermediary).  In each instance, the patent holder sold the entirety of its rights:



As these facts show, the original patent holders collectively sold patent portfolios including the asserted patents between 2004 and 2009 for about ▇▇▇▇▇▇.  Also, the dates of these sales show that Web Chang and Cypress had not yet sold their patents at the time of the hypothetical negotiations, in 2005 and 2006.  Mr. Wagner dismisses these facts, conducting a hypothetical negotiation solely between Xilinx and IV, and therefore without using the prices at which Web Chang and Cypress were willing to and did sell their rights in the asserted patents to IV.

## ARGUMENT

**I.    MR. WAGNER IGNORES THE ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ THAT CAPS IV'S DAMAGES**

Mr. Wagner's reports fail to address the established royalty between IV and Xilinx other than to conclude that "there is no established royalty."  *See id.*, Ex. 3 (Wagner Dep. Tr. at 187:16-189:18).  His fundamental legal error in this regard renders his entire analysis faulty.

A.   ████████████████████ **Establish A Royalty For The Asserted Patents That Is Dispositive Of The Damages Inquiry**

Under 35 U.S.C. § 284, a prevailing patentee is entitled to receive "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty . . . ." Of the ways to measure damages, an established royalty, if there is one, is usually the best. *Clark v. Wooster*, 119 U.S. 322, 326 (1886). When an established royalty exists, there ordinarily is no need to engage in a hypothetical negotiation to identify a reasonable royalty. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc) (reaching a hypothetical negotiation if there is not an established royalty). The one exception where a royalty "reasonable" under § 284 may be greater than an established royalty is where "the evidence clearly shows that widespread infringement made the established royalty artificially low." *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 798 (Fed. Cir. 1988).

In most cases where an established royalty exists, it arises out of licenses the patentee has entered into with third parties. Originating with the Supreme Court in *Rude v. Westcott*, 130 U.S. 152 (1889), certain requirements have been identified to determine whether the license terms are sufficiently uniform, widespread, and executed outside the litigation context to establish a royalty applicable to the defendant as well. *See id.* at 165; *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 993 (Fed. Cir. 1989).

Although less common, an established royalty can also arise from a prior agreement directly between the patentee and the defendant. The seminal case of *Seymour v. McCormick*, 57 U.S. 480 (1854), addressed this situation. There, the patentee had previously licensed the defendants to make machines practicing three patents, but after initially paying royalties, the defendants stopped on the belief that the patentee was not the original inventor. *Id.* at 491. The patentee sued for infringement, but of only one of the licensed patents, and was awarded "nearly double the amount demanded for the use of" all three patents. *Id.* The Supreme Court reversed

the damages award and remanded for a new trial because it exceeded the previously agreed-upon price and therefore was an improper measure of damages.  *See id.* (explaining that "[b]eyond the [defendants'] refusal to pay the usual license price, the plaintiff showed no actual damage").

Here, as in *Seymour*, ███████████████████████ obviate the need to hypothesize about an arms-length negotiation for a reasonable royalty—that negotiation has in fact occurred. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

### B.  Mr. Wagner's Consideration Of Only A Hypothetical Negotiation Renders His Opinions Irrelevant

Mr. Wagner does not dispute any of the law on established royalties.  He agrees that an established royalty can exist where "the parties to the lawsuit themselves have previously entered into an agreement by which they have set the price for the license . . . ."  *See id.* (Wagner Dep. Tr. at 192:12-25).   He also agrees that an established royalty "trumps" the hypothetical negotiation and obviates any need to continue with the *Georgia-Pacific* test—as he put it, if there is an established royalty, "End of analysis."  *See id.* (Wagner Dep. Tr. at 189:3-190:17).  Nor does he seek to apply the sole exception to using an established royalty to measure damages.  *See Nickson*, 847 F.2d at 798.[1]  Yet, Mr. Wagner fails to consider the established royalty between IV

---

[1]  To the contrary, Mr. Wagner conceded that ███████████████████████████ ███████████████████  *See* Lynott Dec., Ex. 3 (Wagner Dep. Tr. at 200:5-201:22, 207:24-208:7).

and Xilinx and opines solely on a royalty arising from a hypothetical negotiation.  *See id.*, Ex. 1 (Wagner Opening Report at ¶ 155), Ex. 3 (Wagner Dep. Tr. at 188:2-18).  When questioned about this flaw at his deposition, Mr. Wagner said that established royalties require "a lot of licenses entered into before the alleged infringement and a lot of commonality in those agreements as to financial terms."  *See id.* (Wagner Dep. Tr. at 188:19-189:2).  But this answer ignores *Seymour* and the possibility of a royalty established, as here, between the parties to the lawsuit themselves.

Accordingly, the requirements for an established royalty that Mr. Wagner listed are immaterial.  *See id.*, Ex. 1 (Wagner Opening Report at ¶ 154).  As he acknowledged, those requirements originated in *Rude v. Westcott*, where the established royalty was between the patentee and others—not the defendant.  *See id.*, Ex. 3 (Wagner Dep. Tr. at 191:17-25).  The Supreme Court explained that the defendant there was "a *stranger* to the license establishing" the royalty.  130 U.S. at 165 (emphasis added).  Mr. Wagner agrees to this limited scope of the *Rude v. Westcott* requirements.  *See* Lynott Dec., Ex. 3 (Wagner Dep. Tr. 190:23-192:11).  ██████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

In his reply report, Mr. Wagner ████████████████████████████████████████████
████████████████████████████████████████████████, relying on *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  *See* Lynott Dec., Ex. 4 (Wagner Reply Report at ¶ 52), Ex. 3 (Wagner Dep. Tr. at 193:13-194:25, 196:10-20).  According to Mr. Wagner, ████████████████ he discerns from *Panduit* dictates rejection of an established royalty here.  *See id.* (Wagner Dep. Tr. at 197:5-198:5).  *Panduit*, of course, is Sixth Circuit authority not binding on any issue in this case, much less on an established royalty—an issue that *Panduit* did not involve or even mention.

In fact, this Court has rejected the expansion of *Panduit* that Mr. Wagner proclaims. In *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1348 (D. Del. 1994), the patentee argued that *Panduit* "precludes a damage award at [the parties'] established rates as a matter of law because that would place [the defendant] in a 'heads I win, tails you lose' situation." As the Court explained, "if *Panduit* were read as [the patentee] contends, a court could never find a patentee's established rates to be the damages which an infringer should pay." *Id.* Moreover, the *Mobil Oil* defendant was "not the type of infringer with which *Panduit* was concerned," *i.e.*, "'a competitor which made no investment in research and development of the invention.'" *Id.* (citation omitted). Here, Xilinx and IV are not even competitors, and Xilinx is the market leader that devotes a substantial portion of its revenues to research and development. *See* Lynott Dec., Ex. 3 (Wagner Dep. Tr. at 341:22-342:2), Ex. 2 (Davis Report at 12–13). Xilinx is not the type of defendant with which *Panduit* was concerned, either.



*See id.*, Ex. 3 (Wagner Dep. Tr. at 202:6-205:23). Mr. Wagner's failure to consider the established royalty cap ▮▮▮▮▮▮ renders irrelevant the entirety of his analysis, which considers solely a hypothetical negotiation reasonable royalty. His opinions should be precluded.

## II.   MR. WAGNER'S OPINIONS ON A REASONABLE ROYALTY ARE BASED ON INCORRECT DATA AND UNRELIABLE METHODS

Even if the Court were to permit IV to put on its damages case using a hypothetical negotiation, Mr. Wagner's opinions should still be excluded under Fed. R. Evid. 702. In constructing his hypothetical negotiation, as well as his opinions on the royalty base and rate, Mr. Wagner's data and methodology are repeatedly incorrect and render his opinions unreliable.

### A.    Mr. Wagner Conducted A Flawed Hypothetical Negotiation

#### 1.    Mr. Wagner Uses The Wrong Date And Parties

Mr. Wagner uses a single negotiation in January 2006 solely between Xilinx and IV.  *See id.*, Ex. 1 (Wagner Opening Report at ¶¶ 88-89).  This is wrong as to the date, and wrong as to the parties.

The date of a hypothetical negotiation is the date "before the infringing activity began." *Integra Lifesciences I, Ltd. v. Merck KgaA*, 331 F.3d 860, 869 (Fed. Cir. 2003).  Where there are separate infringements each commencing on a different date (*e.g.*, different product lines that infringe or different patents), the hypothetical negotiation dates may be different, and thus may lead to different reasonable royalties.  *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361-63 (Fed. Cir. 2006).  Identifying the correct date for each negotiation "is essential for properly assessing damages."  *Integra*, 331 F.3d at 870; *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) (remanding for new trial on damages where the Federal Circuit "alter[ed] the time period" for the hypothetical negotiation).

The parties to the hypothetical negotiation are ordinarily the plaintiff and the defendant, assuming that the plaintiff owned the patent at the time the alleged infringement began.  *See Rite-Hite Corp.*, 56 F.3d at 1554.  If, however, the plaintiff acquired the patent afterwards, the proper licensor negotiating the hypothetical negotiation is the person that then owned the patent. *See Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab., Inc.*, No. 2-cv-46-B (JMA), ECF No. 808, at 7-10 (S.D. Cal. May 2, 2006), *rev'd on other grounds*, 195 F. App'x 947 (Fed. Cir. 2006).

Here, there are three separate beginning dates for alleged infringement of the asserted patents, and therefore three different hypothetical negotiation dates.[2]  Likewise, as of those dates,

---

[2] Devices allegedly infringing the '325 and '087 patents were first sold in February 2005, and in April 2006 for the '646 patent.  *See* Lynott Dec., Ex. 2 (Davis Report at 53).  Xilinx began

there were three separate willing licensors in the negotiations, not merely IV, because Web Chang and Cypress still owned their patents at the time of the negotiations:

| Patent | Negotiation Date | Willing Licensors | Willing Licensee |
|---|---|---|---|
| '325 and '087 patents[3] | February 2005 | Web Chang | Xilinx |
| '646 patent | April 2006 | Cypress | Xilinx |
| '669 patent | January 2006 | IV | Xilinx |

Mr. Wagner originally posited a single hypothetical negotiation in January 2006 solely between IV and Xilinx. *See id.*, Ex. 1 (Wagner Opening Report at ¶¶ 88–89), but later admitted that he was wrong. *See id.*, Ex. 3 (Wagner Dep. Tr. at 224:19-225:6, 267:14-18, 278:17-22 (admitting that ███████████████████████████████████████████ ███████████████████████████ ), 284:8-13). Even so, he still used only IV and Xilinx, attempting to rectify his error by stating in his reply report that Web Chang and Cypress would have been negotiating on IV's behalf. *See id.*, Ex. 4 (Wagner Reply Report at ¶ 41). Mr. Wagner's apparent motive for this assertion is to bring into the hypothetical negotiation IV's 2013 settlement agreements with Microsemi and Lattice—agreements to which only IV, not Web Chang or Cypress, was a party—while simultaneously ignoring the prices at which Web Chang and Cypress sold their patents to IV.

Mr. Wagner's attempt to change the parties to the hypothetical negotiation is contrary to law. He invokes the "Book of Wisdom," arguing that it opens the door to consideration of a wide array of facts and evidence occurring beyond the date of the hypothetical negotiation, indeed "all relevant information." *See id.*, Ex. 1 (Wagner Opening Report at ¶ 86), Ex. 4

---

(continued…)

making devices allegedly infringing the '669 patent before it issued. Mr. Wagner agrees that the date of the '669 hypothetical negotiation is its date of issuance, as no infringement could occur before then. *See id.,* Ex. 1 (Wagner Opening Report at ¶¶ 82, 88, 173).

[3] The '325 and '087 patents describe and claim very similar subject matter, and ██████████████ ███████████████████, so their hypothetical negotiation would be conducted together. *See id.,* Ex. 3 (Wagner Dep. Tr. at 276:12-22).

(Wagner Reply Report at ¶ 41), Ex. 3 (Wagner Dep. Tr. at 222:6-234:22, 267:14-18).  But that doctrine is limited to giving the parties to the hypothetical negotiation knowledge of future *use* of the patents, recognizing that a patent's inherent value may be informed by its subsequent use and sales of infringing products.  *See Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698-99 (1933) (coining the "Book of Wisdom" in permitting evidence of a patent's later use to "bring out and expose to light the elements of value that were there from the beginning," because the later use merely reflects "values inherent in the thing itself"); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009) (under Book of Wisdom, allowing consideration of the patent's "[u]sage (or similar) data").  In other words, knowledge of future use or sales still adheres to the hypothetical construct because the use or sales reflect the inherent value of the patent at the time of the hypothetical negotiation.  The doctrine does not change the law that the negotiation is conducted from the perspective of the patent owner at the time.  Mr. Wagner's erroneous substitution of IV in place of Web Chang and Cypress at the negotiating table should be excluded as unhelpful to the trier of fact.

## 2.    Mr. Wagner Relies On Non-Comparable Agreements

If, as here, an expert considers other licenses in the hypothetical negotiation, then the agreements must be comparable to the circumstances of that negotiation in date, price, and scope.  *See ResQNet.com*, 594 F.3d at 871 (licenses must be "commensurate to the patent in suit").  Mr. Wagner relies solely on ███████████████ settlement agreements.  While IV was the other party to those agreements, the comparability ends there:

- The other parties to those agreements—████████████████—are strangers to the hypothetical negotiations;

- Web Chang and Cypress, who are licensors as to two of the three hypothetical negotiations, would have had no knowledge of the confidential ████████ or ██████ agreements; as such, those agreements provide no evidence of what any of the parties to those two negotiations would have thought of the value of their patents;

- The agreements were entered into long after the hypothetical negotiations (8.5 years after the hypothetical negotiation for the '325 and '087 patents and 6.5 years later for the '646 patent)—*see Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999) (affirming exclusion of licenses granted four and five years after hypothetical negotiation date);

- The agreements were entered into in the midst of this lawsuit to settle litigation, and thus reasonably include nuisance value and litigation costs—*see LaserDynamics*, 694 F.3d at 77-78 (abuse of discretion to admit litigation license and noting "the longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages");



; and

-  *see Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1446-47 (Fed. Cir. 1990) (vacating damages award relying on license agreement granting rights to other inventions).

### 3.   Mr. Wagner Failed To Consider The Sales Prices Of The Patents

Compounding his improper use of non-comparable agreements, Mr. Wagner refuses to consider the information most relevant to the Web Chang and Cypress hypothetical negotiations, an independent error in his analysis. In 2008 and 2009, Web Chang and Cypress valued all rights to the '325, '087, and '646 patents when they sold them to IV. Those sales involve the same parties to the hypothetical negotiations for those patents and are close enough in time to be relevant. No rational person would expect to convey a non-exclusive license at a price higher than a sale of the patents outright. Yet even though he concedes that Web Chang's and Cypress's sales prices constituted "fair value" for the entirety of the '325, '087, and '646 patent rights (*see* Lynott Dec., Ex. 3 (Wagner Dep. Tr. at 324:13-325:8)), he did not use this

---

[4] Mr. Wagner ignores the actual testimony from persons with knowledge of Lattice's and Microsemi's intent for entering into [the] settlement agreement, instead relying on hearsay from an IV representative. *See id.*, Ex. 4 (Wagner Reply Report at ¶ 11).

information in his hypothetical negotiation for a non-exclusive license to the patents. Mr. Wagner's refusal to take into account this highly relevant information renders his opinion unreliable and based on insufficient facts, and requires exclusion of his testimony.

### 4.   Mr. Wagner Ignores All Record Evidence That The Form Of The Negotiated Royalty Would Be A Lump Sum

The Federal Circuit has instructed that the form of a reasonable royalty depends on the parties' preference. *See Lucent*, 580 F.3d at 1326 (the question is whether the parties to the hypothetical negotiation "would have agreed to a lump-sum payment or instead to a running royalty based on ongoing sales or usage"). All the evidence in the case on this issue demonstrates that the parties to the hypothetical negotiations would have agreed on a lump-sum payment as the form of the royalty. █████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████    ███████████████████    ███████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████

Mr. Wagner ignores all of this evidence, relying instead on an amicus brief from a different case identifying certain benefits of running royalties.[5] *See* Lynott Dec., Ex. 1 (Wagner

---

[5] That case presented an entirely different question—whether the standard for declaratory-judgment jurisdiction should be the same in patent cases as elsewhere where the parties have a license between them. The amicus brief supported respondents' position that a patent-special rule should apply, which the Supreme Court rejected. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

Opening Report at ¶¶ 97-100), Ex. 3 (Wagner Dep. Tr. at 247:2-18).   But even that brief recognizes that the preference is case-specific, observing that licenses "today are of infinite variety" and that blanket rules should not be imposed "in place of those of the parties."   Brief of Richard L. Donaldson et al. as Amici Curiae in Support of Respondents at 9, 11, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) (No. 05-608).   And at his deposition, Mr. Wagner conceded that lump-sum payments have benefits.   *See* Lynott Dec., Ex. 3 (Wagner Dep. Tr. at 249:7-250:9); *see also Lucent*, 580 F.3d at 1326.   Yet he wholly failed to evaluate the evidence in this case.   Mr. Wagner's testimony on the form of royalty is not "based on sufficient facts or data," as required by Rule 702, and should be excluded.

### B.   Mr. Wagner's Royalty Base Improperly Uses The Entire Market Value Rule, And Fails To Apportion Between Infringing And Non-infringing Features

A patentee may obtain damages only for the infringer's use of "the invention."   35 U.S.C. § 284.   Damages evidence that is "unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of" § 284.   *ResQNet.com*, 594 F.3d at 869; *see also Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) (rejecting patentee's damages model because it "does not associate [the] proposed royalty with the value of the patented method at all, but with the unrelated cost of the entire [oil drilling] platform" that purportedly used the patented method).   Thus, if the accused product contains various components only some of which are patented, the patentee must "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features."   *Uniloc*, 632 F.3d at 1318 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).   If the patentee instead seeks to use the entire value of that product as the royalty base, it must show that this value "is properly and legally attributable to the patented feature."   *Id.*   In other words, the patentee must show that "the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'"   *Id.* (quoting *Lucent*, 580 F.3d at

16

1336).  This "ensure[s]" that damages "are in fact 'reasonable' in light of the technology at issue."  *LaserDynamics*, 694 F.3d at 67.

Mr. Wagner's analysis does not satisfy either method for properly determining the royalty base.  He does not apportion between patented and unpatented features, even though he admitted that the accused products ███████████████████████████████████████

██████████████████  *See* Lynott Dec., Ex. 3 (Wagner Dep. Tr. at 243:13-18, 336:25-337:7).  He also performed no analysis whatsoever regarding customer demand for the product, even though he used the total revenue from sales of the accused products as the royalty base.  *See id.* (Wagner Dep. Tr. at 181:25-184:9, 236:17-22, 238:22-239:4).  Given his failure to follow the entire market value rule, Mr. Wagner disclaims any intent to use the entire market value as the royalty base.  *See id.* (Wagner Dep. Tr. at 236:23-237:2, 238:9-18).  Instead, he seeks to cloak his analysis in the ███████████████████████████████████████████

██████████████████  *See id.* (Wagner Dep. Tr. at 239:5-15), Ex. 4 (Wagner Reply Report at ¶¶ 27-30).  This does not work as a matter of law.

*LaserDynamics* does not establish an exception to the longstanding rule that, to use the entire sales revenue of a product containing non-patented features, the damages evidence must establish that customer demand for the product was driven solely by the patented features.  In *LaserDynamics*, the Federal Circuit emphasized that, where only certain features of a product are accused of infringement, using the price of the entire product as a royalty base, "[b]y definition, is an application of the entire market value rule" requiring proof that "the demand for [that product] is driven by the patented technology."  694 F.3d at 68-69.  Because the patentee had not provided proof that the patented feature drove customer demand for laptops, the Federal Circuit rejected use of the laptop revenue as the royalty base, even though that was the defendant's smallest salable patent-practicing unit because it sold only laptops.  See id. at 68, 69-70; see also

*Network Protection Sciences, LLC v. Fortinet, Inc.*, No. C 12–01106 WHA, 2013 WL 5402089, at *7-8 (N.D. Cal. Sept. 26, 2013) (excluding damages expert who used the "smallest salable patent-practicing unit" for royalty base but without showing that the patented features drove demand for the product: "When using a multi-component product as a royalty base, even if it is the smallest salable unit, a patentee must *still show* that the patented feature drives demand for the entire product" (emphasis in original)); Martha K. Gooding, *Reasonable Royalty Patent Damages and the "Smallest Salable Patent-Practicing Unit" Dicta*, 86 PATENT, TRADEMARK & COPYRIGHT J. 771, 772 (2013) (tracing Federal Circuit law and patentees' flawed view that the "smallest salable patent-practicing unit" could be anything other than simply a "*starting point* for the royalty base analysis" (emphasis in original)).  Mr. Wagner makes the same mistake.  His use of the products' entire sales revenue without satisfying the legal test will not assist, and would surely prejudice, the jury.  *See LaserDynamics*, 694 F.3d at 67.

In an attempt to rectify his legal errors, Mr. Wagner opines that he actually did conduct an apportionment analysis inherently, asserting that apportionment was ████████████ ██████████████████████████████████████████████████████████████ ████████       *See* Lynott Dec., Ex. 3 (Wagner Dep. Tr. at 284:16-286:13).   According to Mr. Wagner, ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ *See id.* (Wagner Dep. Tr. at 285:13-286:7).  This opinion has several flaws.

*First*, "the requirement to prove that the patented feature drives demand for the entire product may not be avoided by" using a low royalty rate.  *LaserDynamics*, 694 F.3d at 67.

*Second*, although Mr. Wagner concedes that Xilinx's products are different from those of ████████████████, Mr. Wagner fails to account for the fact that different products often,

including in this industry, have different features.  *See* Lynott Dec., Ex. 3 (Wagner Dep. Tr. at 167:15-170:14).  He takes the position that ████████████████████████████████ ██████ (*see id.* (Wagner Dep. Tr. at 286:8-13)), but this blanket statement completely fails to apportion *Xilinx's* products, that is, to separate profits "between the patented feature and unpatented features" using evidence that is "reliable and tangible, and not conjectural or speculative."  *Uniloc*, 632 F.3d at 1318.

    *Third*, Mr. Wagner ignores that the ████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████  *See* Lynott Dec., Ex. 3 (Wagner Dep. Tr. at 170:15-21).  But distinguishing between "patented" and "unpatented" features under the ████████████████████████████████ would require an analysis very different from distinguishing between "patented" and "unpatented" features under the four patents asserted against Xilinx, which Mr. Wagner has not performed.

    Mr. Wagner's use of Xilinx's total sales revenue as a royalty base without satisfying the requirements of the entire market value rule or performing apportionment is legally wrong, cannot help the trier of fact, and should be excluded.

### C.  Mr. Wagner Uses An Arbitrary Royalty Rate

    Mr. Wagner assigned a ███████████ rate for each patent and ultimately increased it to ████ per patent.  *See id.*, Ex. 1 (Wagner Opening Report at ¶¶ 130, 296).  His rates are doubly arbitrary.

    Mr. Wagner reached his ██████████████████████████████ ██████████████████████████████, it is not an evaluation of the patented invention's technical value.  Mr. Wagner agreed that ████████████████████████ ███████████████████  *See id.* (Wagner Dep. Tr. at 37:14-17).  Moreover, the value of those patents as between the parties to IV's licenses to ████████████████ has nothing

whatsoever to do with the value of those patents as between IV and Xilinx.  Mr. Wagner's attempt to extrapolate a baseline rate from the ██████████ settlement agreements is wholly arbitrary.

Mr. Wagner's jump from ██████████ is just as arbitrary.  He starts with his ██████████ (*see id.*, Ex. 1 (Wagner Opening Report at ¶ 130)), then discusses each of the *Georgia-Pacific* factors and for each one, merely concludes that it would either suggest an unspecified "increase" or "decrease" in the royalty rate, or would have a "neutral" effect without explaining how much each factor affects the royalty rate; then, without explanation, he concludes that the final royalty rate should be over twice the baseline rate.  *See id.* (Wagner Opening Report at ¶ 296).  The Federal Circuit has unequivocally rejected this kind of "bare-bones *Georgia-Pacific* analysis."  *WhitServe*, 694 F.3d at 15-17 (Fed. Cir. 2012) (vacating jury's damages award where plaintiff's expert opined that a factor would either "increase" the royalty rate, "decrease" it, or have a "neutral" impact, but "did not explain how much each factor affected the rate").  Experts opining on the *Georgia-Pacific* factors must provide "some explanation of both why and *generally to what extent* the particular factor impacts the royalty calculation."  *Id*. at 15.  (emphasis added).  Where they fail to do so, their testimony is unreliable.  *See id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (an opinion "connected to existing data only by the *ipse dixit* of the expert" may be "too great an analytical gap" and warrant exclusion).  Mr. Wagner's testimony on a royalty rate should be excluded as arbitrary, that is, not "based on sufficient facts or data" under Rule 702.

## CONCLUSION

Any one of these errors independently renders Mr. Wagner's damages analysis unreliable and unhelpful to the jury.  His opinions and testimony should be excluded under Rule 702.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Karen Jacobs (#2881)
Michael Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Xilinx, Inc.*

OF COUNSEL:

Patrick T. Michael
David L. Wallach
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94140
(415) 626-3939

William C. Rooklidge
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA 92612-4408
(949) 553-7501

David B. Cochran
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(216) 586-7029

Laurie M. Charrington
Joe C. Liu
Kathleen D. Lynott
JONES DAY
Silicon Valley Office
1755 Embarcadero Road
Palo Alto, CA  94303
(650) 739-3939

November 20, 2013
7785735.4