**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **INTELLECTUAL VENTURES I LLC** *et al.*,<br><br>            **Plaintiffs,**<br><br>   **v.**<br><br>**ALTERA CORPORATION** *et al.*,<br><br>            **Defendants.** | **Civil Action No. 10-1065-LPS**<br><br><br>**<u>FILED UNDER SEAL</u>** |

<u>**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO XILINX'S *DAUBERT*
MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF IV'S DAMAGES
EXPERT MICHAEL J. WAGNER**</u>

Brian E. Farnan (Bar No. 4089)
FARNAN LLP
919 North Market Street
12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com

*Counsel for Plaintiffs
Intellectual Ventures I LLC and
Intellectual Ventures II LLC*

John M. Desmarais (admitted *pro hac vice*)
Michael P. Stadnick (admitted *pro hac vice*)
Justin P.D. Wilcox (admitted *pro hac vice*)
Ameet A. Modi (admitted *pro hac vice*)
Laurie N. Stempler (admitted *pro hac vice*)
Kevin K. McNish (admitted *pro hac vice*)
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400
(212) 351-3401
jdesmarais@desmaraisllp.com
mstadnick@desmaraisllp.com
jwilcox@desmaraisllp.com
amodi@desmaraisllp.com
lstempler@desmaraisllp.com
kmcnish@desmaraisllp.com

Dated:  December 20, 2013

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................................. i

I.      NATURE AND STAGE OF PROCEEDINGS ................................................................ 1

II.     SUMMARY OF ARGUMENT ........................................................................................ 1

III.    FACTUAL BACKGROUND ........................................................................................... 3

IV.     LEGAL STANDARDS .................................................................................................... 4

V.      ARGUMENT .................................................................................................................... 6

        A.      Mr. Wagner Considered All Relevant Evidence And Concluded
                That An Established Royalty Does Not Exist In This Case ....................... 6

        B.      Mr. Wagner's Hypothetical Negotiation Analysis Is Reliable And
                Sound. ...................................................................................................... 9

        C.      Mr. Wagner Proposes A Reasonable Royalty That Is Already
                Properly Apportioned To Account For The Value Of The Patents-
                In-Suit. .................................................................................................... 15

        D.      Mr. Wagner's Use Of The *Georgia-Pacific* Factors To Arrive At
                His Proposed Reasonable Royalty Is Reliable And Consistent With
                Court Precedent ....................................................................................... 17

VI.     CONCLUSION ............................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*,
No. 09-598-LPS, 2011 WL 4351600 (D. Del. Sept. 16, 2011) .................................. 7, 11

*Cornell Univ. v. Hewlett-Packard Co.*,
609 F. Supp. 2d 279 (N.D.N.Y. 2009) ................................................................. 19

*Fromson v. Western Litho Plat and Supply Co.*,
853 F.2d 1568 (Fed. Cir. 1988) ................................................................ 2, 12, 13

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ......................................................... 5, 14

*Heller v. Shaw Indus., Inc.*,
167 F.3d 146 (3d Cir. 1999) ................................................................ 7

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
378 F. Supp. 2d 459 (D. Del. 2005) ..................................................... 13

*i4i P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ............................................................ 4, 21

*ICU Med., Inc. v. RyMed Techs., Inc.*,
752 F. Supp. 2d 486 (D. Del. 2010) .................................................... 6

*In re Heckmann Corp. Securities Litig.*,
C.A. No. 10-378-LPS-MPT, 2013 WL 2456104 (D. Del. June 6, 2013) .......................... 6

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1996) ................................................................ 6, 7

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .......................................................... 3, 12, 19

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ......................................................... 4

*Masimo Corp.  v. Philips Elecs. N. Am. Corp.*,
C.A. No. 09-080, 2013 WL 2178047 (D. Del. May 20, 2013) ................................. 4, 21

*Masimo Corp. v. Philips Elecs. N. Am. Corp.*,
C.A. Nos. 09-080, 11-742, 2013 WL 1332606 (D. Del. Apr. 2, 2013) .................. 1, 11, 15

*Mobil Oil Corp. v. Amoco Chemicals Corp.*,
915 F. Supp. 1333 (D. Del. 1995) ....................................................... 11, 12

*Network Protection Services v. Fortinet*,
No. C-12-01106-WHA, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013) ................... 19, 20

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
  575 F.2d 1152 (6th Cir. 1978) ...................................................................... 10, 11

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
  989 F. Supp. 547 (D. Del. 1997) ........................................................................ 13

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ............................................................................ 17

*Rude v. Westcott*,
  130 U.S. 152 (1889) .............................................................................................. 9

*Sandcastle Realty, Inc. v. Castagna*,
  No. 921-S, 2006 WL 2521437 (Del. Ch. Aug. 16, 2006) ..................................... 8

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
  289 U.S. 689 (1933) ............................................................................................ 13

*Southern Track and Pump, Inc. v. Terex Corp.*,
  852 F. Supp. 2d 456 (D. Del. 2012) .................................................................. 3, 6

*Spectralytics, Inc. v. Cordis Corp.*,
  649 F.3d 1336 (Fed. Cir. 2011) .......................................................................... 16

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*,
  C.A. No. 03-241, 2004 WL 2213562 (D. Del. Sept. 28, 2004.) ............... 2, 13, 14

*Stickle v. Heublein, Inc.*,
  716 F.2d 1550 (Fed. Cir. 1983) .......................................................................... 10

*Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*,
  872 F.2d 978 (Fed. Cir. 1989) .............................................................................. 9

*TVM Mfg. Co. v. Dura Corp.*,
  789 F.2d 895 (Fed. Cir. 1986) ...................................................................... 10, 13

*Whitserv, LLC v. Computer Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ......................................................................... 20, 21

*Withrow v. Spears*,
  C.A. No. 12-06-LPS-CJB, 2013 WL 4510305 (D. Del. Aug. 22, 2013) ............... 6

## <u>Rules</u>

Fed. R. Evid. 702 .......................................................................................................... 5

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "Plaintiffs" or "IV") respectfully request that the Court deny Xilinx's *Daubert* Motion to Exclude the Opinions and Testimony of IV's Damages Expert Michael J. Wagner.

## I.      NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed this patent infringement action in December 2010 against Altera Corporation ("Altera"), Lattice Semiconductor Corporation ("Lattice"), and Microsemi Corporation ("Microsemi") and added claims in February 2011 against Xilinx, Inc. ("Xilinx"). Only Xilinx remains as a defendant.  The parties exchanged opening expert reports on June 26, 2013, rebuttal reports on August 9, 2013, and reply reports on September 6, 2013.  Expert discovery closed October 25, 2013.  A 10-day jury trial is scheduled to begin on May 12, 2014.

## II.     SUMMARY OF ARGUMENT

1.      First, sound grounds exist for Mr. Wagner's opinion that damages for Xilinx's infringement are not constrained by an established royalty. ███████████████████ ███████████████████████████████████████████████ Contrary to Xilinx's assertion, Mr. Wagner fully considered those agreements, as well as Xilinx's previous business relationship with IV and ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ as Xilinx's own damages expert has conceded.  Xilinx's contention that Mr. Wagner failed to consider an established royalty therefore lacks merit, amounts to nothing more than a disagreement with his conclusion, and provides no basis for excluding his testimony.  *Masimo Corp. v. Philips Elecs. N. Am. Corp.*, C.A. Nos. 09-080, 11-742, 2013 WL 1332606, at *38, *40 (D. Del. Apr. 2, 2013).

2.      Second, Xilinx's criticisms of Mr. Wagner's reasonable royalty damages analysis based on a hypothetical negotiation model simply amount to a disagreement with his conclusions

regarding (1) the dates and parties to the hypothetical negotiations, (2) the royalty structure of the license resulting from the hypothetical negotiation, (3) the weight properly afforded to the purchase prices of the patents-in-suit, and (4) the weight properly afforded to license agreements for the patents-in-suit.  None of those disagreements justify exclusion of his testimony.  Mr. Wagner properly used the earliest date of infringement for the hypothetical negotiation.  In addition, he correctly applied the judicially-created authority commonly referred to as the "Book of Wisdom," which permitted him to consider facts and events dated after the hypothetical negotiation to draw conclusions about the value of the license and to conclude that IV was the correct party from whose perspective the licensor's interests should be gauged.  *See Fromson v. Western Litho Plat and Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988); *St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, C.A. No. 03-241, 2004 WL 2213562, at *2 (D. Del. Sept. 28, 2004.)  Mr. Wagner's application of a running royalty, as opposed to a lump sum royalty, is well-grounded in the evidence and in Mr. Wagner's own expertise regarding the benefits of a running royalty structure.  Moreover, Mr. Wagner fully and properly considered the purchase transactions for the patents-in-suit and concluded that the underlying agreements are not relevant to, let alone dispositive of, a reasonable royalty damages analysis because no evidence exists as to how the transacting parties actually valued the patents-in-suit.  Finally, Mr. Wagner also reasonably weighed ██████████████████████████████████████████████ ████████ which specifically reference the patents-in-suit as the most comparable real-world licenses to inform a damages analysis.  Xilinx may disagree with the conclusions that Mr. Wagner has drawn and the weight that Mr. Wagner placed on certain evidence, but those disagreements do not constitute a basis for excluding Mr. Wagner's testimony.  *Southern Track and Pump, Inc. v. Terex Corp.*, 852 F. Supp. 2d 456, 469 (D. Del. 2012).

3.      Third, Mr. Wagner properly apportioned the value of the patents-in-suit to the

accused products in performing his analysis of reasonable royalty damages.  As an initial matter,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████        Contrary to Xilinx's assertions, Mr. Wagner did not apply the entire

market value rule in calculating his royalty base for his reasonable royalty.  Aside from

apportioning the value of the patents-in-suit using the ████████████████        Mr. Wagner

calculated the royalty base using the smallest saleable patent-practicing unit.  *LaserDynamics,*

*Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).  While the smallest saleable unit

happens to be the entire accused semiconductor device, that fact does not place Mr. Wagner's

analysis in conflict with governing substantive law or the *Daubert* standard.

4.      Finally, Mr. Wagner conducted a thorough analysis of each *Georgia-Pacific*

factor to arrive at a proposed royalty rate for his damages analysis.  Xilinx alleges that Mr.

Wagner's analysis is deficient for failing to quantify the impact that each factor has on his

proposed rate.  But Mr. Wagner's evaluation of each *Georgia-Pacific* factor, his discussion of

each factor's impact, and his conclusions regarding a royalty rate meet the standards required by

law, and his methodology has been approved by both this Court and the Federal Circuit.  *Masimo*

*Corp.  v. Philips Elecs. N. Am. Corp.*, C.A. No. 09-080, 2013 WL 2178047, at *24 (D. Del. May

20, 2013); *i4i P'ship v. Microsoft Corp.*, 598 F.3d 831, 857-58 (Fed. Cir. 2010).

## III.     FACTUAL BACKGROUND

IV seeks damages in the form of a reasonable royalty as compensation for Xilinx's

infringement of the patents-in-suit.  (D.I. 1 at 9; D.I. 17 at 13; D.I. 477 Ex. 4 at 3.)  IV's

3

economic expert, Michael Wagner, submitted an opening report June 25, 2013.  Consistent with controlling authority, Mr. Wagner opined that IV is entitled to damages in the form of a reasonable royalty, as determined by the hypothetical negotiation that would have taken place between a willing licensee and a willing licensor.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  (Ex. A.1, ¶¶ 84-105.)[1]  Mr. Wagner first determined a baseline royalty using ██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████.  (*See, e.g.*, D.I. 476 Ex. 5 at IV-ALT00249548-50, IV-ALT00249555, Ex. 6 at IV-ALT00303817, IV-ALT00303819-20, IV-ALT00303823; *see also* Ex. A.1 ¶ 105.)[2]

Mr. Wagner then conducted an analysis of the fifteen *Georgia-Pacific* factors, *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), to adjust his baseline royalty rate for differences ██████████████████████████████ (Ex. A.1 ¶¶ 104-132.)  Finally, Mr. Wagner applied the resulting royalty rate to sales of the accused Xilinx products to arrive at a final damages figure.  (Ex. A.1 ¶ 300, Fig. 31.)

## IV.   LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the

---

[1] Unless otherwise noted, all exhibits are attached to the Declaration of Laurie Stempler, Esq., filed herewith.

[2] ███████████████████████████████████████████████████ ██████████████████████████████ *See, e.g.*, D.I. 476 Ex. 5 at IV-ALT00249548, Ex. 6 at IV-ALT00303817.)

> testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The court acts as a gatekeeper to ensure that expert testimony is relevant and reliable.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *ICU Med., Inc. v. RyMed Techs., Inc.*, 752 F. Supp. 2d 486, 495 (D. Del. 2010).

Courts must evaluate proposed expert testimony under Federal Rule of Evidence 104(a) and determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.  The party offering the expert testimony bears the burden of proving that the testimony is admissible, *Withrow v. Spears*, C.A. No. 12-06-LPS-CJB, 2013 WL 4510305, at *5 (D. Del. Aug. 22, 2013), and, pursuant to Rule 104(a), must establish that the testimony is reliable by a preponderance of the evidence.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1996).

The Federal Rules of Evidence favor admissibility.  *In re Heckmann Corp. Securities Litig.*, C.A. No. 10-378-LPS-MPT, 2013 WL 2456104, at *5 (D. Del. June 6, 2013).  "The exclusion of important evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Southern Track and Pump*, 852 F. Supp. 2d at 462-63 (quoting *Paoli*, 35 F.3d at 791-92 (internal quotation marks omitted)).  Issues of weight and credibility are for the factfinder and are not grounds for excluding testimony. *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, No. 09-598-LPS, 2011 WL 4351600, at *1, *3 (D. Del. Sept. 16, 2011).  "[E]ven if the judge believes 'there are better grounds for some alternative conclusion,' and that there are some flaws in the scientist's methods, if there are 'good grounds' for the expert's conclusion, it should

be admitted." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152-53 (3d Cir. 1999) (quoting *Paoli* , 35 F.3d at 744).

## V.    ARGUMENT

### A. Mr. Wagner Considered All Relevant Evidence And Concluded That An Established Royalty Does Not Exist In This Case.

Xilinx contends that its broad business agreements with IV establish a royalty rate for the patents-in-suit.  (D.I. 471 at 7.)  In particular, Xilinx cites ████████████████

██████████████████████████████████████████████████████

████████████████████████████████ (*Id.* at 4-5; D.I. 476 Exs. 7 & 8.)  Xilinx argues that ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

(Dkt. 471 at 5.)  Xilinx further contends that Mr. Wagner allegedly erred by deeming those agreements to be irrelevant.  (*Id.* at 4.)

As an initial matter, Mr. Wagner fully considered and analyzed Xilinx's previous relationship with IV.  (*See, e.g.*, Ex. A.1 ¶¶ 54-58.)  From his analysis, Mr. Wagner concluded that an established royalty does not exist here.  (*Id.* ¶¶ 154-155.)  ***Notably, Xilinx's own damages expert, Julie Davis, agrees with Mr. Wagner.***  (Ex. B at 402:23-403:11.)

That consensus is justified:  an established royalty cannot exist when the parties never negotiated or agreed on licensing terms for the patents-in-suit.  ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███ *See, e.g.*, D.I. 476 Ex. 7 at IV-ALT00014492-96, Ex. 8 at IV-ALT00026177-81.)  ████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████   *See, e.g.*, Ex. C at IV-ALT00170324, -326; Ex. D at

71:11-73:13.)  Under basic principles of contract law, Xilinx and IV never had a "meeting of the

minds"—they never ***agreed*** on a royalty, let alone an established royalty, for any of the patents-

in-suit.  *Sandcastle Realty, Inc. v. Castagna*, No. 921-S, 2006 WL 2521437, at *2 (holding that

without an acceptance of an offer, "[t]here was never a 'meeting of the minds' and, thus, there

was never a contract") (Del. Ch. Aug. 16, 2006).

Moreover, even if Xilinx and IV had agreed on a royalty rate in ████████████████

████████████  which they did not, ███████████████████████████  as a whole do not

meet the requirements for an established royalty.  A royalty qualifies as an established royalty

when (1) it was agreed before infringement; (2) it was paid by enough persons, or by an

exclusive licensee that makes sufficient sales, to constitute "general acquiescence in its

reasonableness"; (3) it was not negotiated under the threat of suit or in a settlement context; and

(4) it paid for comparable rights of activity.  *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*,

872 F.2d 978, 993 (Fed. Cir. 1989), *overruled on other grounds by A.C. Aukerman Co. v. R.L.*

*Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992); *see also Rude v. Westcott*, 130 U.S. 152,

165 (1889).  ████████████████████  lack at least three of those factors.

For example, ██████████████████████████████████████████████

█████████████  (Dkt. 476 Exs. 7 & 8.)  But the date of the hypothetical negotiation is

January 1, 2006, ████████████████████████████████████  (Ex. A.1 ¶ 88.)  In

addition, Xilinx has offered no evidence that the putatively "established" royalty was paid by a

sufficient number of persons to indicate general acquiescence.  *Sun Studs*, 872 F.2d at 993.

Finally, ███████████████████████████████████████  (*see, e.g.*, Ex. E at 82:19-

85:5, 87:11-88:7, 90:25-91:14); ██████████████████████████████

████████████ Dkt. 476 Exs. 7 & 8.)  Thus, the Xilinx agreements do not cover comparable

activity.

 Xilinx cites *Seymour v. McCormick* to support its theory that ████████████

████████ demonstrate an established royalty.  But unlike the defendants in *Seymour*, ████

█████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████ Dkt. 475

Ex. 10 at IV-ALT00014496, Ex. 11 at IV-ALT00026174.)

 Moreover, Xilinx cannot now, ████████████████████████

████████ seek to cap its damages exposure.  *See Panduit Corp. v. Stahlin Bros. Fibre*

*Works, Inc.*, 575 F.2d 1152, 1158-59 (6th Cir. 1978).  In *Panduit*, the Sixth Circuit identified

four actions that an accused infringer can take:

> (1) it can make and sell a non-infringing substitute product, and refrain from making, using, or selling a product incorporating the patented invention; (2) it can make and sell the patented product, if the patent owner be willing, negotiating a license and paying a reasonable (negotiated) royalty; (3) it can simply take the invention, running the risk that litigation will ensue and that the patent will be found valid and infringed, or (4) it can take a license under option (2) and thereafter repudiate its contract, challenging the validity of the patent.

*Id.* at 1158-59.  The *Panduit* court identified a combination of the above options that it found

impermissible:  "Determination of a reasonable royalty, after election of option (3), cannot,

without injustice, be treated as though the infringer had elected option (2) in the first place."  *Id.*

at 1159.  The Federal Circuit has since endorsed that sound reasoning.  *See, e.g.*, *TVM Mfg. Co.*

*v. Dura Corp.*, 789 F.2d 895, 900 (Fed. Cir. 1986) (citing *Panduit* and rejecting accused

infringer's argument that patentee would have agreed to a lesser royalty because that "would be to pretend that the infringement never happened"); *see also Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed. Cir. 1983) (rejecting accused infringer's argument that it should not pay more for a license than it would have paid to purchase the product and citing *Panduit* for the proposition that the accused infringer cannot be in a "heads-I-win, tails-you-lose" situation).

As Mr. Wagner explains, Xilinx's behavior here fits the pattern that the *Panduit* court properly adjudged inequitable:   Xilinx chose option (3) by continuing to use the patented technology and risking litigation.  Xilinx cannot now proceed as if it had chosen option (2).[3]

Ultimately, Xilinx's criticisms of Mr. Wagner's damages conclusions amount to nothing more than a disagreement with his conclusion that an established royalty does not exist here. But disagreement with an expert's conclusion, as opposed to his methodology, is not grounds for excluding expert testimony, *Masimo*, 2013 WL 1332606, at *38; *Ateliers*, 2011 WL 4351600, at *1, *3, particularly when *Xilinx's own damages expert agreed with Mr. Wagner that there is no established royalty under the facts here*.  (Ex. B at 402:23-403:11.)  Xilinx's motion to exclude Mr. Wagner's opinions should therefore be denied.

### B.  Mr. Wagner's Hypothetical Negotiation Analysis Is Reliable And Sound.

Legal and factual support exists for Mr. Wagner's analysis concerning each point of contention that Xilinx raises in its opening brief.  Indeed, Xilinx's own expert *agrees* with Mr. Wagner on several issues that Xilinx now contends are grounds for excluding his testimony.

### 1.   Mr. Wagner's Proposed Date And Parties To The Hypothetical Negotiation Are Legally And Factually Sound.

---

[3] Xilinx wrongly contends that this Court rejected that argument in *Mobil Oil*.  In *Mobil Oil*, this Court explained that defendant Amoco did not risk using the invention and then seek to be treated as if it had negotiated a license.  Instead, Amoco took a license but later challenged the patents, falling into the fourth category that the *Panduit* court described.  *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1348-49 (D. Del. 1995).

Contrary to Xilinx's assertions, Mr. Wagner did not use the wrong parties or dates in his hypothetical negotiation analysis.  With respect to the date of the hypothetical negotiation, Mr. Wagner examined the earliest sale dates of the products that IV has accused of infringing the patents-in-suit.  (Ex. A.1 ¶ 88.)  In particular, the earliest sold product accused of infringing the '087 and '669 patents was the Virtex 4 FX, and the date of first infringement for those patents is January 31, 2006, the issue date of the '669 patent.  (Ex. F at 8; Ex. A.1 ¶ 43, Tab 3, Sched. 7.2.)  The Virtex 5 LX/LXT is the earliest sold product accused of infringing the '646 and '325 patents.  The first on-sale date of the Virtex 5 LX/LXT is April 1, 2006.  (Ex. G Exhibit 5, Scheds. B.1, B.2, D.1, D.2.)

Based on those undisputed facts, Mr. Wagner concluded that infringement began no later than January 31, 2006.  (Ex. A.1 ¶ 88.)  Such use of a single date is acceptable under the law.  *LaserDynamics*, 694 F.3d at 76 ("It also makes sense that in each case there should be only a single hypothetical negotiation date . . . ."); *Mobil Oil*, 915 F. Supp. 1333, 1353 (D. Del. 1994).  And, in any event, both parties' experts in this case agree that the differences in their proposed hypothetical negotiation dates—at most 4 months—do not impact the ultimate damages calculations.  (*See, e.g.*, Ex. H at 275:24-276:5; Ex. A.2 Fig. 1; Ex. B at 472:10-474:4.)

As for the parties to the hypothetical negotiation, Mr. Wagner properly concluded that IV, as the real party in interest, would be present at the hypothetical negotiation as the real licensor.  (*See, e.g.*, Ex. H at 231:14-22, 267:14-18.)  Applying the established "Book of Wisdom" analysis, *Fromson*, 853 F.2d at 1575, thereby taking into consideration subsequent facts and events that relate to the value of the license at the hypothetical negotiation, Mr. Wagner reasoned that the original owners of the '087, '325, and '646 patents would have negotiated a license on behalf of IV.  (Ex. A.2 ¶ 41.)  Mr. Wagner was justified in assuming that

10

IV would be the hypothetical licensor.  After all, the Book of Wisdom permits Mr. Wagner to assume that the original owners would have been aware of IV's eventual ownership of the patents-in-suit.  *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933); *Fromson*, 853 F.2d at 1575; *St. Clair*, 2004 WL 2213562, at *2.

Xilinx complains that Mr. Wagner has applied the Book of Wisdom too broadly, but flexible application of the Book of Wisdom is central to the hypothetical negotiation analysis. *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465 (D. Del. 2005) (citing *Fromson*, 853 F.2d at 1575); *see also TVM*, 789 F.2d at 900; *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 606 (D. Del. 1997).  Indeed, the Book of Wisdom "prevents the hypothetical negotiation method from determining a reasonable royalty at a point in time before the patent has proven its worth." *Honeywell*, 378 F. Supp. 2d at 465. Notably, the viability of Xilinx's own damages theories depend on a liberal application of the Book of Wisdom.  For example, Ms. Davis relies heavily on the Patent Purchase Agreements governing the sale of the patents-in-suit from their original owners to IV (the "PPAs"), even though most of those PPAs were executed ***after*** the date Ms. Davis posits for the hypothetical negotiation.  (Ex. G at 53, 55-58; D.I. 477, Exs. 6, 7.)[4]

Mr. Wagner analyzed the date and parties to the hypothetical negotiation in accordance with the law.  Indeed, this Court has previously approved Mr. Wagner's consideration of facts

---

[4] Notably, Mr. Wagner's assumption that IV would be at the hypothetical negotiation table results in a conservative estimate of damages.  Among the factors that courts consider when analyzing a reasonable royalty using a hypothetical negotiation framework is "[t]he commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter." *Georgia-Pacific*, 318 F. Supp. at 1120.  When the licensor and licensee to the hypothetical negotiation are competitors, the reasonable royalty is likely to increase.  For example, had Cypress been at the hypothetical negotiation with Xilinx, Cypress would have demanded a higher royalty rate because Xilinx is Cypress's very successful competitor.  (Ex. H at 73:6-74:3.)

and events dated after the hypothetical negotiation in determining reasonable royalty damages. *St. Clair*, 2004 WL 2213562, at *2-*3.  In *St. Clair*, the defendants moved to exclude Mr. Wagner's testimony on the grounds that he gave too much weight to events subsequent to the hypothetical negotiation.  *Id.* at *3.  This Court denied the motion, reasoning that Mr. Wagner's analysis comported with both the Supreme Court's and the Federal Circuit's articulation of the Book of Wisdom:

> Due to the lack of evidence of the value of the inventions in April, 1995, Mr. Wagner uses evidence of subsequent events as a basis from which to infer what the pre-infringement negotiated value of a license would have been.  The Court finds this aspect of his methodology is based upon sufficient facts or data and thus, satisfies the requirements of the first prong of Rule 702.

*Id.* at *3; *see also id.* at *2.  Here, as in *St. Clair*, no evidence exists as to the patent owners' subjective valuation of the patents-in-suit at the time of the hypothetical negotiation.  Mr. Wagner therefore permissibly relied on subsequent events, ███████████████████████ ███████nd the fact that IV would be the real party in interest to the hypothetical negotiation, to inform the hypothetical negotiation.

### 2. Mr. Wagner's Application Of A Running Royalty Is Based On Sufficient Facts And Data.

Xilinx contends that Mr. Wagner also erred in opining that the parties would have agreed to a running royalty structure.  Contrary to Xilinx's characterization of Mr. Wagner's opinion, Mr. Wagner relies on more than the amicus brief cited in his opening report to conclude that the hypothetical negotiation would result in a running royalty-bearing license—he relies on his knowledge of the benefits associated with a running royalty.  For example, a running royalty ties the agreed-upon price to the use of the invention.  (Ex. H at 248:18-24.)

███████████████████████████████████████████████████

(Ex. A.1 ¶ 104; Ex. A.2 ¶ 13.)  And while Mr. Wagner acknowledges that lump sum agreements

have benefits, he explains that many of those benefits—including ease of administration and

protection of private sales data—are not relevant in the context of the hypothetical negotiation.

(Ex. H at 249:17-250:4.)  While Xilinx may not agree with Mr. Wagner's decision to structure

the hypothetical license as a running royalty payment structure, that does not justify excluding

his opinions. *Masimo*, 2013 WL 1332606, at*38.

### 3.   Mr. Wagner Considered The Patent Purchase Agreements And Properly Concluded That They Are Not Helpful To Determination Of A Reasonable Royalty In This Case.

Xilinx's contention that Mr. Wagner failed to consider the purchase prices of the

patents-in-suit again mischaracterizes Mr. Wagner's analysis.  (D.I. 471 at 14.)  Mr. Wagner

fully considered the PPAs.  (*See, e.g.*, Ex. A.1 ¶¶ 133-153, 156-158.)  In fact, Mr. Wagner does

not dispute that the purchase price of a patent can be relevant to the determination of a

reasonable royalty.  (Ex. H at 233:8-18).  But based on the facts of this case, Mr. Wagner

properly concluded that the purchase prices are not highly probative to the result of a

hypothetical license negotiation.  (Ex. A.1 ¶¶ 145-153, 156-158.)

For example, Mr. Wagner explains that the purchase prices of the patents-in-suit do not

constitute legitimate proxies for the value that the patent sellers attributed to the patented

technology at the time of the sales because no evidence exists of the subjective worth that they

placed on the patents-in-suit at the time of the underlying transactions, let alone of a correlation

between any such subjective valuation and the actual intrinsic value of the patented inventions.

(*See, e.g.*, Ex. A.1 ¶ 153; Ex. H at 233:8-18; Ex. B at 150:3-151:16, 224:3-11, 229:9-20,

355:14-356:1, 436:2-437:6.)  Given the illiquid market for patents, Mr. Wagner reasonably

concluded that the purchase prices actually accepted by the original owners of the patents-in-

suit are not a reliable indication of their value.  *See Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d

1336, 1347 (Fed. Cir. 2011) (finding that jury could have reasonably concluded that patentee's

earlier sale of assets had little relevance to the reasonable royalty resulting from a hypothetical

negotiation).  Xilinx may not agree with Mr. Wagner's decision to attribute minimum

significance to the PPAs as evidence of the reasonable royalty that the parties to the

hypothetical negotiation would have reached, but that disagreement simply presents a factual

issue for the jury to resolve.



    **4.  Mr. Wagner's Use Of ▮▮▮▮▮▮ To Determine A Baseline Royalty Rate Is Appropriate Because They Are The Most Comparable Licenses To The Hypothetical License And They Are The Best Evidence Of What The Parties To The Hypothetical Negotiation Would Have Agreed.**

Finally, Xilinx finds fault with Mr. Wagner's use of ▮▮▮▮▮▮▮▮▮ as

data for establishing a baseline royalty rate from which he derives his reasonable royalty

damages conclusions.  But Mr. Wagner relies on ▮▮▮▮ because they are the best evidence of

what would have occurred at a hypothetical negotiation between IV and Xilinx concerning a

license to the patents-in-suit.  (Ex. A.1 ¶¶ 104-105; Ex. H at 291:11-292:11, 298:16-299:17.)

As Mr. Wagner explains, IV, a ▮▮▮▮▮▮ would be the licensor at the

hypothetical negotiation.  The patents-in-suit, the only patents to be licensed in the hypothetical

negotiation, are likewise ▮▮▮▮▮▮▮▮▮.  (*See, e.g.*, D.I.

476 Ex. 5 at IV-ALT00249548-50, IV-ALT00249555, Ex. 6 at IV-ALT00303817, IV-

ALT00303819-20, IV-ALT00303823.)  Moreover, the same type of  products are at issue▮

▮▮▮▮ the hypothetical negotiation.  (D.I. 476 Ex. 5 at IV-ALT00249547, Ex. 6 at

IV-ALT00303818.)  Accordingly, this case presents a situation where real-world agreements,

▮▮▮▮▮, are the most reliable evidence for determining a baseline rate.  *See*

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010).

To the extent that some differences exist between ▮▮▮ and a hypothetical license,

Mr. Wagner accounts for those differences both in his determination of a baseline rate and in his

*Georgia-Pacific* analysis.  For example, Mr. Wagner takes into account the facts that (1) the



(4) the required

assumption of validity and infringement, required for the hypothetical negotiation,

(*See, e.g., id.* ¶¶ 84, 132; Ex. I at 26:11-

23; D.I. 476 Ex. 5 at IV-ALT00249551-52, IV-ALT00249, Ex. 6 at IV-ALT00303824, IV-

ALT00303827.)

### C.  Mr. Wagner Proposes A Reasonable Royalty That Is Already Properly Apportioned To Account For The Value Of The Patents-In-Suit.

Xilinx alleges that Mr. Wagner's royalty base improperly applies the entire market value

rule and neglects to apportion the value of the patented technology.  (Dkt. 471 at 16.)  But Mr.

Wagner does not apply the entire market value rule at all.  Moreover, in determining his

baseline royalty rate, he performs a two-step apportionment process to properly account for the

value that the patents-in-suit contribute to the accused products.

Mr. Wagner does not apply the entire market value for at least two reasons.  First, Mr.

Wagner apportions his reasonable royalty—not once, but twice—to account for the value that

the patents-in-suit contribute to the accused products.                already reflect actual, real-

world apportionment of the value of the patented technology to FPGAs

(D.I. 476 Ex. 5 at IV-ALT00249555, Ex. 6 at IV-

ALT00303828; Ex. A.2 ¶ 31; Ex. H at 238:9-18.)

15

███████████████████████████████████████

████████   (Ex. H at 284:14-285:21, 289:13-24, 291:11-292:8.)

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

████████████████████   (Ex. H at 330:13-332:6.)  Mr. Wagner applied this investor-approved

analysis and concluded that each of the patents-in-suit accounted for 0.44 percent of the agreed

upon rate.  (Ex. A.1 ¶¶ 123-130.)

The second reason that Mr. Wagner does not apply the entire market value rule is that he

calculates the royalty base using sales of the smallest salable patent-practicing units—in this

case, the accused products.  (Ex. A.2 ¶ 30; Ex. H at 238:9-239:22.)  The technology of the

patents-in-suit is fundamental to the operation of the accused products as a whole.  It is

impossible to isolate a smaller patent-practicing component.  (*See, e.g.*, Ex. J ¶ 27; Ex. A.2

¶¶ 27, 30; *see also* Ex. K at 202:5-202:10.)  In fact, other leading companies in the FPGA

industry acknowledge that no meaningful way exists to further partition value to features of the

products at issue here.  (Ex. L at 172:15-173:11 (noting that determining the value of individual

features is "not practical").)

Sales revenue for a smallest salable unit present a permissible basis for calculating the

royalty base for a reasonable royalty damages analysis:  "[I]t is generally required that royalties

be based not on the entire product, but instead on the smallest salable patent-practicing unit."

16

*LaserDynamics*, 694 F.3d at 67 (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)) (internal quotation marks omitted).  In *LaserDynamics*, the Federal Circuit found that the plaintiff's expert improperly used the entire market value rule by calculating the royalty base using sales of laptops (which the defendant actually sold) rather than optical disk drives (the smallest salable patent-practicing unit).  *LaserDynamics*, 694 F.3d at 68-69.  No such defect exists here.  And, as explained above, no data exists that would allow Mr. Wagner to ascertain the sales of patent-practicing units smaller than the accused products.

Xilinx cites *Network Protection Services v. Fortinet*, No. C-12-01106-WHA, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013), for the proposition that even when the royalty base is comprised of sales of the smallest saleable unit, the patented feature must drive the demand for the product.  But *Network Protection Services* is not controlling law in this Court.  More importantly, the technology in *Network Protection Services* involved hardware that was sold with, but distinct from, the accused software.  *Network Protection*, 2013 WL 5402089, at *6. That is not the case here, where the patented technology is found throughout the accused products and cannot be separated from the accused products and sold separately.  (Ex. J ¶ 27.)

### D.  Mr. Wagner's Use Of The *Georgia-Pacific* Factors To Arrive At His Proposed Reasonable Royalty Is Reliable And Consistent With Court Precedent.

After determining a baseline royalty rate through reference to the most comparative real-world licenses, Mr. Wagner properly considered each factor under *Georgia-Pacific*, including the impact, if any, it had on his conclusion as to the proper measure of reasonable royalty damages.  Xilinx asserts that Mr. Wagner's *Georgia-Pacific* analysis is deficient because Mr. Wagner purportedly does not explain "how much each factor affects the royalty rate."  (D.I. 471 at 20.)  But Xilinx does not cite any support for the proposition that such a quantitative assessment is required.

17

Xilinx's reliance on *Whitserv, LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012), is misplaced.  In *Whitserv*, the expert merely stated that most of the *Georgia-Pacific* factors tended to increase his proposed rate, a few had a neutral impact, and none justified decreasing the rate.  *Whitserv*, 694 F.3d at 31.  In contrast, Mr. Wagner analyzes each factor at length before determining its impact, on a factor-by-factor basis, on the resulting royalty.  (*See, e.g.*, Ex. A.1 ¶¶ 154-295, Fig. 27.)  That analysis comports with the Federal Circuit's guidance that a *Georgia-Pacific* analysis must explain "both why and generally to what extent" each factor impacts the reasonable royalty.  *Whitserv*, 694 F.3d at 31.  Indeed, Mr. Wagner's own use of such methodology has been endorsed by both this Court and the Federal Circuit.  *Masimo*, 2013 WL 2178047, at *24; *i4i*, 598 F.3d at 857-58 (affirming damages award supported by Mr. Wagner's testimony and noting that "any reasonable royalty analysis necessarily involves an element of approximation, and uncertainty").

## VI.    CONCLUSION

For the foregoing reasons, IV respectfully requests that the Court deny Xilinx's *Daubert* Motion to Exclude the Opinions and Testimony of IV's Damages Expert Michael J. Wagner.

Dated:  December 20, 2013                    By:     Respectfully submitted,

                                             FARNAN LLP

                                             */s/ Brian E. Farnan*
                                             Brian E. Farnan (Bar No. 4089)
                                             919 North Market Street
                                             12th Floor
                                             Wilmington, DE 19801
                                             (302) 777-0300
                                             (302) 777-0301
                                             bfarnan@farnanlaw.com

                                             John M. Desmarais (admitted *pro hac vice*)
                                             Michael P. Stadnick (admitted *pro hac vice*)
                                             Justin P.D. Wilcox (admitted *pro hac vice*)
                                             Ameet A. Modi (admitted *pro hac vice*)
                                             Laurie N. Stempler (admitted *pro hac vice*)
                                             Kevin K. McNish (admitted *pro hac vice*)
                                             DESMARAIS LLP
                                             230 Park Avenue
                                             New York, NY 10169
                                             (212) 351-3400
                                             (212) 351-3401
                                             jdesmarais@desmaraisllp.com
                                             mstadnick@desmaraisllp.com
                                             jwilcox@desmaraisllp.com
                                             amodi@desmaraisllp.com
                                             lstempler@desmaraisllp.com
                                             kmcnish@desmaraisllp.com

                                             *Counsel for Plaintiffs*