# EXHIBIT A

1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -
    INTELLECTUAL VENTURES I LLC, and
4   INTELLECTUAL VENTURES II LLC,          :    CIVIL ACTION
                                           :
5             Plaintiffs,                   :
    v                                      :
6                                          :
    XILINX, INC.,                          :
7                                          :    NO. 10-1065 (LPS)
              Defendant.
8                              - - -

9                         Wilmington, Delaware
                         Friday, April 25, 2014
10                        *Pretrial Conference*

11                             - - -

12  BEFORE:        HONORABLE **LEONARD P. STARK**, U.S.D.C.J.

13  APPEARANCES:                 - - -

14
                FARNAN, LLP
15              BY:  BRIAN E. FARNAN, ESQ.

16                  and

17              DESMARAIS, LLP
                BY:  JOHN M. DESMARAIS, ESQ.,
18                   MICHAEL P. STADNICK, ESQ.,
                     AMEET A. MODI, ESQ., and
19                   LAURIE N. STEMPLER, ESQ.,
                     (New York, New York)
20
                         Counsel for Plaintiff
21

22

23

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

4

1  APPEARANCES:  (Continued)

2

3      MORRIS NICHOLS ARSHT & TUNNELL, LLP
4      BY:  KAREN JACOBS LOUDEN, ESQ., and
       MICHAEL J. FLYNN, ESQ.

5      and

6

7      JONES DAY, LLP
       BY:  WILLIAM C. ROOKLIDGE, ESQ.
           (Irvine, California)

8      and

9

10     JONES DAY, LLP
       BY:  THARAN GREGORY LANIER, ESQ.
           (Palo Alto, California)

11     and

12

13     JONES DAY, LLP
       BY:  JENNIFER L. SWIZE, ESQ.
           (Washington, District of Columbia)

14

       Counsel for Xilinx Inc.

15

16

17          - oOo -
18        P R O C E E D I N G S
19     (REPORTER'S NOTE:  The following pretrial
20  conference was held in open court, beginning at 10:01 a.m.)
21     THE COURT:  Good morning, everyone.
22        (The attorneys respond, "Good morning, Your
23  Honor.")
24
25     THE COURT:  We'll have you put your appearances

---

4

1  go through it pretty quickly.

2        My hope is to have you out of here by noon, so

3  I'm going to try to, as I say, move things pretty rapidly if

4  I can.

5        My agenda is that I'll hear briefly on the

6  motions in limine from both sides.  Then we'll go through

7  the pretrial order and try to cover the issues in dispute

8  there as well as the various miscellaneous issues that

9  appear at the end of the pretrial order and also the ones

10 that are sprinkled throughout the pretrial order.

11       I do want to talk briefly about whether I should

12 be redacting any portion of my opinion on Mr. Wagner's

13 testimony I still have pending in front of me.  And I

14 will provide an opportunity at the end for parties to raise

15 any other issues if I don't reach them.

16       Before we dive in, let me ask if there have been

17 any developments with respect to any of the many issues you

18 put in front of me, that I sort of suggested I'm going to

19 cover.  But if you already know you resolved everything or

20 anything, I wouldn't mind knowing.

21       MR. ROOKLIDGE:  Nothing we're aware of.

22       MR. STADNICK:  Nothing we're that aware of

23 either.

24       THE COURT:  All right.  Let's start with the

25 motions in limine.

---

3

1  on the record for us, please.

2        MR. FARNAN:  Good morning, Your Honor.

3        THE COURT:  Good morning.

4        MR. FARNAN:  Brian Farnan on behalf of the

5  plaintiffs.  With me today is Michael Stadnick.

6        MR. STADNICK:  Good morning.

7        MR. FARNAN:  Lauren Stempler.

8        MS. STEMPLER:  Good morning.

9        MR. FARNAN:  Ameet Modi.

10       MR. MODI:  Good morning.

11       MR. FARNAN:  And John Desmarais.

12       MR. DESMARAIS:  (Nodding "hello.)

13       MR. FARNAN:  All from Desmarais, LLP in New York

14 City.

15       THE COURT:  Thank you.  Welcome to all of you.

16       MS. JACOBS:  Good morning, Your Honor.  For the

17 defendant, Xilinx, Karen Jacobs and Michael Flynn from

18 Morris Nichols.  Here at counsel table are William

19 Rooklidge, William Lanier, and Jennifer Swize from Jones

20 Day.

21       (Jones Day counsel nod "greetings.")

22       THE COURT:  Welcome to all of you as well.  Good

23 morning again.  We're here for a pretrial conference for a

24 trial set to begin in the middle of May, on May 12th.  I

25 have a pretty extensive agenda but I hope to

---

5

1        First, IV's first motion in limine.  Let me have

2  whoever from IV wants to address this.  And this is the one

3  that we agreed "no patent troll," in quotes.  And let me

4  tell I want to grant this motion but my concern is that as

5  soon as you put on the witness from IV that starts to tell

6  what IV is, what its business model is, and he suggests we

7  promote innovation, things like that, I think that opens the

8  door up to everything other than something that is clearly

9  derogatory or per jog tiff such as patent troll.  So tell me

10 if you do intend to try to tell the jury something about who

11 you are and what you do.

12       MR. STADNICK:  We certainly intend to inform the

13 jury who IV is and generally what our business model is.

14 We don't intend to go with a big rah-rah story about how we

15 promote invention and our driving force for the patent

16 system, and our spurring innovation across the country or

17 anything over the top like that.  That we think would fairly

18 open the door to the types of attacks that we're trying to

19 exclude from motion in limine.

20       Certainly, as we now agree, no reference to IV

21 as a troll but then likewise any other description of IV

22 that doesn't use literally the word "troll" but essentially

23 says the same thing.  And there are some examples of that,

24 if you look at the exhibits on.

25       THE COURT:  First of all, why do you have to

6

1  tell the jury anything other than we own the patent?  I know
2  we'll talk about the standing, but let's just say something
3  to the effect we own the patents or we're just incorporated
4  and we believe they're infringed and valid.  Why does the
5  jury have to hear anything else about who IV is?
6          MR. STADNICK:  I think there are two reasons.
7          First of all, our preference would be to give
8  the jury a little bit of flavor who IV is and where they
9  came from just so that our client has a face for the jury.
10         But, secondly, some of the issues relating to
11 damages in the case are going to involve the agreements
12 between IV on the one hand and Xilinx on the other hand.
13 And I think the jury is going to have a tough time
14 understanding what those agreements are, why they exist
15 without a larger context for who IV is and what they do as
16 a business.
17         THE COURT:  So then if you think that they have
18 to have a larger context, don't I have to let the defendants
19 in fairness give their spin on what that larger context is?
20         MR. STADNICK:  I think there is a distinction
21 between informing the jury of the facts of who IV is and what
22 they do for a business and going the extra step as to making
23 formative judgments as to whether that is a legitimate, a good
24 business model or a bad business practice, whether that makes
25 IV a good patentee or a bad patentee.

7

1          THE COURT:  I mean, I would like to be able to
2  draw that line, but I don't know that I can.  I think it
3  implicit in human nature, we all think what we're doing is
4  good for the most part so when you put whoever your witness
5  is from IV up there, it may not directly say I think I'm
6  spending my days on a useful and socially productive way by
7  but it's implicit I think, and isn't the defendant entitled
8  at that point to challenge it?
9          MR. STADNICK:  I think the defendants are
10 entitled to cross-examine within the bounds of what the
11 witness puts on.  But I think maybe I'm not clearly
12 explaining what it is we're trying to keep out here.  What
13 we're trying to keep out is Xilinx making arguments for
14 that for some reason that Xilinx arguments are illegitimate
15 because they didn't invent the patent in suit or they
16 don't make the product so they don't actually practice the
17 patents in suit, which is a legally inaccurate statement and
18 doesn't fairly respond to a statement of IV as to who they
19 are.  But that said, if Your Honor is concerned about
20 drawing a line that is going to keep things fair for both
21 sides, we would be willing to agree to not introduce
22 anything about IV's general business model if the other side
23 is willing to abide by the same preclusion.
24         THE COURT:  About their business you mean?
25         MR. STADNICK:  About IV.  If we don't introduce

8

1  information about who IV is and what they generally do for a
2  business and whether it's good or bad for innovation at all
3  and just stick to the facts of the case, we're happy to do
4  that if Xilinx will likewise be precluded from taking
5  attacks on our business model.
6          THE COURT:  Let's see what Xilinx has to say.
7  Thank you.
8          MR. LANIER:  Thank you, Your Honor.  Greg Lanier
9  for Xilinx.
10         Of course, we will not use pejorative terms,
11 whatever they may be, synonyms, antonyms or anything else.
12 Of course, there is the risk that Your Honor recognizes that
13 whatever IV presents about itself will open the door which
14 is the ultimate reason why there can't be a broad brush
15 ruling on those motion in limine.
16         But the other point is that there are reasons
17 why some discussion of IV's business -- I don't want to
18 suggest anything pejorative by saying business practices
19 but the way it conducts its business is actually relevant to
20 issues in dispute in the case.
21         The first is if we're going to have a
22 hypothetical negotiation damages discussion, which is we
23 think deserves more discussion by itself and Mr. Rooklidge
24 is prepared to address in detail, but if we're going to
25 have it, then we do need to look at the evidence of what

9

1  would have been in the minds of the parties to the
2  hypothetical negotiation at the time of the hypothetical
3  negotiation.  At least one of these hypothetical
4  negotiations, it's agreed, would involve IV as a party that
5  relates to the '669 patent because it was the owner by the
6  time of the agreed date of the hypothetical negotiation in
7  that case.  And it would be appropriate for Xilinx to say
8  in sitting down at this table, of course, we're not going to
9  challenge the assumption of infringement or the need for a
10 license but we have to think about the economics of taking a
11 license and here is the relationship.
12         The second way that the business practices of
13 IV is relevant to issues in dispute in the case is on the
14 inducement claim.  And Xilinx is entitled to present
15 evidence of its subjective believe and good faith belief in
16 noninfringement or invalidity, and that is influenced by the
17 relationship it had with IV, the quality of patents it was
18 getting and its perception of the declining quality of
19 patents it was getting.  So there is room there where that
20 issue is relevant to an issue in dispute in this case.
21         But the bottom line, though, Your Honor, I think
22 that it's not appropriate to give up a blanket ruling on
23 this.  Your Honor has already recognized that the most
24 important documents potentially on damages are actually part
25 of the business relationship.  The jury needs some context

10

1 for where did the 2005 or where did these election notices
2 agreements come from.
3     THE COURT: Why? Why does the jury need
4 context? The agreements say what the agreements say.
5     MR. LANIER: And the election notices say what
6 the election notices say. It is a material fact of Xilinx's
7 defense of the inducement claim, which has a subjective
8 element to it, that they elected some notices, they accepted
9 some elections, they didn't accept others, and at a minimum
10 we have to at least be able to explain the relationship
11 between these parties. And as Your Honor recognized, it is
12 almost inevitable that they will tell a story about IV.
13     THE COURT: Well, they're now offering not to.
14     MR. LANIER: They're offering not to. If they
15 don't tell a story about IV, then the only story we would
16 tell about these issues relates to the relationship between
17 Xilinx and IV. And then, of course, to the extent the
18 Altera, Lattice and Microsemi agreements come in, we
19 have to discuss that as well.
20     THE COURT: All right.
21     MR. LANIER: Thank you.
22     THE COURT: Thank you. Mr. Stadnick, is there
23 anything further?
24     MR. STADNICK: Just briefly, touching on the
25 two grounds of relevance that Xilinx has raised. As far as

11

1 hypothetical negotiation goes, at this point in time the
2 only person that would be talking about the hypothetical
3 negotiation is their damages expert. Their damages expert
4 analysis is not impacted in any way by the Xilinx/IV
5 relationship. She performed an analysis predicated on the
6 formulas that are set forth in the agreements, and it does
7 not change that number one way or the other based on any of
8 the *Georgia-Pacific* factors, let alone that one.
9     Then on the inducement claim, to the extent
10 the subjective intent is at issue, the subjective belief in
11 whether or not they're infringing the patents in this case
12 and whether they thought, generally speaking, the quality
13 of IV's patents were going down over time has nothing to
14 do with whether they had a subjective belief that these
15 particular patents were not valid or infringed.
16     THE COURT: All right. Thank you.
17     So I think in some respects it is amenable, this
18 dispute, to a broad ruling but obviously going to be subject
19 to some more granular decisions over the course of the trial.
20     But my ruling right now is I'm granting IV's
21 motion. There will be no reference to IV as a patent troll.
22 There will be no other pejorative terms referring to IV or
23 its business model and they will not be reference to IV
24 litigation or license activity unrelated to the patent in
25 suit. As I understand it, that is the full extent of the

12

1 relief IV is seeking. That is, no reference to IV's
2 litigation or licensing activity unrelated to the patents
3 in suit.
4     In my mind, that allows for, and it will be
5 necessary I'm sure for the relationship between the parties
6 to come in. Certainly, the agreement between the parties
7 will come in. Even there, of course, the defendants will
8 not about permitted to characterize what IV has done in a
9 pejorative way or bring in anything about larger views some
10 may have as to the impact of this type of business model on
11 innovation, making it good or bad for patentees and that
12 sort of thing.
13     So I take it from what has been represented
14 here, and I think the impact of my ruling, is that IV is not
15 going to really provide flavor as to who they are. But if
16 they do so, that will open the door. I think it's a door
17 that is either going to be very tightly shut or pretty far
18 wide open. And I'm accepting IV's representation that it
19 prefers to have that door shut. I prefer to have that door
20 shut.
21     What I don't want to see happen is IV decide
22 that you are going to rather open the door and sandbag all
23 of us at trial with that. If you decide you are going to
24 take a different approach than what we discussed this
25 morning, you need to give fair notice of that to Xilinx and

13

1 to the Court some time, let's say, the middle of the week
2 before trial begins. It can't be that we all hear that
3 during your opening and the rest of us are prepared for a
4 trial on which that door is shut. Understood?
5     MR. STADNICK: Understood, Your Honor.
6     THE COURT: Let me just say for the record, it
7 is implicit in what I already said, but in my view, there is
8 no relevance to pejorative terms or any effort to denigrate
9 either side's business practices including IV or no
10 relevance really to whatever impact on the economy or on
11 innovation there may be from IV's business practice. That
12 is not what is on trial here in our courtroom.
13     To the extent there is any relevance, it is far
14 outweighed by the risk of unfair prejudice and the likelihood
15 of this trial devolving from what it should be, which is to
16 focus on the infringement, the validity and the damages
17 issues to a sideshow about I suppose current issues in
18 patent litigation, patent reform.
19     All of that said, if IV does open the door, in
20 fairness I'll have to let Xilinx do what it needs to do to
21 challenge IV's evidence.
22     And on some of the specifics, in terms of
23 determining a reasonable royalty, I have the representation
24 from the plaintiff that that is not really part of Ms.
25 Davis's reasonable royalty analysis. Any understanding of

14

1  who IV actually is and what they would have brought to
2  the table at the time of the hypothetical negotiation and
3  Mr. Wagner will not be testifying.  And on the indirect
4  infringement, I am not really seeing the relevance even to
5  the state of mind but to the extent it is relevant I think
6  it is far outweighed by the other concerns I have outlined
7  here.
8       So I am granting IV's Motion in Limine No. 1.
9       Let's move on to IV's Motion in Limine No. 2
10  regarding the reexam.  I'll hear briefly from IV on that.
11       MR. MODI:  Good morning, Your Honor.  Ameet Modi
12  for the plaintiffs.
13       I think given Your Honor's ruling on the
14  willfulness issue, both are parties are in agreement that
15  the only possible thing that the reexaminations will be
16  relevant to is the intent prong of inducement.  And so I
17  guess in some sense, IV would just be looking for a ruling
18  to that effect that the only issue we believe would be
19  relevant to is that issue.
20       THE COURT:  I think that is right.  But is it
21  relevant to the state of mind?  Of intent -- I mean of
22  inducement?
23       MR. MODI:  I think the Federal Circuit in *Carmel*
24  said that it may be one factor in that specific instance.
25  It would be our position that nevertheless still they should

15

1  be excluded as prejudicial because to the extent they are
2  relevant to Xilinx's belief in the invalidity of the
3  patents, Xilinx can always point to the invalidity evidence
4  that's put on at trial as its evidence of good faith of
5  belief and invalidity.  By pointing to the reexams, really
6  all they're doing is trying to seek what is essentially
7  cumulative and trying to seek the stamp of the Patent Office
8  and their ongoing decisions.
9       THE COURT:  The reexams that you seek to exclude
10  evidence involve are not complete in they haven't reached
11  final appeal from the Federal Circuit; correct?
12       MR. MODI:  None of them reached final appeal to
13  the Federal Circuit.  The reexam on the '669 patent is at a
14  point where it's essentially waiting to go to the Federal
15  Circuit.  The reexams on the other two patents are still
16  languishing in the Patent Office.
17       THE COURT:  What is the timing of the alleged
18  induced infringement vis-a-vis the timing of the initiation
19  of the reexams?
20       MR. MODI:  I think that is a great point, Your
21  Honor.  With respect to the '325 and '087 patents, the
22  timing of the induced infringement could begin as early as
23  when Xilinx had knowledge of the patents which we laid out
24  in the briefing, I believe it's 2008 or 2009.  The reexams
25  were started in 2011.  So certainly Xilinx has no evidence

16

1  linking their good faith belief and invalidity to their
2  decision later on to file reexams.
3       THE COURT:  What about in respect to the third
4  patent?
5       MR. MODI:  With respect to the third patent,
6  Xilinx, I believe it's undisputed that their first knowledge
7  of the '669 patent was in 2004.  Again, the reexamination
8  was initiated in 2011.  So there is a seven year gap there.
9       THE COURT:  All right.  Thank you.
10       MR. MODI:  Thank you.
11       THE COURT:  We'll hear from Xilinx.
12       MR. LANIER:  Thank you, Your Honor.  Greg Lanier
13  again.
14       A few points.  The first is that it's important
15  to remember that some mention in discussion of reexams will
16  come in anyway because the '087 patent claims, as Your Honor
17  may recall, were all new reexamination claims.  So it is
18  going to come in, and to not allow the more evidence about
19  the reexaminations to come in when that is already going to
20  be in front of the jury would unfairly suggest to the jury
21  that plaintiff gets a double presumption of validity or that
22  the Patent Office has looked at this twice and the patent
23  is extra good, to put it in terms that the jury might be
24  confused by that.
25       THE COURT:  How would that be if the jury

17

1  doesn't hear that there was a reexam of these other ones?
2       MR. LANIER:  If they don't hear there was a
3  reexam of the other ones, all they would hear about the '087
4  patent is that these claims went to the Patent Office and
5  these are the claims that resulted without also them being
6  told the Patent Office has looked at those claims and those
7  claims all stand cancelled as we sit here today, admittedly
8  in non-final proceedings.
9       Now, we understand the point that there is a
10  risk of jury confusion on the question of validity, and we
11  agree that a curative instruction would be appropriate.  But
12  the evidence is relevant, as counsel conceded, to the
13  question of Xilinx's subjective good faith intent.  It is
14  relevant to that and the *Carmel* case makes that clear.
15       So the question then is only whether the
16  evidence is more prejudicial than probative.  And the fact
17  is that there is a curative instruction possible.  There is
18  also the fact that the prejudice could cut both ways because
19  as it sits today, the '669 patent actually stands confirmed
20  in the Patent Office.  We would have to live with the
21  consequences of that evidence coming into the jury to be
22  able to present to them evidence about our subjective good
23  faith belief with respect to the '325 and the '087 patents.
24  So there is a balance there.
25       The third point, though, is that there is not a

18

1   timing issue the way counsel suggests if, on whatever other
2   evidence needs to be taken on this point, the Court agrees
3   with us that the contractual relationship, in that contract
4   provision we discussed last time we were in front of Your
5   Honor, bars evidence of the prior notice of the '325 and the
6   '087 patents.  Your Honor did not eliminate that issue from
7   the case but just was not able to find it on summary
8   judgment and so there wouldn't be a time gap there either.
9           It also frankly, that time gap, would be
10  something that could be addressed on cross-examination and
11  in argument.  They certainly can argue you can't really be
12  telling the jury this when it took you this long.
13          But as it sits, two of the three patent claims
14  or the claims of two of the three patents stand cancelled
15  based on reexaminations initiated by Xilinx.  Xilinx has
16  relevant evidence of its subjective good faith belief in
17  invalidity of these patents.  It is not more prejudicial
18  than probative to allow that evidence to come in with a
19  curative instruction and with a balance that is presented
20  by the fate of the '669 patent.
21          THE COURT:  Talk about the timing a little more.
22  Remind me more about the contract issue.
23          MR. LANIER:  Sure.  We had argued on summary
24  judgment, Your Honor, that the contract between the parties,
25  the specific section, and I have forgotten it but we can get

19

1   the reference again, it's in the record, barred any evidence
2   arising from, arising out of the agreement, communications
3   arising out of the agreement to be used as evidence of
4   willfulness or inducement.  And on summary judgment, Your
5   Honor found that the factual record wasn't clear enough
6   that the communications to which we had cited were such
7   evidence.  So the issue hasn't been ended but it wasn't
8   resolved on summary judgment.  So we do believe that that
9   contractual provision would bar raising this timing issue.
10  So that is one more reason why this evidence is not more
11  prejudicial than probative.
12          THE COURT:  It may bar.  I think I understand
13  the idea that the jury would be told you knew about this
14  patent and knew that you allegedly infringed as of an
15  earlier date; right?
16          MR. LANIER:  Yes.
17          THE COURT:  But what about the timing
18  discrepancy between when, regardless of your knowledge, I
19  suppose, about when you allegedly did start infringing,
20  whether you were told of it or not versus when you initiated
21  the reexams?  Is that not relevant to whether I should let
22  this evidence in of your subjective intent?
23          MR. LANIER:  It certainly is relevant to the
24  discussion.  We wouldn't dispute that they would be entitled
25  to say look at this time capsule.  It is relevant to that.

20

1   But it doesn't decide by itself the relevance of the
2   evidence we offer.  It doesn't make it irrelevant and it
3   balances against any potential unfair prejudice, undue
4   prejudice because that is really the standard here, as the
5   Court is well familiar.
6           Of course, all evidence that is intrinsic is
7   prejudicial.  This evidence is interesting.  It is the
8   culmination of Xilinx's activities arising out of a belief
9   that IV was giving them less effective patents.  That issue
10  wouldn't come up unless the door is open, but it is the
11  culmination of it.  They stand cancelled and it would be,
12  from our perspective, manifestly unfair for the jury not
13  to hear this critical evidence about Xilinx's subjective
14  state of mind.  It goes directly to that.
15          THE COURT:  But you are not going to argue or
16  suggest in questioning that it makes it more probative that
17  these patents are invalid?
18          MR. LANIER:  Correct.  We would not argue that.
19  We understand that.
20          THE COURT:  All right.  Thank you.  Is there any
21  reply?
22          MR. MODI:  Just three quick points, Your Honor.
23          First, again, I think everyone is in agreement
24  if IV doesn't put on an inducement case of this particular
25  patents, reexams as to those patents shouldn't come in.

21

1           THE COURT:  Well, as far as I know, you are
2   putting on an inducement case.  If you are telling me you
3   are not putting on an inducement case, that may change
4   things.
5           MR. MODI:  I think to some extent that may be
6   impacted by Your Honor's ruling on the forthcoming claim
7   construction rulings.  But I guess that was the first point.
8           The second point, I think the bottom line is,
9   Your Honor, it wouldn't -- it's hard, it would be impossible
10  I think to have a fair trial if the jury were left with
11  the impression.  I'm not sure a curative instruction would
12  cure it based on evidence of ongoing reexams which counsel
13  conceded were non-final.  I think they would inevitably be
14  left with the impression that they are invalid regardless
15  of the particular purpose.  And I guess the only thing I can
16  say is if they are allowed to put in evidence of reexams,
17  ongoing reexams, at a minimum I think IV should be entitled
18  to put on evidence of how often the Patent Office gets
19  reversed or changes its mind in the context of ongoing reexams.
20          THE COURT:  And what about, is it the '669 that
21  the claims are confirmed as of now?
22          MR. MODI:  Yes, Your Honor.
23          THE COURT:  So doesn't that create the same
24  concern on their end as you have with respect to the other
25  patent, if this all comes in?

22

1      MR. MODI:  I don't think it's quite the same
2  because in fact, as we have discussed in the reexams, there
3  is a broader standard that is applied.  So the fact that
4  they have been confirmed actually I think tends to negate
5  their alleged good faith, belief, and validity.  But I mean
6  I understand Your Honor's point.  I just think it's a little
7  bit different because of the broader standard and the fact
8  they have been confirmed.
9      THE COURT:  All right.
10     MR. MODI:  Thank you.
11     THE COURT:  Thank you.
12     I'm going to deny the second motion in limine.
13 That's IV.  I am very concerned about the risk of confusion,
14 the risk of unfair prejudice.  Certainly, I don't think
15 there is relevance to the validity question itself, but I
16 think it is conceded, I think it is correct that there is
17 some relevance to the state of mind element of induced
18 infringement.  That is part of the case as we sit here now.
19     I'll provide a limiting instruction that directs
20 the parties to meet and confer and propose something to me,
21 say, by a week from Monday -- so a week before trial begins,
22 I think that is the same, I mean a week before trial begins
23 -- that I would intend to read to the jury at the time the
24 evidence of the reexam first comes in and again to repeat it
25 in the final instruction.  I think that is the best way to

23

1  be fair to both sides given the posture of the case.
2      MR. DESMARAIS:  Your Honor, may I ask
3  clarification on that point?
4      THE COURT:  Yes.
5      MR. DESMARAIS:  So how do you deal with it in
6  the opening?  Are you going to read the instruction before
7  the opening or is it off limits for the opening?
8      THE COURT:  Neither of those.  I would say you
9  can refer to it during the openings.  I'm not going to read
10 an instruction during opening.  I would say the ruling is
11 you can't -- and the representation is that wouldn't happen
12 anyway.  You can't argue or suggest that the patents are
13 invalid because of the status of the reexams, and likewise
14 -- you can strike the likewise.  No one has asked me to
15 decide that.  Forget that.
16     But what I would further say is as you meet and
17 confer, if either side thinks I should add to my preliminary
18 instruction something about this point, then go ahead and
19 let me know that with what you propose I add to the
20 preliminary instruction in your submission a week before.
21     Does that answer the question?
22     MR. DESMARAIS:  Yes, Your Honor.  I was just
23 struggling with the difficulty in the opening because I
24 object to the evidence, so during the trial I'll just make
25 an objection to preserve it for appeal; but if he is going

24

1  to open it on it, then I have to open on it, and it puts me in
2  an odd situation of wanting to preserve the issue but then
3  having to go first and address it because I don't want the
4  jury to hear it for the first time in his opening.
5      So I would prefer, if Your Honor is going to
6  let them prove it -- which I understand your ruling, I am not
7  rearguing that -- that they only do it through witnesses so
8  that we don't have to open on it and get into the weird
9  situation where we're going first on the issue.
10     THE COURT:  Let me first ask, do the defendants
11 know now whether they would want the opportunity to refer
12 the reexams during the opening?
13     MR. LANIER:  We would, Your Honor.  It would
14 be one of a lot of other things.  It wouldn't be the
15 centerpiece.  And we would probably say expressly in that
16 context that we're not going to argue that these proven
17 patents are invalid.  They only go to Xilinx's state of
18 mind, but it is we think important.  It is important enough
19 evidence to fight over here, and we do think it deserves
20 some mention in the opening.
21     THE COURT:  Well, I think you are going to meet
22 and confer and give me your proposed instruction.  It may be
23 that I have to reference it in my preliminary instructions.
24 I'm not deciding that yet.  But I think unless you hear
25 otherwise, Mr. Desmarais, you can expect the jury is going

25

1  to hear about it from the defendants in the opening.  I'm
2  going to let them do that.  So you will decide whether you
3  want to do in your opening.
4      Does that answer your question?
5      MR. DESMARAIS:  Yes, Your Honor.  Thank you.
6      THE COURT:  Quickly.  IV's Motion in Limine No.
7  3 to exclude reference or argument to IV's investment and
8  return from the IV fund.  This is only directed to
9  investment and returns that are totally unrelated to any of
10 the patents in suit.  Is that correct?
11     MS. STEMPLER:  That's correct, Your Honor.  This
12 has to do with licensing practices and investment Xilinx
13 made to a separate patent.  None of the patents in suit.
14     THE COURT:  Okay.  Let me actually have them
15 up here.  Why do you think I should deny this motion,
16 particularly from what I've heard from defendant?
17     MR. ROOKLIDGE:  Good morning, Your Honor.  Bill
18 Rooklidge for Xilinx.
19     First of all, Xilinx's investment in Intellectual
20 Ventures is through the 2005 and 2008 agreement that has now
21 become the centerpiece for IV's damages claim.  And that total
22 contractual arrangement is extraordinarily relevant as a
23 result, and it would be prejudicial for Xilinx not to be able
24 to explain both its investment, its licenses, and its returns.
25 IV has put its business relationship with Xilinx at issue in

26

1  the damages case, and Xilinx is entitled to rebut Intellectual
2  Ventures' arguments with relevant evidence of those investments.
3       It is relevant in several ways.  It's relevant,
4  first of all, as to the particular patents because of the fact
5  that the Court alluded to in its order when it recognized that
6  those investments, or excuse me, those election prices were
7  maximums.  In other words, that 40 or 50 percent declined as
8  other investors took licenses under those particular patents.
9  So that investment scheme is going to have to be discussed.
10      THE COURT:  As I understand it, the motion only
11 goes to excluding evidence like that that does not relate to
12 the patents in suit.  So you would be permitted I think,
13 even if I granted the relief sought, to explain that in the
14 context of the agreements that relate to the patents in suit.
15      MR. ROOKLIDGE:  Let's talk about the other
16 patents then because that is directly relevant to the state
17 of mind as far as inducement goes.  One of the things that
18 we're going to be pointing out is that Xilinx took licenses
19 to over 1,000 Intellectual Ventures patents and paid millions
20 of dollars for those licenses, many millions of dollars in
21 order to do so.  And in some cases, they received returns
22 for doing that.  But it was at a great cost that they took
23 those licenses.
24      The basis for that is that Xilinx looked at these
25 patents, and when it believed it needed to take a license, it

27

1  took a license and it paid for those.  That is directly
2  relevant to Xilinx's state of mind in the inducement claim.
3  So it's relevant on both grounds, and Xilinx should be able
4  to explain the contractual relationship between the parties
5  in order to give the jury a full picture of what that
6  relationship is.
7       THE COURT:  Why is it not enough to say we had
8  the opportunity to take other licenses, sometimes we did,
9  sometimes we didn't?
10      MR. ROOKLIDGE:  Well, because of the fact, Your
11 Honor, that Xilinx paid tens of millions of dollars for
12 those licenses, well over 1,000 licenses is to us very
13 persuasive evidence that Xilinx was considering this very
14 carefully and it directly rebuts the state of mind on the
15 evidence.
16      THE COURT:  I think the numbers were something
17 on the order of you paid around ▮▮▮▮▮  In fact, it
18 may be ▮▮▮▮▮ s roughly right?
19      MR. ROOKLIDGE:  That's roughly right, Your
20 Honor.
21      THE COURT:  Don't I have a really big risk if
22 the jury hears those numbers, the jury is going to think,
23 you know, all right, these are all sophisticated people.
24 That is a lot of money.  I don't really care about the fact
25 that --

28

1       MR. ROOKLIDGE:  It's relevant in one more way,
2  Your Honor.
3       THE COURT:  Well, first answer my question.
4       MR. ROOKLIDGE:  Okay.
5       THE COURT:  Isn't there that risk that the jury
6  may wrongly draw the conclusion, it doesn't really matter if
7  your client infringed about the patent.  They have already
8  paid ▮▮▮▮▮ to the other side.  Why worry about it?
9       MR. ROOKLIDGE:  Well, I don't think that is
10 anywhere near as great a risk as being deprived of that
11 evidence that is relevant to the state of mind issue.  So,
12 once again, the Court has to engage in that balancing.  And
13 as long as there is an inducement issue in the case, this
14 is a very difficult issue for us.
15      But it's also relevant in one more way.  And
16 this came out in the deposition of Scott Hover-Smoot who is
17 on our witness list and we plan on calling at trial.
18      When Mr. Hover-Smoot was questioned about this
19 relationship, what he explained was the arc of the quality
20 and the relevance of the patents that Intellectual Ventures
21 was providing to Xilinx and then early on, in connection
22 with Fund 1, there was lots of relevant patents.  In
23 connection with Fund 2, there was less and less relevant
24 patents.  In his perspective as far as Xilinx was concerned,
25 the quality of the patents was diminishing, and that is a

29

1  fact that is echoed by the fact that their returns on these
2  patents were diminishing.
3       And so the problem is that Xilinx was faced
4  with an issue of patents that were becoming less and less
5  relevant to its business.  It was still considering those
6  patents, and at that point is when the strong-arm and the
7  position of the True Up program came along where these
8  patents were identified as part of 15 IP groups full of
9  patents and Intellectual Ventures asked for a lot of money
10 as part of that True Up program.
11      So that is very relevant evidence to the
12 background of all of that, on how we got here today.
13      THE COURT:  All right.  Thank you.  What is your
14 response?
15      MS. STEMPLER:  Your Honor, just to be clear.
16 We're not disputing the relevance of the relationship
17 between the parties.  But what Xilinx has said is not what
18 we're concerned about here.  The jury will hear that they
19 have already invested millions of dollars and they haven't
20 received what they thought they should have received.  It's
21 extremely prejudicial especially because it's concerning
22 patents that are not at issue here.  And it is suggesting
23 that Xilinx has already paid IV enough when it's not even
24 addressing what Xilinx should pay for the patents.
25      In terms of its dissatisfaction with its

30

1  investments and the testimony of Mr. Hover-Smoot, I think
2  that can be expressed in a way that would avoid references
3  to the expense of the investments and how much they received
4  in return.
5          THE COURT:  All right.  Thank you.  I agree
6  with the plaintiff on this one.  The more I hear about what
7  Xilinx wants to do in the context of describing what its
8  relationship is with IV, the more I'm concerned that what we
9  would end up with is putting IV's entire business model on
10  trial, which I've already ruled is not going to happen in
11  this case unless IV opens the door to that being done.
12          The arc and quality and relevance of the patent
13  seems to me, while I understand it has some relevance to
14  the parties' relationship, it raises in my mind much, much
15  greater concerns about the risk of unfair prejudice to the
16  plaintiff, confusing the jury, perhaps to inflaming their
17  passion, and taking this trial on a track that I don't think
18  is where it should be.
19          There may be some minimal relevance for the
20  reasons that Xilinx has described here, but, again, I think
21  that minimal relevance is substantially outweighed by the
22  risk of prejudice.  And I think the idea would be hard to
23  avoid if you had in the jury's mind that enough money has
24  already been paid as a result of its business relationship.
25  There is too great a risk the jury might not look carefully

31

1  at whatever evidence is presented to them with respect to
2  infringement, validity, and damages.  So I'm granting IV's
3  Motion in Limine No. 3.
4          Let's move on to Xilinx's motion.  First is the
5  one to preclude the doctrine of equivalents evidence.
6          MR. LANIER:  Yes, Your Honor.  Thank you.
7  Again, Greg Lanier.
8          Summarizing it and then, with apologies,
9  identifying one argument that we didn't put in our papers
10  because it occurred to us as we were preparing for this
11  argument, so we apologize for that.  It was not an intent
12  to evade page limits or anything like that.
13          The fundamental point is that IV's expert does
14  not even invoke the doctrine of equivalents except with
15  respect to two specific elements, PCIe and the '325 patent
16  and its whole processor issue in the '669.  But from
17  our perspective, there should be no dispute that the
18  doctrine of equivalents cannot be mentioned with respect
19  to anything else on infringement.
20          The only thing, if you turn to those two
21  specific elements, there is one general argument and a
22  couple of comments about the two specific elements.
23          The general argument is that all that the
24  expert does recite the mantra, same function, same way, same
25  result, and the conclusory paragraphs of his analysis, which

32

1  is in front of the Court, are very clear.  There is a long
2  or longish direct or literal infringement analysis and then,
3  oh, by the way, just recites it.  There is nothing else.
4  That is not the particularized evidence that is required,
5  and we won't restate all the cases that we cited, it simply
6  isn't that.  Critically, there is no analysis and there is
7  no why.  Why are they the same?  And that is really where
8  the jury confusion comes from potentially on that issue.
9  The doctrine of equivalents requires an acknowledgment
10  that there is a difference between what the accused device
11  and the claim device but then allows you to argue that that
12  difference is insubstantial and you get to claim infringement
13  under the doctrine of equivalents.
14          There was no such analysis here in this case.
15  There is no acknowledgment that what IV experts are doing is
16  telling you why you don't have to worry about this difference.
17  And there is a substantial risk that the jury says,
18  well, if it's close, that is good enough.  We're not playing
19  horseshoes here.  It is important to have that particularized
20  evidence be specific and acknowledge the difference and
21  explain why that difference is insubstantial.
22          Turning briefly to the two specific points.  On
23  the PCIe analysis, what is interesting there is that they
24  point as evidence of Dr. Zeidman's extensive doctrine of
25  equivalents analysis to his argument in favor of including

33

1  PCIe within PCI.  That was a claim construction dispute on
2  which IV prevailed.  So what that means then if you look at
3  that section that is in the exhibits for this motion, IV's
4  position now is that that is literal infringement.  So there
5  is no analysis of direct infringement.
6          THE COURT:  But their concern is your expert
7  wants to say something to the contrary; right?
8          MR. LANIER:  Well, our expert wants to say that
9  just because the Court -- well, not talk in terms of what
10  the Court did but just because PCI might include PCIe does
11  not mean they are the same, so that is not to reargue the
12  claim construction.  And obviously we agree, as we must,
13  that we will not present any testimony that is inconsistent
14  with the Court's claim construction.  We certainly don't
15  intend to do that.
16          But there is no doctrine of equivalents analysis
17  for them to present.  At a minimum, they know exactly what
18  we're arguing, and we don't have a doctrine of equivalents
19  analysis from them.
20          THE COURT:  The one point that is new, have you
21  gotten to it yet?
22          MR. LANIER:  Absolutely.  On the whole processor
23  unit, that element was added by amendment.  There is a
24  presumption of no range of equivalence, and we don't have
25  any rebuttal to that presumption in the experts analysis.

34

1    That is all I have to say.  The rest is in our
2    papers.
3        THE COURT:  All right.  Thank you very much.
4        MR. LANIER:  Thank you.
5        THE COURT:  We'll hear from IV.
6        MR. MODI:  Thank you, Your Honor.
7        Your Honor raised the point exactly.  The
8    concern is Xilinx's experts, despite their representation,
9    are going to take the positions they have taken in their
10   expert reports which we believe are contrary to the claim
11   construction.  We believe that if they're going to take
12   those positions at trial, Mr. Zeidman should be able to rely
13   on the doctrine of equivalents to prove infringement as he
14   listed out in his expert report.
15       THE COURT:  Is it with respect to anything more
16   than the two elements that have been discussed?
17       MR. MODI:  In fact, fixed functional unit and
18   ASIC, for example, are additional limitations that Mr.
19   Zeidman has disclosed DOE theories for.
20       THE COURT:  And where are those?
21       MR. MODI:  To those are in, we included them as
22   Exhibit 1 to IV's opposition.  They're part of Mr. Zeidman's
23   opening report, the body of his report, and that is actually
24   a portion that Xilinx ignores in its motion in limine.
25       Your Honor, just briefly to address the point

35

1    that there is no evidence or no why.  I just don't think
2    that is right.  And this is again part of Exhibit 1 to IV's
3    opposition.  But Mr. Zeidman points to specific evidence
4    that PCIe is the next generation evolution of PCI.  It's
5    backwards compatible with PCI, and that is why they are
6    substantially similar, and these are Xilinx documents he is
7    pointing to.  So the notion there is no evidence to back up
8    Mr. Zeidman's claims I don't think is well founded.
9        Finally, Your Honor, I think they addressed this
10   issue in the *Power Integrations* case, an expert is entitled
11   to rely partly on the same evidence that they are using for
12   literal infringement to prove the doctrine of equivalents.
13       If there is not a requirement, then the expert
14   has to start from Square One.
15       THE COURT:  Is there anything further on this?
16       MR. LANIER:  Very briefly, Your Honor.
17       With respect to what counsel just showed, Your
18   Honor, that is exactly what I was referring to with the
19   opening argument here.  That is argument for a construction
20   that literally includes PCIe.  It's not a doctrine of
21   equivalents analysis.  The Court has accepted that argument.
22   That is the construction.  So there is literal infringement
23   there.
24       On the reference to the fixed functional units,
25   it's worth emphasizing, and I am putting in page 37 which is

36

1    also in the record before Your Honor from Mr. Zeidman's
2    report.  I have just blocked off the paragraph where Mr.
3    Zeidman offers an opinion about the fixed functional units
4    equivalency, and you will see that it is nothing but a
5    recitation of function, way, and result.  It lists things.
6    There is no analysis.  There is no particularized evidence.
7    It is nothing but a recitation of the mantra.  It's a long
8    one but that is all it is.  Thank you.
9        THE COURT:  All right.  Thank you.  I'm denying
10   Xilinx's Motion In Limine No. 1.  I'm not excluding IV from
11   asserting infringement by doctrine of equivalents.  This
12   is subject to, we'll talk about how we're going to handle
13   objections to expert testimony as being beyond the scope of
14   what was previously disclosed.  So it's without prejudice to
15   Xilinx in this instance making those objections, but I'm not
16   persuaded at this point that there is an inadequate basis,
17   full stop, for allegations of infringement by equivalence to
18   go forward at trial.
19       Having reviewed the evidence that was provided
20   in connection with the motion, we think that there is at
21   least minimally sufficient particularized evidence linking
22   up with the doctrine of equivalents.  So that motion is denied.
23       Next is Xilinx Motion in Limine No. 2.
24       MR. ROOKLIDGE:  Very briefly, Your Honor.
25       Neither Xilinx's overall profits or revenues or

37

1    margins, nor Xilinx revenues --
2        THE COURT:  Hold on.  Mr. Stadnick?
3        MR. STADNICK:  Your Honor, if I may
4    short-circuit this in light of Your Honor's ruling
5    concerning Mr. Wagner.  We don't intend to introduce any
6    evidence of Xilinx's product revenue, overall revenue, or
7    profit margins or profits for the products in general.
8        MR. ROOKLIDGE:  We appreciate that.  Thank you,
9    counsel.
10       Thank you.
11       THE COURT:  That takes part of the motion but
12   not all of the motion?
13       MR. STADNICK:  I believe that takes care of all
14   of the motion.
15       THE COURT:  Do you agree with that?
16       MR. ROOKLIDGE:  Yes, Your Honor.
17       THE COURT:  All right.  Great.  Thank you.  That
18   one I guess is denied as moot.
19       Then how about Xilinx's Motion In Limine No. 3?
20       MR. ROOKLIDGE:  Your Honor, this is related to
21   inducement damages.  We acknowledge the Court's ruling on
22   summary judgment that there was sufficient evidence for a
23   reasonable jury to find inducement.  Our argument here is
24   different.  The difference between inducement and damages
25   for inducement.  We believe Mr. Wagner had no basis for

38

1   damages for inducement unless every single sale of the
2   product's infringement infringe and now Mr. Wagner is gone
3   and there is absolutely no evidence in the record for
4   inducement damages.
5           The evidence that the Court cited in the summary
6   judgment motion related only to the clocking patent, the
7   '669 patent.  There is no similar evidence to the Web Chang
8   patents.
9           Thank you, Your Honor.
10          THE COURT:  Thank you.  From IV?
11          MR. STADNICK:  Your Honor, under the damages
12  theory that we are going to pursue at trial in light of your
13  ruling on Mr. Wagner, the model doesn't distinguish between
14  damages for inducement or damages for direct infringement
15  because it's based upon the investment agreements between
16  the parties which drew no distinction between the two.  So
17  we don't intend to put on any evidence, certainly not from
18  Mr. Wagner obviously, of linking specific acts of direct
19  infringement in support of a specific damages number that is
20  unique to indirect infringement.
21          THE COURT:  All right.  Does that help?
22          MR. ROOKLIDGE:  That does.  It sounds like a
23  concession to me Your Honor.  So thank you.
24          THE COURT:  Okay.  So I'll deny that one as moot
25  as well.

39

1           That takes care of the motions in limine.  So
2   let's turn to the pretrial order.  There is lots of
3   miscellaneous issues that I sort of sprinkled throughout, so
4   hopefully we'll cover everything.
5           First, generally, if there is an issue that
6   there is a matter you all have discussed in the pretrial
7   order and there is no dispute in what you have put in here,
8   if you have agreed on it and we don't talk about it now,
9   then, fine, it is adopted and it will govern our further
10  proceedings in this matter.
11          With respect to uncontested facts, I agree,
12  any party can read any portion of what is listed here as
13  uncontested facts to the jury.  Just give notice to the
14  other side that you intend to do that with such-and-such a
15  witness.  And, of course, that time will be charged to you
16  as you are reading those uncontested facts.
17          In terms of the factual issues to be tried, the
18  first question I have for all of you is this dispute about
19  whether or not Xilinx has adequately answered IV's operative
20  first amended claim or whether I should require them to file
21  something further.
22          IV, what is the dispute, and what are you asking
23  me to do, if anything?
24          MR. STADNICK:  I don't know that we're specific
25  asking the Court to do anything.  We were just summarizing

40

1   the pleading history in the case.  We thought it might be
2   nice to have, just for the record, an answer filed to the
3   complaint that we originally lodged in this case, but we're
4   not asking for any kind of default judgment or anything like
5   that.
6           THE COURT:  Okay.  And I understood Xilinx was
7   willing to complete the record with such a filing; is that
8   right?
9           MR. LANIER:  If it's of interest to them, and if
10  it's interest to the Court, we will do that.
11          THE COURT:  It is of interest to them so I will
12  hereby order you to do it by the time trial begins.
13          MR. LANIER:  Thank you, Your Honor.
14          THE COURT:  Okay.  My next question is about
15  standing, whether IV lacks standing and whether that is
16  going to be a disputed issue on which evidence is going to
17  be presented.  Mr. Stadnick, why don't you address that
18  first for me.
19          MR. STADNICK:  Yes, Your Honor.  It came to
20  light during the meet-and-confer process on the proposed
21  pretrial order that Xilinx intends to challenge standing in
22  this case not simply based upon whether we can prove up the
23  chain of title from the original inventor to the entities
24  that are parties to the litigation but by affirmatively
25  entering evidence of what they believe to be a prior

41

1   assignment of the two Chang patents, the '325 and the '087
2   patents to a third party before Mr. Chang sold them to IV,
3   and their argument is going to be that because Mr. Chang
4   didn't own the patents at the time he assigned them to IV
5   that IV doesn't have any rights in the patents and there is
6   no standing.
7           The problem with that argument is twofold.
8   There is no factual record to support a finding that Mr.
9   Chang previously assigned his patents to another party.
10  But even if there were, as a matter of law, it's legally
11  irrelevant here because there is no dispute that if there
12  was a prior assignment, it wasn't recorded in the Patent
13  Office.  And the consequence of that is that when Mr. Chang
14  later sold them to IV, because the alleged prior assignment
15  wasn't recorded in the Patent Office and because there is no
16  evidence or even suggestion that IV knew about the alleged
17  prior assignment, under Section 261 of the patent statute,
18  any prior assignment would be ineffective as to IV's title
19  and ownership of the patents in suit.
20          Our position is that even if they can't prove up
21  there was a prior assignment in the first place and given
22  that the operation of Rule 261 would leave it irrelevant to
23  the standing issue in this case that the jury shouldn't be
24  exposed to that sort of inflammatory allegation of some
25  kind of prior assignment which undermines the entire case.

42

1       THE COURT:  All right.  Thank you.  We'll hear
2  from Xilinx.
3       MR. LANIER:  Just briefly, Your Honor.
4       I don't think in the end we'll have an issue
5  here.  One of the reasons that we thought having proof of
6  the chain of ownership was important got to the question
7  of who was standing in whose shoes at this time of the
8  hypothetical negotiation.  That is obviously an issue that
9  has evolved a little bit.  In fact, even as late as last
10  night, as Mr. Rooklidge will discuss, we got some new
11  information on what their damage theory is.  So assuming the
12  hypothetical negotiation is out of this case, we will not
13  require them to put on an affirmative proof of standing or
14  the chain of owner issue.  That is really what we were
15  interested in was the chain of ownership.
16       THE COURT:  Okay.  Mr. Stadnick, is that
17  satisfactory at this point?
18       MR. STADNICK:  Yes.  As I understand, that
19  Xilinx is not attempting to offer evidence of the prior
20  assignment that destroys standing, then we will certainly
21  take them at their word, and I think that resolves the
22  issue.
23       MR. LANIER:  (Nodding yes.)
24       THE COURT:  Okay.  If Xilinx changes its mind on
25  that, you have to give fair notice to the plaintiff.  And

43

1  then if there is a dispute, you have to all let me know.
2  Okay?
3       MR. LANIER:  Absolutely, Your Honor.
4       THE COURT:  All right.  Let's next talk about
5  the order of presentation.  The Court is adopting Xilinx's
6  proposal as elaborated by IV in footnote 2 of the pretrial
7  order and for hopefully the sake of clarity, what I mean
8  is there will be four steps here to the evidentiary
9  presentation:
10       IV will go first on infringement and damages.
11  Those are the issues on which it bears the burden of proof.
12       Next, Xilinx will go on all issues.  So in this,
13  let's call it Phase II, Xilinx will respond on infringement
14  and damages and will also make affirmative case on invalidity
15  and any other issue on which it bears the burden of proof.
16       Then at Phase III, IV will be able to rebut on
17  infringement and damages.  Those are the issues it has the
18  burden of proof on, and it will also be as IV responds on
19  invalidity and any other issue on which Xilinx bears the
20  burden of proof.  And
21       Then, finally, there will be a Phase IV at which
22  Xilinx can rebut on invalidity and any other issue on which
23  it bears the burden of proof.
24       When we get to closing arguments, however, I
25  only allow three steps to that, three phases, so the

44

1  plaintiff will get the first and last word at closing
2  argument.
3       Is there any question about order of presentation
4  from the plaintiff?
5       MR. STADNICK:  No, Your Honor.
6       THE COURT:  From defendant?
7       MR. LANIER:  Nothing from us, Your Honor.
8       THE COURT:  Xilinx has asked IV to identify the
9  damages date window and also the accused products by April
10  30th.  Is that something that the plaintiffs are opposed to?
11       MR. ROOKLIDGE:  Your Honor, I can address briefly
12  the accused date window.  If, in fact, our understanding
13  is correct that the reasonable royalty, the hypothetical
14  negotiation reasonable royalty is no longer at issue and that
15  we're dealing with a lump sum, the date issue goes away.
16       THE COURT:  I see.  Okay.
17       MR. STADNICK:  Subject to Your Honor's ruling on
18  Mr. Wagner, the damages theory we're putting on in light of
19  that ruling, that's correct.
20       THE COURT:  Okay.
21       MR. STADNICK:  As for the products, Your Honor,
22  I don't think there is a real dispute between the parties.
23  We have identified the products we intend to proceed on in
24  our expert reports.
25       I think the issue they have is that the language

45

1  we used said something like the accused products include or
2  include at least.  We don't intend to go forward obviously
3  at trial accusing any products that have not been disclosed
4  properly in our expert reports.
5       THE COURT:  Does that take care of that issue as
6  well?
7       MR. ROOKLIDGE:  Yes, Your Honor.  It does.
8  Thank you.
9       THE COURT:  Thank you.  Is there anything else
10  in terms of what may be in dispute factually at the trial?
11  Anything you need further from me, any lack of clarity as to
12  what this trial is going to be about?
13       MR. ROOKLIDGE:  Yes, Your Honor.
14       THE COURT:  Okay.
15       MR. ROOKLIDGE:  We have raised the damages issue.
16  We understand the Court ordered that summary judgment was
17  precluded by damages evidence that was in the record.  The '05
18  and '08 agreements that were between IV and Xilinx and the
19  testimony of Julie Davis, we're not trying to reargue that.
20       The issue now is what, if any, damages evidence
21  can IV present at trial and does IV plan to present it at
22  trial.  We pointed out at the last hearing before this Court
23  that Intellectual Ventures had identified nothing but Mr.
24  Wagner in its Rule 26 disclosures and its interrogatory
25  responses.

46

1  Since then, even though I hammered on that, they
2  have not updated their Rule 26 disclosure or interrogatory
3  responses. And, in fact, witness lists were due on March
4  19th and even then, even though Xilinx knew, or excuse me,
5  even though IV knew then that Mr. Wagner could be excluded,
6  it did not identify Ms. Davis on its witness list or reserve
7  the right to call Ms. Davis or Xilinx's witnesses generally.
8  Likewise, deposition designations were due on
9  March 19th and IV did not designate Ms. Davis's deposition
10 transcripts until April 18th, just a few hours before the
11 pretrial conference order was due to the Court. We didn't
12 have time to object to those designations. So for that
13 reason alone, under Rule 37(c)(1), IV should not be able to
14 present a damages case unless its failure was substantially
15 justified or harmless. It is neither.
16 IV hasn't performed an update and that has pre-
17 juiced Xilinx because at this point, we have very little
18 idea what IV's damages case is. When I say we have very
19 little idea, we can go on several different things.
20 Intellectual Ventures has designated deposition testimony
21 that raises irrelevant, confusing and prejudicial testimony.
22 Testimony on damages that includes Julie Davis's
23 reference to numbers that include the '646 patent that IV
24 has dropped from this case.
25 Designated testimony that solely rebuts the

47

1  testimony of Mr. Wagner, refers to Mr. Wagner, refers to his
2  one percent royalty rate and refers to his .44 percent
3  royalty rate.
4  Testimony that refers to the Microsemi and
5  Lattice agreements and their ostensible ███████ oyalty
6  rate even though Mr. Wagner was the only one that could
7  testify about that. Ms. Davis testified that those
8  agreements are not comparable and she couldn't make them
9  comparable and that Mr. Wagner had not made them comparable.
10 Those agreements, those settlement agreements
11 were ███████████████████████ They
12 were entered into six and eight years after the relevant
13 hypothetical negotiations. They were entered into to settle
14 litigation ███████████████████ They were not
15 relevant at all to the Web Chang hypothetical negotiation
16 because he was not a party to that and neither was Xilinx.
17 And there is no expert information that can make those
18 license agreements relevant or comparable.
19 It's not just Intellectual Ventures' designation
20 of Ms. Davis's deposition testimony. Intellectual Ventures
21 has proposed jury instructions that have IV as a party to
22 the sole hypothetical negotiation. This is something that
23 Mr. Wagner and Julie Davis agreed that Web Chang was the
24 party for the two Web Chang patents, to that hypothetical
25 negotiation.

48

1  Now, if hypothetical negotiation is out, there
2  is a whole raft of jury instructions that need to go out.
3  Ordinarily, we would be content with asking for an additional
4  motion in limine to address these problems and we do ask for
5  that. But the Court should not need to get to that. It
6  should apply Rule 37(c)(1), prevent IV from putting on a
7  damages case because it has failed to update its disclosures,
8  failed to update its interrogatory responses, failed to timely
9  identify Julie Davis as a witness, and failed to designate
10 her deposition testimony with no justification, and to
11 Intellectual Ventures' prejudice.
12 We are going to hear from the other side that
13 they have told us what the damages case is. The evidence
14 for that is an e-mail that we received at 10:13 p.m., that's
15 10:13 last night. This provided a summary of IV's current
16 thinking on damages. In other words, this isn't a binding
17 update, this isn't any kind of formal document. What this
18 is is three sentences on their damages case. And what this
19 tells us is that they are going to present proof concerning
20 the amount that Xilinx would have paid under the terms of
21 the agreement had it elected into the relevant deals when it
22 had that opportunity.
23 What it is going to is use is the agreements,
24 testimony from some still undisclosed IV fact witness. We
25 don't know who they are. We never had the opportunity to

49

1  depose them. And possibly the testimony of Ms. Davis.
2  What they say is based on that proof, IV will
3  seek $110,400 for the Web Chang patents and $3.6 million for
4  the '669 patent.
5  Now, those numbers are relevant to the Court.
6  They should be familiar to the Court because they were
7  listed in the Court's Order.
8  Now, I stood up here at the last hearing and I
9  explained why IV could not carry its burden of proof. I
10 explained that the $110,000, which was 50 percent of the
11 total cost of ownership; in other words, that was the
12 maximum election price; but I also explained that because of
13 the relationship between Intellectual Ventures and Xilinx,
14 any time an additional investor took a license under that
15 group of patents, that that percentage would be reduced.
16 Julie Davis didn't present that information and
17 neither did Mr. Wagner. There is no evidence in the record.
18 We don't have a witness on that. We haven't been able to
19 depose somebody of how much that maximum should be reduced.
20 Now, it's even worse with the '669 patent
21 because the number that has been provided on the '669 patent
22 in the e-mail, the number that has been provided is $3.6
23 million they're going to be seeking. If the Court recalls
24 from its Order, $3.6 million was the total cost of ownership.
25 Xilinx was entitled to elect at 40 percent of that, about

50

1   $1.4 million.

2          We have absolutely no basis or idea how IV is

3   going to be able to say that instead of paying the election

4   price, Xilinx should have to pay the total cost of ownership.

5   And that is for a portfolio. Remember, the '669 was the

6   patent application at the time that at the time it was

7   licensed had 24 other applications and seven patents in it.

8          Somebody would have to come in, an expert would

9   have to come in and apportion the value of the '669 patent

10  from the rest of that portfolio. There is no expert testimony,

11  and there never has been in this case, to be able to do that.

12         THE COURT: Putting aside all the other problems

13  there may be, just tell me, why would it have to be an

14  expert as opposed to a fact witness that IV says this is how

15  we do things as a factual matter?

16         MR. ROOKLIDGE: Because IV, from the very

17  beginning, said that analysis that we do is protected by

18  attorney-client privilege because it's done by the lawyers.

19  So we have been prevented from getting any discovery into

20  that. That is why Ms. Davis did not have that information,

21  and that is why Mr. Wagner did not have that information.

22  Nobody has had the information on how to get from the

23  $1.4 million down to a number that is just for the '669

24  patent. And we have absolutely no idea how Intellectual

25  Ventures can be asking for the total cost of ownership --

51

1   more and above that, the total cost of ownership for that.

2          So the problem is we're just a couple weeks

3   from trial. IV has not nailed down its damages case. We're

4   having to play Whack-A-Mole this with no idea what the

5   basis for this is, even under the apparently established

6   royalty approach that they are taking.

7          Their failure of burden of proof, because of

8   their conscious decisions to claim the privilege over that

9   analysis, and their failure to provide any expert testimony

10  that would allow us to apportion that number down has now

11  come home to roost. And because of that, they do not have

12  appropriate evidence that they can put forth before the jury

13  to be able to apportion that down.

14         I'm not going to take up the Court's time with

15  reiterating our belief that I expressed at the last hearing

16  what the consequences should be of the failure of proof on

17  damages. But I will say is if the Court decides to overlook

18  all of these deficiencies, Xilinx would ask that the Court

19  allow Xilinx a reasonable time to provide objections to Julie

20  Davis's deposition designations, that the Court require IV

21  to update its Rule 26 disclosures and interrogatory answers

22  immediately, and to identify the witnesses and the evidence,

23  to allow Xilinx to depose those witness, and to allow Xilinx

24  to file a new motion in limine on the damages evidence.

25         In any event, if this Court allows IV to present

52

1   a damages case, Xilinx would bring Ms. Davis and it would

2   be inappropriate to allow IV to use her deposition testimony

3   instead of her live testimony.

4          But if Ms. Davis testifies at trial, that raises

5   the issue of when does she testify. And our position is

6   that IV should call her and the damages portion at its case

7   in chief and that we should be able to put on our damages

8   case through Ms. Davis in, in effect, cross-examination,

9   albeit not limited by the scope of the direct.

10         Also, if Ms. Davis testifies, the Court should

11  issue a curative instruction that she is not supporting an

12  award of damages and is not IV's expert and explain why IV

13  doesn't have an expert of its own.

14         And if Ms. Davis is excluded, then the issue

15  turns to whether IV can still cobble together a damages

16  case based on the '05 and '08 agreements. And as we have

17  explained, they cannot. First of all, they don't have any

18  evidence of how to apportion that maximum royalty down to an

19  actual number because Ms. Davis didn't do that, Mr. Wagner

20  didn't do that. Nobody did that.

21         Also, this is not something where the jury can

22  simply apply a percentage to a number and achieve a result.

23  An expert is going to need to lead them through that analysis.

24         If the Court would like, I can address the

25  remaining damages issues that we have in about 30 seconds.

53

1          THE COURT: That sounds like a good offer.

2          MR. ROOKLIDGE: Okay. IV's request for Wagner's

3   offer of proof. The appellate record is completely adequate

4   with the Daubert motion. Their reports and their testimony,

5   that was all included. There is no need for Mr. Wagner to

6   give an offer of proof.

7          Government sales that we raised are relevant

8   only to Ms. Davis's rebuttal of Mr. Wagner's running royalty

9   opinion, so this Court need not get to the Government sales

10  issue. Just like the distributor margin issue, that all

11  becomes irrelevant. Likewise, we already talked about the

12  time periods, how those have become irrelevant if there is

13  no more hypothetical negotiation.

14         THE COURT: In your recitation of your proposal,

15  if I do allow them to do a damages case, the various items

16  of relief you wanted, I just want to make sure I caught all

17  of it. You would have Ms. Davis be called by the plaintiff

18  and then you get to cross her not limited by the scope of

19  what they did on direct?

20         MR. ROOKLIDGE: That is correct, Your Honor.

21         THE COURT: Okay. I just wanted to make sure I

22  caught that.

23         MR. ROOKLIDGE: Okay.

24         THE COURT: All right. Let me hear from IV.

25         MR. STADNICK: Thank you, Your Honor. Mike

54

1 Stadnick again.

2 Those were a lot of issues, and I don't really

3 have a roadmap for them, but I will try to address them all.

4 I would like to start by noting that obviously

5 in the past two weeks, the Court has made three separate

6 rulings that impact the way the damages proof is going to

7 come in at trial. That was the ruling excluding Mr. Wagner's

8 testimony.

9 Then about a week ago, Your Honor ruled that the

10 case would go forward on all issues at trial. Not only on

11 infringement and invalidity but also on damages. In making

12 that ruling, Xilinx had made many of the same arguments to

13 the Court that we have heard here again today.

14 Then, finally, earlier this week, Your Honor

15 denied a motion for summary judgment of no damages which

16 again raised many of the same arguments we heard here today.

17 In response to those rulings, IV has worked very

18 diligently to try to inform Xilinx of exactly what our plan

19 is for going forward with damages proof at trial. In two

20 days of the Court's Daubert ruling, we informed the Court

21 and Xilinx of the evidence that we intended to put on to

22 demonstrate damages in the absence of Mr. Wagner's testimony.

23 And then as soon as we had figured out exactly which, from

24 among the several options we had, as to how we would precisely

25 put forth damages at trial, we notified them of that. And I

55

1 know we heard today that Xilinx doesn't seem to be satisfied

2 with what we told them but I couldn't see how it can't be

3 any clearer.

4 I'll make it perfectly clear now with respect

5 to if there was any ambiguity in the e-mail we sent to them.

6 The case we plan to put on it is simply the case that Xilinx

7 itself advocated is not only an acceptable way of proving

8 damages, but three weeks ago at this very podium they argued

9 it was the only way to prove damages and that any other

10 attempt to prove damages would be legally deficient.

11 That is, we're going to look at the formulas

12 that are set forth in the investment agreement between IV

13 and Xilinx. We're going to go back to the date when Xilinx

14 had an opportunity to avail itself of its option to take

15 steps to obtain rights to the patents in suit, and we're

16 going to prove up the amount that Xilinx would have paid on

17 each of those dates to get rights to the patents in suit.

18 How are we going to do that? We're going to do

19 it primarily through the IV/Xilinx investments agreements

20 themselves which set forth the formulas that would apply.

21 As far as which fact witnesses we're going to

22 introduce, it's no surprise to Xilinx. We have given them

23 a list of the four fact witnesses we're calling. They've

24 deposed all of them. Specifically, Peter Detkin is an

25 executive at IV. And Joe Kosiara, who is a finance guy at

56

1 IV. Both of whom have been deposed, both of whom have been

2 asked questions about these agreements, both of whom are

3 responsible for administering these agreements. Also, they

4 are going to explain the provisions and how they operate,

5 and how they would operate as of the date that Xilinx had

6 an opportunity to take advantage of the agreements and get

7 rights to the patents in suit. And we're going to just

8 explain what those numbers are. Certainly, based upon the

9 arguments we've heard it should be sufficient to sustain a

10 damages finding in this case.

11 It might make sense just to step back for a

12 second and think about what Xilinx is asking Your Honor to

13 do. In order to exclude Mr. Wagner, they argued vehemently

14 that the formula set forth in the investment agreements are

15 the one true reliable measure of damages in this case.

16 Having now excluded Mr. Wagner, they're telling Your Honor

17 that we can't rely on those very formulas established in

18 measuring damages and it just doesn't make sense.

19 With respect to the specific arguments in

20 evidence that Xilinx is challenging, as far as the Altera

21 and Microsemi, Lattice agreements go, based upon what we

22 told them, and now of course Your Honor, we plan to present

23 at trial, we don't intend to present any evidence based on

24 those agreements, certainly not for purposes of damages. We

25 could arguably introduce them as secondary considerations of

57

1 nonobviousness but it's going to take that issue off the

2 table. We're looking to go forward with that.

3 As far as their objection to what they view as

4 our lack of ability to explain how that $3.6 million number

5 for the '669 patent should be apportioned, the easy answer

6 is it doesn't need to be apportioned. The number that they

7 came up with based upon the 40 percent of the cost of

8 ownership election doesn't apply to the '669 patent as our

9 witnesses can explain because at the time historically once

10 Xilinx had an opportunity to get rights, the election window

11 had already closed.

12 So under the terms of the agreement itself, the

13 formulas in the agreement itself, in order to get rights at

14 the point historically when they had a chance to get rights

15 for the '669 patent, they would have paid the total cost of

16 ownership which was $2.6 million, and that is how we came up

17 with that number. It is a simple calculation.

18 And I would note that it's the same calculation

19 that their own expert, Julie Davis performed. She got the

20 -- well, she applied the total cost of ownership with 40 percent

21 inaccurately, but having done that, she made no further

22 attempt to apportion that value now because, by her own

23 admission, the right measure of damages on the facts of this

24 case is what Xilinx would have actually paid. And the only

25 way they could have gotten a right, any rights to the '669

58

1 patent was to pay the total cost of ownership, so that is
2 why the $3.6 million number is fair and appropriate.
3        THE COURT:  So there is a recitation of specific
4 relief that Xilinx would ask for if I stick to what I have
5 ruled and allow you to go forward on the damages case.  It
6 came in pretty quickly.  I don't know that I necessarily
7 have to decide right this minute on all of it.  But if you
8 are prepared to respond, including things like formally
9 updating some of your discovery responses, not allowing them
10 I guess to object to Ms. Davis's deposition designations,
11 although it also sounded like maybe there would be no Ms.
12 Davis's deposition testimony since you would be permitted to
13 call her.  And also I recall putting your fact witnesses up
14 for further deposition on some of these specific points.  Do
15 you have a position on any of that request for relief?
16        MR. STADNICK:  I think as to amending our formal
17 disclosure, we are certainly happy to do that.  As far as
18 their procedures for eliciting testimony from Ms. Davis, I
19 think we're generally okay for that if they bring her live
20 for trial.  Obviously, we won't be playing her dep.
21 testimony.  They asked for some period of time to provide
22 objections to the dep. testimony that was designated.
23 Obviously, we're fine with that.  Given that our position is
24 now solidified, we might even be able to go back and narrow
25 the designations we submitted a week or a week and-a-half

59

1 ago for Ms. Davis to just the very minimum that we would put
2 on at trial if we were to play her dep. testimony.
3        As far as additional depositions of the IV fact
4 witnesses, they have taken the deposition of Mr. Detkin.
5 They took his deposition on these agreements.  Given that
6 we're applying the very formulas that they have argued all
7 along as the right way to calculate damages in this case, I
8 don't know what they would possibly depose him on, but if
9 Your Honor thinks that they are entitled to a deposition
10 for Mr. Detkin at the time of the trial, we can make that
11 happen.
12        The same thing with Mr. Kosiara.  They had his
13 deposition.  They deposed him on these very agreements, but
14 if Your Honor believes that they should be entitled to a
15 further deposition based upon the damages model we now
16 intend to present in light of Your Honor's Daubert ruling,
17 then we're fine with that as well.
18        THE COURT:  Thank you.  Where does that leave us
19 from what you have heard?
20        MR. ROOKLIDGE:  First of all, Your Honor, as to
21 the statement that these are the dollar numbers that Xilinx
22 advocated, that is completely incorrect.  Julie Davis in the
23 deposition testimony on which Intellectual Ventures relies
24 testified that the maximum amount on the '669 was, let's
25 see, $706,000, a far cry.

60

1        And this suggestion that Xilinx was not able
2 to take advantage of the reduction of the total cost of
3 ownership is completely new.  It's something we have heard
4 here today for the first time.  We have not had the
5 opportunity to depose Peter Detkin or Joe Kosiara on these
6 issues, applied to these patents, applied under this new
7 theory.
8        We appreciate that the Microsemi and Lattice
9 agreements are out, notwithstanding the deposition transcript
10 designations that Intellectual Ventures has made, but, once
11 again, this is a completely new theory and a surprise to us.
12        Once again, they said that Julie Davis didn't do
13 this as if it were her choice.  She had no evidence to make
14 this apportionment, and Mr. Wagner didn't do it.  Remember,
15 it's plaintiff's burden to prove damages here.
16        We believe that Rule 37(c)(1) should be applied,
17 and that Intellectual Ventures should not be able to put on
18 a damages case; but if they are, we should get all of that
19 relief including the depositions of Mr. Detkin and Mr. Kosiara.
20        THE COURT:  All right.  So here is where I see
21 this issue.  As referenced, we have gotten a lot of
22 rulings out lately relating to damages, and each one it has
23 either been express or implicit that IV would be permitted
24 to go forward with the damages case, such as it is, after
25 our ruling excluding Mr. Wagner.

61

1        That continues to be my view, and so I adhere
2 to that ruling.  IV is going to be permitted to present a
3 damages case.
4        I further believe from what I have heard that IV
5 has been acting diligently in response to the Court's recent
6 ruling.  All that said, I think that Xilinx is entitled to
7 full and fair notice as to what the damages theory is going
8 to be, what evidence is going to be the basis for that damages
9 case and have the opportunity to take further depositions of
10 the witnesses through whom that testimony is going to come in.
11        I also think IV should be permitted, will be
12 permitted to call Ms. Davis to testify, to the extent IV
13 properly discloses that they are going to rely on her in
14 part as the basis for their damages case.
15        So that is broad.  In order to make it more
16 concrete, I'm directing that you all meet and confer and get
17 back to me with a joint letter next Tuesday, and tell me
18 whether you have, in light of what has been said by all of
19 you here today and by me, whether you worked out exactly how
20 we're going to accomplish what I have tried to articulate I
21 think should be accomplished in order to allow IV to proceed
22 to trial but not ambush or surprise Xilinx about what their
23 case is going to be.
24        To the extent there remains disputes about that,
25 put your proposals and your position in your letters to me

62

1 Tuesday. I'll essentially treat it like discovery disputes.
2 And if I need to talk to you on the phone, I'll reach out to
3 you and let you know that.
4       Are there any questions about all of that or
5 further things we should talk about?
6       MR. ROOKLIDGE: Nothing, Your Honor.
7       MR. STADNICK: No, Your Honor. Not on that issue.
8       THE COURT: All right. Let me see. That allows
9 me to cross off a number of things that were on my list.
10       Just before we move on. Legal issues. I'll
11 handle any remaining sort of legal issues in the context of
12 jury instructions which we'll have a chance to argue during
13 trial. Other than me saying that, is there anything on your
14 proposed conclusions of law or legal issues that you need
15 from me right now from the plaintiffs?
16       MR. STADNICK: No, Your Honor.
17       THE COURT: From the defendant?
18       MR. LANIER: Nothing from us, Your Honor.
19       THE COURT: All right. There was an issue
20 about enhanced damages as being an issue, and post-trial
21 accounting, and interest matters for the Court. This was
22 raised by Xilinx somewhere in the filing.
23       Does IV disagree with any of that? Did you
24 think anything should be in front of the jury about enhanced
25 damages and accounting for post-trial damages or interest?

63

1       MR. STADNICK: No, we didn't, Your Honor.
2       THE COURT: All right. Let's talk about
3 witnesses to the extent we haven't already. IV was asking,
4 at least at the time of filing, that Xilinx be ordered to
5 reduce the number of fact witnesses I think from 12 to 6
6 that would be called live. Is that an issue that IV wants
7 to be heard on?
8       MR. STADNICK: Yes, Your Honor. Just briefly.
9 We are a few weeks away from trial now and Xilinx has on
10 their witness list in addition to five experts a total of 14
11 fact witnesses, 12 Xilinx employees and two third parties.
12       Given the time we expect to have for trial, it
13 doesn't seem realistic that Xilinx would actually call that
14 many people. So we encouraged them to try to disclose for
15 us who they know they're actually going to call so we can
16 get started on preparing examinations and the like. And
17 the best they'll do is commit to narrowing the list as we
18 move forward towards trial, so that is why we requested to
19 facilitate our trial preparation as we get clarity as to who
20 they are really calling.
21       THE COURT: Okay. Xilinx's position on this.
22       MR. LANIER: Greg Lanier again.
23       Your Honor, a couple of points here. In view of
24 the recent developments and the discussions today, we can
25 knock two of our witnesses off the list. They were relating

64

1 to the Lattice and Microsemi agreement so they can go. So
2 that is Elashmawi and Milstead.
3       THE COURT: Will not be called live?
4       MR. LANIER: Will not be called live.
5       As to the rest of the witnesses, we really do
6 need to wait for the Court's rulings and for IV's decisions
7 on what it does with inducement to narrow the list down.
8 Everyone on there has been deposed on the topics we present
9 them on.
10       We have several engineers on there who would
11 testify on very specific aspect of the functionality of the
12 products. So there is no new issues here.
13       We don't know what all the issues will before
14 trial on the operation of our products, and that is why we
15 have several people here for short amounts of testimony, all
16 within the topics that they have already seen them on. We
17 are not trying to keep our list long. There are no
18 surprises here.
19       Separately related to that, on inducement
20 Mr. Hover-Smoot, Mr. Liu, in view of the Court's guidance,
21 will depend entirely whether inducement is in or out of the
22 case.
23       THE COURT: Could you, to the extent there is
24 any uncertainty, disclose to them which of the I guess it's
25 12 fact witnesses now would drop out depending on rulings

65

1 that may come from the Court? Would that be a burdensome
2 task, knowing what issues are still in front of me?
3       MR. LANIER: It would not be unduly burdensome.
4 I would like to consult with one of my colleagues, and I'm
5 happy to send them that later today or over the weekend.
6       THE COURT: Okay. How quickly are you willing
7 to commit to? Maybe it will just follow from what you said,
8 but to the extent it doesn't, how quickly can you confirm if
9 there is any narrowing of your list after the Court rules
10 on the pending motions, assuming that we do rule on this
11 motion?
12       MR. LANIER: I would imagine within a day. I
13 can't imagine it will take very long. We have specific
14 purposes for these folks, and it's going to relate whether
15 we can do it for trial. We can do it quickly.
16       THE COURT: Okay. Thank you. How much does
17 that help?
18       MR. STADNICK: I think that is very helpful,
19 Your Honor. We'll work with counsel for Xilinx to figure
20 out what is preventing them from dropping witnesses. We can
21 have a better understanding of what witnesses actually have
22 a better clarity.
23       THE COURT: Let's proceed in that manner. I
24 appreciate that there is still a fair amount in front of us.
25 We're waiting for some supplemental briefing, and we'll turn

66

1  to it, the issues in front of us, as quickly as we can and
2  try our best to get you a ruling to allow you to prepare for
3  trial.  I say all that making no promises at all.  I'm just
4  trying.
5        Also with respect to witnesses, there is a
6  dispute as to how much, if at all, we can comment on
7  witnesses not being brought to trial.  Let's talk about
8  that.
9        MR. STADNICK:  Yes, Your Honor.  That is
10  actually a really discrete issue.  Intellectual Ventures, as
11  you know, acquired the patents from the original owners
12  through arm's-length transactions.  There is no relationship
13  between the original inventors and IV.  We have no control
14  over them whatsoever.  We cannot secure their attendance at
15  trial.
16        Nobody sought to take their depositions because
17  basically I don't think, given the issues that are to be
18  tried, they had anything relevant to say.  Nevertheless,
19  during the meet-and-confer process, Xilinx indicated to us
20  they would like to be able, during the trial, to comment on
21  the absence from the courtroom of Mr. Chang or Mr. Sherwin
22  or any of the other inventors presumably to leave an
23  inference that the inventors don't believe in the invention,
24  so they don't like IV or they don't support what is going on
25  here.

67

1        We don't think the absence of the inventors
2  under the circumstances has any relevance to any issue in
3  the case and potentially prejudicial, so that is why we
4  would like them to prevent from mentioning that the
5  inventors aren't at trial.
6        THE COURT:  All right.  Thank you.  Let's hear
7  from Xilinx.
8        MR. LANIER:  Briefly, Your Honor.  I think it's
9  hard to imagine what prejudice there is to IV and us stating
10  the obvious.  It's not a point on which we would belabor.
11  There is not much argument to come from.
12        It's also related to two other things that may
13  have been resolved through today's discussions, which is if
14  we're not having a hypothetical negotiation case, obviously
15  we don't need to talk about not hearing from the person who
16  we contend should have been at that table in the form of Web
17  Chang, so that eliminates one reason for him to have been
18  there.
19        But also if we're not going to hear a story
20  about IV, its contribution to invention and things like
21  that, then it may be less relevant to comment on whether
22  the inventors are there or not.
23        It's also not something that is in any way
24  particularly prejudicial to IV as well to point out the
25  obvious, the inventors aren't here.  You will not hear from

68

1  them.
2        THE COURT:  Thank you.  I think in light of
3  today's ruling, the case is going to come in as of now
4  unless we hear further to the contrary from IV, it's going
5  to come in as was just articulated, which means in my mind
6  I don't think there is any relevance to the fact that the
7  inventors will not be here.
8        It seems undisputed that neither side attempted
9  to depose them during discovery, so I'm not seeing the
10  relevance.  Therefore, unless there is some further Order
11  of the Court, there will be no commenting on I guess the
12  failure to call any witness, including the inventors.
13        So if either side thinks they have a case as to
14  commenting on the failure of a witness to testify, you will
15  have to give notice to the other side that you intend to
16  do that.  If there is a dispute about it, bring it to my
17  attention, and I will give you a ruling before you are
18  permitted to do it.
19        Are there any questions about that?
20        MR. STADNICK:  No, Your Honor.
21        THE COURT:  Questions?
22        MR. LANIER:  No, Your Honor.  As long as that
23  encompasses our potential intention that they have opened
24  the door and we raise that live at trial.
25        THE COURT:  Right.  Yes, you would have to raise

69

1  it with me before you start doing things.
2        MR. LANIER:  Absolutely.
3        THE COURT:  Okay.  A couple things for me to
4  tell you.  How are we going to handle impeachment with the
5  prior testimony with deposition testimony, either written
6  or video?
7        As counsel know, I have done all sorts of
8  different things with that.  The way we're going to do it
9  here is you do need to give a copy of the deposition
10  testimony to the witness that you are trying to impeach with
11  his or her prior inconsistent statement.  You need to have
12  that available to them if they want to look at it and you
13  need to state for opposing counsel and the record what pages
14  it is that you are going to read or play for impeachment
15  purposes.  But other than that, once you have done that, you
16  can go ahead and play or read that testimony that you
17  believe is impeaching.
18        To the extent opposing counsel has an objection
19  that what you are reading is incomplete or is not actually
20  inconsistent with what the witness has said here from the
21  stand, opposing counsel can make that objection after the
22  testimony has been read or played.  I won't grant it but you
23  can note it for the record.  I'm hopeful that that preserves
24  your right on appeal.
25        Then on your redirect, this would be your own

70

1  witness we're talking about, you can feel free to use other
2  portions of that witness's deposition, read it or play it
3  to the extent you have a good faith basis to believe that
4  additional testimony is necessary for completeness purposes.
5      Are there any questions about how we're going to
6  do that from the plaintiff?
7      MR. STADNICK:  No, Your Honor.
8      THE COURT:  From the defendant?
9      MR. LANIER:  No, Your Honor.
10     THE COURT:  All right.  Objections to expert
11 testimony as being beyond the scope of the expert report or
12 prior expert disclosures.  I have also lately experimented
13 with how to handle that.  And the way I'm going to do that
14 at this trial is that I will rule on those objections during
15 trial.  With all respect to Mr. Farnan who is present in
16 the courtroom, what I refer to affectionately as the "Judge
17 Farnan Rule" where I would not rule on those objections during
18 trial, I'm now experimenting with this alternative approach
19 where I do rule during the trial.  So we won't be following
20 that Farnan Rule here.
21     So what does this mean for you?  It means be
22 certain at the time you call an expert witness that you
23 give us two copies of that expert's reports, declaration,
24 deposition testimony, anything that you may rely on in
25 response to an objection that the testimony that you are

71

1  eliciting from the stand is beyond the scope of the prior
2  disclosure.  So we need to have two copies of that.
3      By the time you call that witness, understand I
4  will not have read, absorbed, memorized all of that before
5  you call the witness.  So if an objection is made that
6  something is beyond the scope, the party who has called the
7  witness will have to direct me specifically to where I can
8  find support for the idea that it is not beyond the scope.
9  And then I will do my best up here to review what you direct
10 me to.  And if need be, I will leave the bench and review
11 it more carefully as some length in order to rule on that
12 objection.
13     Whatever time that takes is going to be charged
14 to somebody.  That will come out of somebody's trial time.
15 Allocation, specifically whose I take it out of will depend
16 on how things are going.  I just don't know.  We'll see
17 how often it comes up.  We'll see who is prevailing on the
18 objection.
19     That's it on that.  Are there any questions
20 about how we're going to handle those objections?
21     MR. STADNICK:  Not from IV, Your Honor.
22     MR. LANIER:  No, Your Honor.
23     THE COURT:  All right.  Examinations of
24 witnesses are limited to direct, cross, redirect.  We don't
25 permit recross.  You need to ask for leave to approach the

72

1  witness once.  After that, leave is freely granted.
2      We encourage transitions statements, brief
3  non-argumentive statements directed to the jury as the
4  burden of proof is moving or just to introduce who the
5  witness is or what stage of the case we're at.  We permit
6  and indeed encourage that.
7      Depositions.  Other than with respect to
8  Ms. Davis where we'll hear further from you as to how we're
9  going to handle her deposition testimony, other than that,
10 what you have exchanged and given us is what I consider the
11 maximum universe of the potential deposition designations,
12 counterdesignations and objections.
13     I expect that you will narrow all of that as
14 we get closer to trial.  And to the extent that you have
15 remaining objections about deposition designations or
16 counterdesignations, I believe I've set out the process for
17 resolving those in the pretrial order that should ultimately
18 culminate in a letter to me, clearly identifying for me
19 where the remaining objections are so that we can get you
20 a ruling before you call that witness to testify by a
21 deposition.
22     At the time you call the witness to testify by
23 deposition, please hand up to us the transcripts of just the
24 portions of the testimony that you were going to be playing.
25 We'll take two copies of that.  The time that it takes to

73

1  play or read depositions, of course, is going to be charged
2  to the parties, and that does include basically the clock is
3  running the whole time.  So if it takes a minute or two to
4  press play or get everything going, somebody is going to be
5  charged for that time.  That whatever percentage allocation
6  you tell us follows from the designation of the testimony.
7      Are there any questions about depositions?
8      MR. STADNICK:  No, Your Honor.
9      MR. LANIER:  No, Your Honor.
10     THE COURT:  All right.  In terms of the exhibits
11 and demonstrative exhibits, again in our view, the pretrial
12 order contains the maximum universe of the exhibits at least
13 and of the objections if an exhibit is on the exhibit list
14 and in the pretrial order.
15     If it is not objected to in the pretrial order,
16 the exhibit is received into evidence by operation of the
17 pretrial order, once the exhibit is shown to a witness and
18 offered into evidence and the Court says it is admitted.
19     What I'm trying to say is you don't need to lay
20 a foundation for that circumstance but you can't just dump a
21 bunch of documents into evidence without at least taking a
22 few seconds to show them to a witness.  And we do go through
23 the formality of offering the evidence by the written number
24 into evidence.  I'll ask if there is an objection, knowing
25 that there aren't, and then I'll say that the exhibit is

74

1   admitted.

2          To the extent there are objections to admissions
3   of exhibits and those objections remain as of the day that
4   you expect to call that witness, you need to get my attention
5   about those objections no later than the morning that you
6   expect that witness to be called.

7          You have set out a schedule in the pretrial
8   order for exchanging the exhibits that you intend to use on
9   direct with each witness and for discussing whether you
10  have remaining objections. If you do have those remaining
11  objections, you need to ask me, address them the morning
12  that the witness is expected to be called. If you don't do
13  that, then those objections to the admission of those exhibits
14  are waived.

15         And the time that it takes to argue those
16  objections in the morning will be charged. It will all be
17  charged to the objecting party. So whatever both parties
18  say, the objecting party will be subject to my right to
19  reallocate time among the parties if I think there has been
20  any abuse or unfairness.

21         Are there any questions about any of that,
22  plaintiffs?

23         MR. STADNICK: No, Your Honor.

24         THE COURT: Defendant?

25         MR. LANIER: No, Your Honor.

75

1          THE COURT: All right. Rule 50 motions. I've
2   done different things with that as well. Here is how we're
3   going to do it at this trial. At the appropriate time
4   during trial, if you have such a motion, advise the Court
5   you have a motion to make. I'll say something to the
6   effect of thank you for letting me know, and then at some
7   appropriate break outside the presence of the jury, I'll
8   allow you to orally tell us what the basis is for that motion.
9   The other side will have a chance to respond orally, if it
10  wishes. The time that either side takes arguing those
11  motions will come out of the trial time allocation. We
12  charge whatever time you are standing up arguing your side
13  of that motion to you.

14         Are there any questions about how we're going to
15  do Rule 50 motions?

16         MR. STADNICK: No, Your Honor.

17         MR. LANIER: Not so much of a question, Your
18  Honor. But one point, which is that we will attempt to meet
19  and confer with IV on this but given the unusual potential
20  circumstances of presenting Ms. Davis's testimony, we might,
21  we'll probably ask Your Honor for leave to make a Rule 50
22  motion and preserve it at the conclusion of her testimony as
23  presented by IV as part of its case before we get to our
24  case even though it will happen right away.

25         THE COURT: Right. Okay. Well, certainly meet

76

1   and confer. If there is a dispute on that, let me know.
2   But my intent here is, of course, to let each side have
3   appropriate notice as to where the other side thinks there
4   is a failure of proof and to let you preserve all of your
5   rights for further proceedings here or in any other court.

6          All right. There may need to be a nonjury trial
7   on some equitable issues. It seemed like the parties were
8   in agreement as to what those issues are and that I should
9   take that up after we see how this trial turns out. Am I
10  right about that? Is there anything else you need from me
11  on those issues at this time?

12         MR. STADNICK: Other than to note that many of
13  those issues are subject to our pending motions, to the
14  extent they go forward, I think everybody is in agreement
15  they need to be dealt with at some point and for Your Honor.

16         THE COURT: After this trial.

17         MR. STADNICK: Exactly.

18         THE COURT: Any issues on any of that?

19         MR. LANIER: We agree with that.

20         THE COURT: All right. Let's talk about the
21  trial and how long it's going to take. As I have noted, I
22  am going to charge time for arguing those objections in
23  the morning or during the breaks, arguing those Rule 50
24  motions, if there are any. Of course, you are charged for
25  all examinations of witnesses as well as your openings, your

77

1   closing.

2          You have an agreement on how much time you want
3   for opening and for closing. That is acceptable to me. I
4   think it was an hour for opening, an hour and-a-half for
5   closing. Mind you on opening, if you don't use it, you lose
6   that time. So if you want to offer an hour, if you don't
7   want to, you can't save that time and use it in later in the
8   trial.

9          Of course, if anybody abuses the time, I have
10  the right to reallocate the time.

11         Basically, if I'm on the bench, someone is being
12  charged for time other than, of course, the whole jury
13  selection process nobody is charged for that. When I'm
14  reading preliminary or final instructions to the jury,
15  nobody is charged for that. And when we have an argument on
16  jury instructions, on the verdict sheet, I won't charge you
17  time for that particular time required.

18         Just so you know, we start on Monday, May 12th.
19  I want counsel here at 8:30 in the morning. The jury pool
20  is available to us at 9:30. Counsel should be available at
21  8:30 every morning thereafter.

22         The jury is available to us from 9:00 to 4:30
23  each day. We try to give them approximately an hour worth
24  of breaks over the course of the day, approximately 15
25  minutes some time in the morning, approximately 15 minutes

78

1  some time in the afternoon, and after the first day of trial
2  we provide them lunch which allows us to try to keep the
3  lunch break to approximately a half an hour.
4         My view is based on the narrowing of the case
5  that there has been and may continue to be that this case
6  no longer requires 10 trial days. I'm not sure if it even
7  requires eight. At least as of the time of the proposed
8  trial order, IV was requesting 16 hours in addition to the
9  time for openings and closing, Xilinx was requesting 20.
10  I'm inclined to go below both of those, but tell me what
11  your current position is or if you need more time to
12  evaluate your position.
13        First, IV.
14        MR. STADNICK: Your Honor, we certainly agree
15  that with the narrowing of the issues, we don't need the
16  time that was originally contemplated. We think we can get
17  things done with 12 hours per side.
18        THE COURT: Okay. What is Xilinx's view?
19        MR. LANIER: Your Honor, subject, of course, to
20  rulings that might further narrow things and all of that,
21  we suggest 14 per side. We do recognize it's going to be
22  shorter than what we had originally thought.
23        THE COURT: Okay. Well, those are both quite
24  reasonable requests. Thank you for that.
25        MR. DESMARAIS: Don't pick 13. It's not lucky.

79

1         THE COURT: I won't pick 13. I will go with
2  Mr. Desmarais's view. How about that? I'll go with 14.
3  I'll make a decision. It is 14 hours per side. I don't
4  anticipate that I will cut that any further.
5         In light of the Court's rulings, to the extent
6  that there are any between now and trial, if you all, if
7  one or both sides thinks you should ask me to reduce that
8  further, I would very much welcome such a request, but I
9  don't expect that sua sponte I will cut below the 14 hours
10  per side that I have now allocated.
11        Are there any questions about that, and the time
12  for trial?
13        MR. STADNICK: No, Your Honor.
14        MR. LANIER: No, Your Honor.
15        THE COURT: All right. I think there are a
16  few other miscellaneous issues. Xilinx had asked whether
17  certain prior art references are in fact prior art. Is
18  there a dispute about that? I guess, what, IV, you saw the
19  list. Is there an issue on there?
20        MR. STADNICK: Yes, Your Honor. There is a
21  dispute with respect to two pieces of prior art. We're not
22  going to require them to prove up publication status or
23  anything that comes out of a known journal or anything like
24  that but there are two references. One is a manual by a
25  company called WSI that has a date on it. It's not a

80

1  standard publication you go to a library and get. They
2  didn't take any steps to verify whether that date actually
3  corresponded in any way to the public availability of the
4  document. So that one we think they should be held to their
5  proof on it.
6         The other reference is something they call
7  Applicant Admitted Prior Art or AAPA. We're just not even
8  sure what that is, so we don't want to agree to the
9  authenticity of prior art status that hasn't been clearly
10  defined.
11        THE COURT: All right. Let's hear from Xilinx.
12        MR. LANIER: On the handbook, Your Honor, we'll
13  be held to our burden of proof on that; and if we use it,
14  we'll prove it up.
15        THE COURT: Is that the manual?
16        MR. LANIER: The manual. Excuse me, Your Honor.
17  Yes.
18        And on the Applicant Admitted Prior Art, that
19  refers to the applicant statement. In the patent, there is
20  a well known, this is all in the record, it's all in the
21  industry. I think what we'll do instead is we'll just have
22  our experts present the prior art and say here is what it
23  is. Here is why we even know the inventor knew it. Then
24  we'll deal with it piece by piece, so that piece is off the
25  table.

81

1         THE COURT: All right. Mr. Stadnick, do you
2  agree? Is there anything I need to decide there?
3         MR. STADNICK: Nothing further from us. That
4  resolves it.
5         THE COURT: All right. The parties want the
6  Court to advise the jury the first time the exhibit is shown
7  with a confidentiality marker what that means. I'm happy to
8  do that provided that you give me notice that that is about
9  to happen. And so anything else on that?
10        MR. STADNICK: No, that is fine, Your Honor.
11        MR. LANIER: That's fine, Your Honor. Thank
12  you.
13        THE COURT: All right. The jury notebooks. My
14  practice is generally only to include what the parties
15  agreed should be included, and it seems like there is a
16  dispute. Does that dispute remain from defendant?
17        MR. STADNICK: Yes, Your Honor, it does. We
18  think an identification of witnesses we expect to be called
19  might wind up being confusing with the witnesses called.
20  There is no reason to have the accused products in the book.
21  We think it's better to keep it to the bare minimum of
22  things we agreed to.
23        THE COURT: The glossary, the three
24  patents in suit, and the Court's claim construction you
25  agreed to?

82

1       MR. STADNICK:  Yes, Your Honor.
2       THE COURT:  All right.
3       MR. LANIER:  One question or proposal, and we
4   can certainly consider this.  What we have done in some
5   trials, and again it depends on how long it is, is maybe
6   each day update with the list of witnesses who have been
7   called, so there is no confusion.  It helps the jurors just
8   keep track of who they have seen.  We'll propose that, and
9   if we can work it out, and Your Honor doesn't disagree,
10   we'll do that.  And if not, then we'll leave it out.
11       THE COURT:  Pretty much if you all agree on
12   something you want to put in the jury's hands and prepare it
13   for them, I will almost certainly agree to it subject to you
14   letting me know.  Okay?
15       MR. STADNICK:  I think we can probably work
16   something out in that regard.
17       THE COURT:  All right.  But to the extent you
18   don't or whether you do or not is irrelevant to what I'm
19   about to say.  The notebooks with the three things you
20   agreed on, prepare them for us and have them when you come
21   to trial so that we can give them to the jurors.
22       MR. STADNICK:  Yes, Your Honor.
23       THE COURT:  Xilinx may ask the courtroom be
24   sealed at certain limited times.  Correct?
25       MR. LANIER:  Yes, Your Honor.  And it appears it

83

1   maybe more limited as the damage cases narrow down in some
2   of the discussion earlier.
3       We don't, of course, know exactly what they're
4   going to present in showing their infringement case, but we
5   do request that the courtroom be sealed for Xilinx source
6   code, if any is going to be presented.
7       THE COURT:  Okay.  Well, you do need to give me
8   advance notice.  The two parties need to stay in contact
9   about this so that Xilinx can know when something may come
10   up that they are sensitive to and think should require the
11   courtroom to be closed.  There are certain preparations we
12   need to take to be able to physically do that.  So we need
13   notice.
14       You will need to, at minimum, present at least
15   some portion of each witness's testimony in open court, and
16   you need to do your absolute best to segregate any sealed
17   portion so that we're not locking and unlocking the door
18   repeatedly during the witness's testimony.
19       Are there any questions about any of that?
20       MR. LANIER:  No, Your Honor.  Thank you, Your
21   Honor.
22       MR. STADNICK:  No questions, Your Honor.
23       THE COURT:  All right.  Let's talk for a moment
24   about the April 14th opinion striking Mr. Wagner which I'll
25   note for the record has been displayed a couple of times

84

1   today, including some of the portions that I think both
2   sides had proposed be redacted.
3       My thought at this point is that I don't think
4   I should redact any of it and I should make it all public,
5   but this is your last best chance to tell me that would be
6   wrong.
7       So first from IV.
8       MR. MODI:  Your Honor, Ameet Modi.
9       I think we had the same concern that Your Honor
10   had with respect to the source code.  We didn't have advance
11   notice that Xilinx was going to be raising those points at
12   the hearing.  With that said, if Your Honor is inclined to
13   make it public, we won't oppose that at this point.
14       THE COURT:  You are talking about the April 14th
15   opinion.
16       MR. MODI:  The April 14th opinion.  We had no
17   advance notice that they were going to raise those issues,
18   and I'm not even sure which of the slides were actually
19   presented in court, but that was our only objection.  That's
20   we just didn't have that heads up.
21       THE COURT:  Okay.  Does Xilinx have a position now?
22       MR. ROOKLIDGE:  Yes, Your Honor.  The
23   information that is proposed to be redacted from that or
24   that was proposed to be redacted from that has now moved
25   front and center, it is the basis for IV's damages case.

85

1   For that reason, we think it should be public.
2       THE COURT:  All right.  Well, then I hereby
3   order that our previously sealed opinion on April 14th
4   striking Mr. Wagner be unsealed, and so we'll go ahead and
5   reflect that on the docket.  That opinion will become later
6   today.
7       On the schedule, I had meant to mention as at
8   least Delaware counsel undoubtedly know on the second day of
9   trial, we have a Federal Bar Association event all afternoon,
10   including Chief Judge Rader coming to visit.  I will need to
11   be in attendance for all of that so we will only be having
12   trial on the morning of May 13th.  I believe that event begins
13   early afternoon.
14       It is also possible and I would probably say
15   likely at this point that the morning of Monday, May 19th,
16   I may not be available.  I may need to start trial on the
17   afternoon on that second Monday.  As soon as I know that for
18   sure, I will let you know so you can plan around it.
19       Just a few other quick things then for me.
20       In terms of jury selection, we use the struck
21   juror method.  I think you all understand that.  Are there
22   any questions about how we do jury selection, plaintiffs?
23       MR. STADNICK:  No, Your Honor.
24       THE COURT:  Defendant?
25       MR. LANIER:  No, Your Honor.

86

1          THE COURT:  All right.  The voir dire, what you
2    submitted is all that I need.  I'll work on it, maybe cut it
3    down a little bit, but whatever I do, I will docket it by
4    the morning of jury selection so you will all have it.
5          The preliminary instructions look to me like I
6    have what I need.  So if I need anything further from you, I
7    will let you know.  Otherwise, I'll get something docketed
8    by the morning of jury selection.
9          On the verdict form, we have competing proposals.
10   And on the final jury instructions, of course, there were a
11   number of disputes.  There has been reference that some of the
12   damages instructions may no longer be necessary, so let's
13   do this.  As of by the first day of trial, some time the
14   first day of trial, get me a revised form of the final jury
15   instruction and any revised revision to the verdict sheet, if
16   there is anything you think is necessary in light of any
17   development between now and the time trial begins.
18          My list of petty stuff I'm happy to say has not
19   increased at least since the last trial.  No chewing gum.
20   No sucking candy.  No eating food here in the courtroom.
21   That applies to you, your client, your witnesses.  Anybody
22   else you have any control or persuasion over, please let
23   them know all of that.
24          If there is a medical need to deviate from any
25   of that, just please approach my staff discretely and we'll

88

1          MR. STADNICK:  No, Your Honor.
2          THE COURT:  From defendant?
3          MR. LANIER:  No, Your Honor.
4          THE COURT:  All right.  The clock says 12:00
5    o'clock.  How about that.  That is auspicious; right?
6    Thirteen hours is not available.  All right.  Well, I wish
7    you all a good weekend.  We'll look for your submission,
8    and we'll see you in a couple weeks.
9          (Pretrial conference ends at 12:00 p.m.)
10
11   I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.
12
13          /s/ Brian P. Gaffigan
            Official Court Reporter
14          U.S. District Court
15
16
17
18
19
20
21
22
23
24
25

87

1    give you permission to do that.
2          We allow you to drink water in the courtroom but
3    only water.  You can use your electronic devices here in the
4    courtroom but only in aid of what is going on here at trial.
5          Do turn off all ringers and other things that
6    make noise off.  Don't wear hats.  Don't read the newspaper,
7    you know, like holding it up in front of you so we can all
8    see that is what you are doing.  Don't wear sunglasses.
9          All of these things have happened.  Luckily, not
10   in the last couple of weeks.
11          If you make any submission in writing after the
12   regular trial day or on the weekend or if there happens to
13   be any holidays, please make sure to serve a courtesy copy
14   by e-mail to Mr. Looby or Mr. Golden.
15          That completes my list.  Is there anything else
16   from plaintiffs?
17          MR. DESMARAIS:  One question, Your Honor.
18          THE COURT:  Yes.
19          MR. DESMARAIS:  I think it's 4:30, but to check,
20   the trial day ends at 4:30?
21          THE COURT:  The jury leaves at 4:30.  I let them
22   go at 4:30.  But as to the extent I can, I am available
23   after 4:30 to discuss any issues.  That is not always the
24   case but sometimes.
25          Is there anything else from plaintiffs?